EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP<br><br>Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lcda. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MVC); Lcdo. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lcdo. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP)<br><br>Demandados | 2024 TSPR 95<br><br>214 DPR ___ |

Número del Caso:  MC-2024-0035


Fecha:  28 de agosto de 2024


Representantes legales de la parte peticionaria:

    Lcdo. Carlos Iván Gorrín Peralta
    Lcdo. Juan Manuel Mercado Nieves
    Lcdo. José Edgardo Torres Valentín
    Lcdo. Krénly Cruz Ramírez de Arellano

Representantes legales de la parte demandada:

Comisionado Electoral del Partido Nuevo Progresista

    Lcdo. Eliezer Aldarondo Ortiz
    Lcda. Rosa Campos Silva
    Lcdo. Claudio Aliff Ortiz
    Lcdo. Eliezer Aldarondo López
    Lcdo. Simone Cataldi Malpica

Comisionada Electoral del Partido Movimiento Victoria Ciudadana

    Lcdo. Frank Torres Viada
    Lcda. Alessandra N. Torres García

Comisionado Electora del Partido Proyecto Dignidad

    Lcda. Chery M. Negrón Rosario

Comisionada Electoral del Partido Popular Democrático

    Lcdo. Gerardo De Jesús Annoni


Oficina del Procurador General

    Hon. Fernando Figueroa Santiago
    Procurador General

    Lcdo. Omar Andino Figueroa
    Subprocurador General

    Lcda. Mariola Abreu Acevedo
    Procuradora General Auxiliar


Materia: Derecho Constitucional – Constitucionalidad de la Ley Núm. 165-2020 y la Orden Ejecutiva OE-2024-016.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP<br><br>Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lcda. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MVC); Lcdo. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lcdo. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP)<br><br>Demandados | MC-2024-0035 |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco

En San Juan, Puerto Rico, a 28 de agosto de 2024.

Nos solicitan que declaremos la inconstitucionalidad de la Ley Núm. 165-2020, *infra*, y de la Orden Ejecutiva OE-2024-016, *infra*, mediante las que se convoca a los electores de Puerto Rico a participar de un plebiscito pautado para el 5 de noviembre de 2024. Este plebiscito ofrecerá a los votantes elegibles la ocasión de escoger una (1) de las tres (3) alternativas de estatus definidas en el proyecto de ley federal *Puerto Rico Status Act*, HR 8393.

Como foro al que se le ha delegado la jurisdicción original y la competencia exclusiva para atender las controversias presentadas, debemos examinar la Ley Núm. 165-2020, *infra*, y especialmente la autorización sobre el uso de la Orden Ejecutiva como mecanismo para convocar este evento electoral. Luego de un examen detallado de las disposiciones cuestionadas y de las alegaciones presentadas por la parte peticionaria, concluimos que la Asamblea Legislativa proveyó al Ejecutivo criterios y principios inteligibles para delegarle la facultad de convocar el plebiscito. Asimismo, concluimos que el Gobernador se ajustó a la delegación concedida, no excedió el mandato de ley ni actuó de forma arbitraria o caprichosa al proclamar la Orden Ejecutiva OE-2024-016, *infra*.

I

El 11 de julio de 2024, la parte peticionaria presentó ante nos una *Demanda* sobre Sentencia Declaratoria e

*Injunction* (Demanda). Amparó su petición en la jurisdicción original del Tribunal Supremo dispuesta en el Art. 3.002 de la Ley Núm. 201-2003, conocida como Ley de la Judicatura de Puerto Rico de 2003, 4 LPRA sec. 24s; el Art. 8.1 de la Ley Núm. 165-2020, conocida como Ley para Implementar la Petición de Estadidad del Plebiscito de 2020, 16 LPRA sec. 984, y la Regla 16 del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B.

La parte peticionaria sostiene como **primera causa de acción** que la Ley Núm. 165-2020, *supra*, y la Orden Ejecutiva Núm. OE-2024-016 violentan la Doctrina de Separación de Poderes al autorizar la celebración de un plebiscito mediante Orden Ejecutiva.[1] Específicamente, arguye que tal autorización conlleva una delegación indebida de las funciones del Poder Legislativo al Ejecutivo. Expresa que esta:

> [p]retende ser una delegación al ejecutivo sin estándares relativos al qué, el cuándo y el cómo de una votación realmente legislada por el gobernador. Se trata de una usurpación ejecutiva de un poder claudicado por el poder legislativo, en violación de la separación de poderes que debe haber en este país, y reorientado a Puerto Rico en la dirección del autoritarismo y el totalitarismo.[2]

Como **segunda causa de acción**, la parte peticionaria sostiene que la Orden Ejecutiva Núm. OE-2024-016 usurpa el poder de

---

[1] Boletín Administrativo Núm. OE-2024-016 de 1 de julio de 2024, conocida como *Orden Ejecutiva del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi, para convocar la celebración de una consulta electoral a los fines de implementar la petición de estadidad del plebiscito de 2020*, https://docs.pr.gov/files/Estado/OrdenesEjecutivas/2024/OE-2024-016.pdf (última visita, 17 de agosto de 2024).
[2] *Demanda*, pág. 11.

la Asamblea Legislativa para aprobar el presupuesto de esta consulta, pues "[p]resumiblemente, el proyecto [de plan presupuestario ordenado por el Art. 3.1 de la Ley Núm. 165-2020] tendría que ser aprobado por el receptor, es decir, el gobernador".[3] Por otro lado, expresa como **tercera causa de acción** que las disposiciones que ordenan al Presidente de la Comisión Estatal de Elecciones de Puerto Rico (CEE) a preparar el borrador de la papeleta de votación,  los proyectos de reglamentos, el plan presupuestario, entre otros, despojan a la CEE de sus facultades reglamentarias en violación a la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4501 *et seq.* (Código Electoral). Añade como **cuarta y quinta causa de acción** que la Ley Núm. 165-2020, *supra*, y la Orden Ejecutiva OE-2024-016 violan la libertad de expresión e igual protección de las leyes al limitar "la capacidad de realizar actividades proselitistas, para promover la abstención electoral, o para realizar alguna modalidad de expresión electoral sobre otras opciones de estatus" y que, a su vez, anulan el valor del derecho al voto. Finalmente, como **sexta causa de acción** expresa que la Ley Núm. 165-2020, *supra*, viola la Constitución "al no contemplar en su título delegación alguna al gobernador ni la convocatoria y celebración de una votación plebiscitaria".[4]

---

[3] *Demanda*, pág. 11.
[4] *Alegato de la Parte Demandante Peticionaria*, pág. 10.

Por todo lo anterior, la parte peticionaria solicita que declaremos inconstitucional la Ley Núm. 165-2020, *supra*, y que determinemos que la Orden Ejecutiva OE-2024-016 usurpa facultades legislativas y reglamentarias. De igual forma, solicita que dictemos una orden de *injunction* dirigida a los demandados para impedir la implantación de la Ley Núm. 165-2020, *supra*, y la Orden Ejecutiva OE-2024-016.

El 16 de julio de 2024, acogimos la petición presentada en jurisdicción original, y ordenamos a la parte peticionaria a que en un término improrrogable de quince (15) días presentara su alegato. Transcurrido este término, concedimos quince (15) días a la parte demandada para que presentara su posición. Así las cosas, el 15 de agosto de 2024 el Comisionado Electoral del Partido Nuevo Progresista (PNP), Lcdo. Aníbal Vega Borges, compareció mediante *Moción de desestimación por falta de jurisdicción*[5] y *Alegato en oposición.* El 16 de agosto de 2024, presentaron sus alegatos la Comisionada Electoral del Movimiento Victoria Ciudadana (MVC), Lillian Aponte Dones; la Comisionada Electoral del Partido Popular Democrático (PPD), Lcda. Karla Angleró González; el Comisionado Electoral del Proyecto Dignidad (PD), Lcdo. Juan Manuel Frontera Suau; y el Gobierno de Puerto Rico, por sí y en representación del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi Urrutia, la Comisión Estatal de Elecciones (CEE) y la Presidenta Alterna de la

---

[5] En cuanto a la *Moción de desestimación por falta de jurisdicción*, proveemos no ha lugar.

CEE, Hon. Jessika D. Padilla Rivera, el Secretario del Departamento de Hacienda, Hon. Nelson Pérez Méndez, y el Director de la Oficina de Gerencia y Presupuesto, Lcdo. Juan Carlos Blanco Urrutia.

Con el beneficio de la comparecencia de las partes estamos en posición de resolver.

II

Como expresamos, la Demanda se presentó al amparo de la jurisdicción original de este foro. A pesar de no haber cuestionamiento alguno sobre el particular, como parte de la obligación que tenemos de auscultar nuestra propia jurisdicción, examinaremos nuestra facultad para atender el recurso de autos previo a atender en los méritos la impugnación de la celebración del plebiscito.

Sobre este aspecto, la Sec. 5 del Art. V de la Constitución de Puerto Rico establece que "[e]l Tribunal Supremo, cada una de sus salas, así como cualquiera de sus jueces, podrán conocer en primera instancia de recursos de hábeas corpus **y de aquellos otros recursos y causas que se determinen por ley**". (Negrillas suplidas). Art. V, Sec. 5, Const. PR, LPRA, Tomo 1, ed. 2023, págs. 434-435. Asimismo, el Art. 3.002(a) de la Ley Núm. 201-2003, *supra*, recoge la facultad constitucional anteriormente expuesta y añade, en lo pertinente, que el Tribunal Supremo o cada una de sus Salas conocerá "[e]n primera instancia[…] **de aquellos otros recursos y causas que se determinen por ley**". (Negrillas suplidas). El procedimiento a seguir en los casos de

jurisdicción original está recogido en la Regla 16 del Reglamento del Tribunal Supremo, *supra*.

Al amparo de estas disposiciones, la Ley Núm. 165-2020, *supra*, nos confirió jurisdicción original para atender aquellas acciones legales que tengan como fin evitar la celebración de una votación bajo ese estatuto. Sobre el particular, el Art. 8.1(a) de la Ley Núm. 165-2020, *supra*, establece que:

> Toda controversia, demanda, litigio o impugnación relacionada con este capítulo que sea ventilada en un tribunal de justicia, se tramitará y considerará bajos los términos y las condiciones dispuestas en el Código Electoral de Puerto Rico. **Cuando alguna impugnación, controversia o acción legal plantee directamente, o conlleve en alguna de sus consecuencias, la paralización de los procesos conducentes a la celebración de la votación en la fecha y horario dispuestos según esta Ley, será considerada y resuelta directamente por el Tribunal Supremo de Puerto Rico.** (Negrillas suplidas).

En *Aponte Rosario et al. v. Pres. CEE II*, 205 DPR 407 (2020), examinamos una disposición idéntica a la citada y reconocimos la jurisdicción original y competencia exclusiva de este Tribunal para atender la impugnación de la Ley Núm. 51-2020, conocida como Ley para la Definición Final del Estatus Político de Puerto Rico, 16 LPRA sec. 939, *et seq*. En esa ocasión, expresamos de forma detallada que, ante el andamiaje constitucional y legal que nos autoriza a examinar aquellas causas que se determinen por ley, "somos el único tribunal en el sistema local de justicia que puede atender la impugnación a la Ley Núm. 51-2020 y, por eso, nos toca

resolver y emitir mediante Sentencia lo que proceda en los méritos".[6] Íd., pág. 427. De manera similar, la Ley Núm. 165-2020, *supra*, nos delega el poder de atender, en jurisdicción original y competencia exclusiva, la impugnación de este estatuto y de cualquier Orden Ejecutiva proclamada a su amparo, que conlleve la paralización de la votación en ella contemplada. Por lo tanto, resulta forzoso concluir que podemos atender el recurso de autos en sus méritos.

Procederemos entonces a examinar el derecho aplicable a las causas de acción presentadas por la parte peticionaria.

III

## A. Separación de Poderes

La Sec. 2 del Art. I de la Constitución de Puerto Rico, *supra*, pág. 275, consagra la Doctrina de Separación de Poderes al disponer que:

> [e]l gobierno del Estado Libre Asociado tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico.

Esta distribución tripartita del poder público, garantiza la independencia de cada rama estableciendo sus responsabilidades y ámbito de acción. A su vez, busca evitar

---

[6] En específico, expusimos que:
Se trata de un mecanismo especial creado por ley, análogo al de sentencia declaratoria de la Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V., pero para que sea este Foro —y no el Tribunal de Primera Instancia— quien lo atienda y adjudique lo que corresponda. En otras palabras, somos el único tribunal en el sistema local de justicia que puede atender la impugnación a la Ley Núm. 51-2020 y, por eso, nos toca resolver y emitir mediante Sentencia lo que proceda, en los méritos. *Aponte Rosario et al. v. Pres. CEE II*, 205 DPR 407, 427 (2020).

la concentración de poderes en una sola, o el abuso de poder de parte de otra, de forma que se preserven las libertades del Pueblo y un sistema democrático de gobierno. *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 135 (2021); *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 91 (2010). Sin embargo, cada uno de estos poderes es soberano e independiente respecto al ejercicio del poder conferido, y a la vez, se interrelaciona con los otros mediante un sistema de pesos y contrapesos que permite que las tres ramas ostenten algún grado de poder compartido que opere como freno para evitar la acumulación desmedida de poder en una sola rama. *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 802 (2014); *Domínguez Castro et al. v. ELA I*, *supra*.

Históricamente, la aprobación del Presupuesto General ha presentado un claro ejemplo de la coordinación de los poderes constitucionales entre las ramas legislativa y ejecutiva. Por mandato constitucional, este trámite conlleva el Mensaje sobre la Situación del Estado del Gobernador a la Asamblea Legislativa, así como la presentación del Presupuesto Anual de Gastos Operacionales y Mejoras Permanentes del Gobierno de Puerto Rico para el estudio, análisis, enmienda y aprobación por ambas Cámaras Legislativas.[7] Todo ello tiene el objetivo de que se "cumpla con la obligación constitucional de que las asignaciones propuestas no excedan el cálculo de los recursos totales".

---

[7] Art. IV, Sec. 4, Const. PR, LPRA, Tomo 1, ed. 2023, pág. 424. Véase, *Herrero y otros v. ELA*, 179 DPR 277(2010).

*Herrero y otros v. ELA*, 179 DPR 277, 303 (2020). Ciertamente, desde el 2016 en este trámite participa la Junta de Supervisión y Administración Financiera, ente que evalúa y certifica el presupuesto (presupuesto certificado) considerado por la Asamblea Legislativa de conformidad con la Ley Pública 114-187 (2016), conocida como *Puerto Rico Oversight, Management, and Economic Stability Act* (PROMESA). No obstante, el Presupuesto General representa un importante ejercicio de coordinación entre ambas ramas.

En cuanto a esta interrelación entre los poderes de gobierno, examinemos entonces las particularidades del Poder Legislativo y el alcance de la delegación de poderes cuasi-legislativos a la Rama Ejecutiva.

**B. El Poder Legislativo y la delegación de poderes**

En el Poder Legislativo recae la entera facultad de *aprobar, enmendar o derogar* leyes. Art. III, Sec. 1, Const. PR, *supra*, pág. 401. Véase, *Gobierno Ponce v. Caraballo*, 166 DPR 723, 736 (2006). Entre otras facultades de particular pertinencia al caso de autos, la Sec. 4 del Art. VI de la Constitución de Puerto Rico, *supra*, le otorga al Poder Legislativo "la potestad de establecer y reglamentar el proceso electoral". *Santini Gaudier v. CEE*, 185 DPR 522, 531 (2012) (Sentencia). Además, la Asamblea Legislativa tiene la responsabilidad de promulgar las leyes que garanticen la expresión de la voluntad del pueblo mediante el sufragio y que protejan al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Art. II, Sec. 2,

Const. PR, *supra*, pág. 285. Véase, *McClintock v. Rivera Schatz*, 171 DPR 584 (2007).

En atención a esta encomienda constitucional, la Asamblea Legislativa aprobó el Código Electoral de Puerto Rico. En todo lo concerniente a los procesos electorales, este representa una **legislación básica de aplicación general**, mediante la cual se habilita a la CEE a planificar, organizar, coordinar y supervisar los procedimientos de naturaleza electoral. Art. 1.5 de la Ley Núm. 165-2020, *supra*; Art. 3.2 de la Ley Núm. 58-2020, *supra*. Véase, *Santini Gaudier v. CEE*, *supra*, págs. 531-532. Por ello, el propio Art. 11.1(1) del Código Electoral, 16 LPRA sec. 4781, dispone que "[t]odo referéndum, consulta o **plebiscito** que se realice en Puerto Rico, **se regirá por una <u>ley habilitadora</u> y por las disposiciones de[l Código] en todo aquello necesario o pertinente para lo cual dicha ley habilitadora no disponga de manera específica**". (Negrillas y subrayado suplidos).

A pesar de ser facultades propias del Poder Legislativo, nuestro ordenamiento jurídico ha reconocido la validez de la delegación de poderes de la Asamblea Legislativa al Ejecutivo o a una entidad ejecutiva, aunque no de forma absoluta.[8] Hemos validado tales delegaciones, siempre y cuando la ley "establezca normas adecuadas, pautas, estándares, criterios,

---

[8] Con relación a la "discreción judicial", hemos expresado que "[s]e puede establecer como principio invariable, que cualquier delegación de poder legislativo concediendo discreción absoluta, resultaría inconstitucional, pues ello equivaldría a una delegación *in toto* del poder legislativo, actuación contraria a los cánones constitucionales de una democracia". *Pueblo v. Marrero Ramos, Rivera López*, 125 DPR 90, 92 (1990), citando a *Pueblo v. Sánchez González*, 90 DPR 197, 200 (1964).

o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas". *Domínguez Castro et al. v. ELA I*, *supra*, pág. 93. Véase, *Sánchez et al. v. Depto. Vivienda et al.*, 184 DPR 95, 122 (2011). Véanse además, E. Chemerinsky, *Constitutional Law: principles and policies*, 5th ed., New York, Wolters Kluwer, 2015, págs. 343-345; L. Fisher y K.J. Harriger, *American Constitutional Law*, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol.I, pág. 207. Estos criterios no tienen que ser expresos; pueden surgir del historial legislativo y pueden ser amplios y generales. *Hilton Hotels v. Junta Salario Mínimo*, 74 DPR 670, 693 (1953)("Tales normas no necesitan expresarse con precisión o exactitud matemática y pueden ser tan generales que justifiquen más de una conclusión y, a menos que la norma no se exprese o sea tan sumamente vaga que como cuestión de hecho no exista, la presunción de constitucionalidad que conlleva toda ley basta para sostener su validez"). Asimismo, por lo general es suficiente justificación que tenga un fin o interés público para que se sostenga la delegación. *Domínguez Castro et al. v. ELA I*, *supra*, pág. 93.

La determinación de si la ley cuestionada contiene un principio inteligible o normas adecuadas conlleva un análisis caso a caso. En este, los tribunales auscultamos la delegación conferida y los criterios establecidos por la

Asamblea Legislativa. *Sánchez et al. v. Depto. Vivienda et al., supra*, pág. 122. Véase, *Rodríguez v. Bco. Gub. de Fom. P.R.*, 151 DPR 383, 400 (2000). Además, ante el cuestionamiento de una delegación "debemos analizar si 'en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución'". (Énfasis suprimido). *Senado v. Tribunal Supremo y otros*, *supra*, págs. 135-136, citando a *Nogueras v. Hernández Colón*, 127 DPR 405, 426 (1990).

Aún cumplidos todos estos elementos, la Asamblea Legislativa mantiene la autoridad para revocar cualquier delegación de competencia que haya concedido. *Gobierno Ponce v. Caraballo*, *supra*. De igual forma, la Asamblea Legislativa cuenta con otros métodos para mantener el control sobre las delegaciones concedidas a otra rama.[9]

Sobre lo anterior, resume el profesor Farinacci Fernós que:

"Para que una delegación sea constitucionalmente válida, esta debe cumplir con ciertas exigencias. Entre estas podemos identificar: (1) que se trate de un poder delegable, (2) que, en efecto, se haya

---

[9] Con relación a los controles sobre los poderes delegados que se han identificado en la jurisdicción federal, ver L. Fisher y K.J. Harriger, *American Constitutional Law*, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol.I, pág. 213("Congress maintains control over delegated power through a variety of methods: the power to appropriate funds, changes in authorization language, reliance on nonstatutory controls, and different forms of the "legislative veto" (which retains some vitality even after the Supreme Court declared it unconstitutional in 1983). Another form of control, the power to investigate…").

llevado a cabo la delegación, (3) que se acompañen suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado, (4) que la entidad a la que se le otorga el poder actúe dentro de los límites establecidos por la ley, y (5) que el ejercicio de dicho poder no sea arbitrario o caprichoso. Típicamente, el resultado de este ejercicio de poder es la adopción de un reglamento legislativo que genera derechos u obligaciones y tiene fuerza de ley". J.M. Farinacci Fernós, *Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias*, 3 Amicus, Rev. Pol. Púb. Y Leg. UIPR 190, 192 (2020).

## C. Órdenes ejecutivas

La Orden Ejecutiva es uno de los mecanismos con los que cuenta el gobernador para expresar el ejercicio de los poderes que le confieren las leyes, la Constitución o aquellos inherentes a su cargo. *Hernández, Romero v. Pol. de P.R.*, 177 DPR 121 (2009); *Otero de Ramos v. Srio. De Hacienda*, 156 DPR 876 (2002). Esta conlleva un mandato dirigido a uno de los brazos auxiliares de la Rama Ejecutiva para que proceda de conformidad con la Orden emitida. *Hernández, Romero v. Pol. de P.R.*, *supra*, pág. 138. Véanse, W. Vázquez Irizarry, *Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 Rev. Jur. UPR 951, 1020 (2007); J.M. Farinacci Fernós, *supra*. Véase además, Op. Sec. Just. 1968-2. Por lo tanto, cuando se emite una Orden Ejecutiva dentro del marco constitucional y legal apropiado, esta es aceptada como un instrumento de acción gubernamental,

y tiene fuerza y efecto de ley.[10] *Hernández, Romero v. Pol. de P.R.*, *supra*, pág. 138. Véase, Op. Sec. Just. 1981-22. ("En cuanto al alcance de la Orden Ejecutiva, está establecido que se presume su validez y constitucionalidad").

Como cualquier acto de una rama de gobierno, las Órdenes Ejecutivas están sujetas a ser cuestionadas e interpretadas. *Hernández, Santa v. Srio. de Hacienda*, 208 DPR 727, 741 (2022). A pesar de que las controversias relacionadas a estas se vinculan en muchas ocasiones a la relación entre los poderes constitucionales y se atienden dentro del ámbito político, las Órdenes Ejecutivas no están exentas del examen y control de los Poderes Legislativo y Judicial. El primero por los distintos métodos de control con los que cuenta, y el segundo por la responsabilidad de los tribunales de interpretar la Constitución y las leyes.

Así, la impugnación de una Orden Ejecutiva puede responder principalmente a planteamientos sobre "1) su invalidez o inconstitucionalidad por carecer el Gobernador de poder para emitirla, 2) su inconstitucionalidad por infringir alguna disposición de la Constitución, y 3) su invalidez por ser contraria a alguna ley". W. Vázquez Irizarry, *supra*, pág. 1057. En tales casos, la Orden

---

[10] J.M. Farinacci Fernós, *Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias*, 3 Amicus, Rev. Pol. Púb. Y Leg. UIPR 190, 193 (2020)("Si, en efecto, la Asamblea Legislativa le ha delegado debidamente al o a la Gobernador(a) poderes cuasi-legislativos, este(a) puede ejercerlos a través de una orden ejecutiva. Se trata del equivalente de un reglamento legislativo adoptado por una agencia administrativa.").

Ejecutiva debe ser interpretada dentro de las leyes aplicables de ser susceptible a ello, y ante la posibilidad de dos interpretaciones prevalecerá la que sostenga su validez. Op. Sec. Just. 1981-22 y Op. Sec. Just. 1991-25.

Aunque no existe referencia constitucional o estatutaria que regule este mecanismo, su uso en Puerto Rico ha seguido la costumbre federal. *Ramos et al. v. ELA et al.*, 190 DPR 448, 463-464 (2014); *Hernández, Romero v. Pol. de P.R.*, *supra*, págs. 137-138. Véanse, J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados* Unidos, Bogotá, Ed. Temis, Tomo 1, 2009, pág. 257; W. Vázquez Irizarry, *supra*, pág. 1019; G. Igartúa de la Rosa, *Aspectos legales: Promulgaciones de órdenes ejecutivas y proclamas por el Gobernador de Puerto Rico,* 21 Rev. Der. P.R. 271 (1981). De importante influencia en la esfera federal ha sido la Opinión Concurrente del Juez Jackson en *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579 (1952). En esta Opinión, el Juez Jackson encuadra el uso de las Órdenes Ejecutivas por el Poder Ejecutivo en tres (3) escenarios generales: (1) cuando actúa conforme a una autorización legislativa expresa o implícita; (2) cuando actúa sin una autorización o denegatoria legislativa y, por lo tanto, solo se fundamenta en sus propias prerrogativas, y (3) cuando actúa de forma incompatible con la voluntad legislativa expresa o implícita.

El primer escenario es de particular importancia al caso de autos en el que se alega que hubo una delegación

indebida de poderes de la Rama Legislativa a la Rama Ejecutiva y no se cuestiona que actuara sin autorización o de forma contraria a la voluntad legislativa. En tales casos, sostiene el Juez Jackson que cuando existe una delegación expresa o implícita del Poder Legislativo, la autoridad del Poder Ejecutivo está en su máxima expresión por incluir la que posee por sí mismo, así como las delegadas por el Poder Legislativo.[11] Bajo estas circunstancias, indica que existe una fuerte presunción de que los actos del Ejecutivo son válidos, que la interpretación por los tribunales puede ser menos estricta, y que el peso de la prueba descansa sobre quien la impugna.[12] Íd. Véase además, W. Vázquez Irizarry, *supra*, pág. 67. Sin embargo, por existir una autorización legislativa en este tipo de escenario, la controversia gira principalmente sobre la constitucionalidad de la ley. E. Chemerinsky, *op. cit.*, pág. 355.

---

[11] "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." Op. Conformidad Jackson en *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 635 (1952).

[12] Un ejemplo reciente de este escenario es *Trump v. Hawaii*, 138 S.Ct. 2392 (2018). La *Immigration and Nationality Act* (INA) delegó en el Presidente amplios poderes para suspender la inmigración, entre ellos, decidir cuándo, a quienes, por cuánto tiempo y bajo qué condiciones lo haría de ser detrimental a los intereses nacionales. Amparado en esa ley, el Presidente Trump emitió dos Órdenes Ejecutivas y posteriormente emitió una Proclama limitando la inmigración de ciertos países. Esta última fue impugnada. El Tribunal Supremo Federal determinó que la ley confería amplia discreción al Presidente para ello y que sus acciones estuvieron dentro de los poderes delegados y sus propósitos fueron legítimos.

IV

**A. Ley Núm. 165-2020**

En *Aponte Rosario et al. v. Pres. CEE II*, *supra*, hicimos un recuento detallado de las distintas consultas sobre el estatus político que se han presentado al Pueblo de Puerto Rico.[13] También reconocimos la constitucionalidad de la Ley Núm. 51-2020, *supra*, al autorizar la celebración del Plebiscito de 3 de noviembre de 2020, y el fin público que perseguía: ratificar y "hacer valer la expresión sobre la autodeterminación de los puertorriqueños" en los Plebiscitos de 2012 y 2017, así como, promulgar e impulsar un proceso de transición en el Congreso Federal de resultar favorecida la alternativa correspondiente. Así pues, aceptamos que la decisión de realizar este tipo de consultas es prerrogativa de las ramas políticas de gobierno y que "la decisión legislativa de cómo poner en vigor e[l] mandato electoral [resultante] merece deferencia" siempre que esté enmarcada en el esquema constitucional. Íd. págs. 436. Luego de nuestra decisión en *Aponte Rosario et al. v. Pres. CEE II*, *supra*, se celebró el Plebiscito de 2020 contemplado en la Ley Núm. 51-2020, *supra*.

El 30 de diciembre de 2020, se promulgó la Ley Núm. 165-2020, *supra*. Expresa que tiene el fin de hacer valer la voluntad electoral del Plebiscito de 3 de noviembre de 2020 y autorizar al Gobernador a tomar las **medidas necesarias**

---

[13] Sobre los plebiscitos de 1967 al 2017, véase *Aponte Rosario et al. v. Pres. CEE II*, *supra*.

**para ello, incluyendo "agilizar y garantizar que el pueblo de Puerto Rico pueda volver a votar, en caso de ser necesario, para hacer valer su voluntad electoral".** Exposición de Motivos de la Ley Núm. 165-2020 (2020[Parte 4] Leyes de Puerto Rico 3788-3790). Es pues, la ley habilitadora de las Consultas Electorales que puedan surgir en consecución de ese propósito.[14] Expresa el Art. 1.3 de la Ley Núm. 165-2020, 16 LPRA sec. 977a, que este estatuto:

> dispone los procedimientos y los parámetros que regirán la celebración de toda consulta electoral cuyo propósito sea hacer valer la voluntad electoral de la mayoría absoluta de los electores en el plebiscito de 3 de noviembre de 2020, **incluyendo cualquier petición, propuesta, respuesta o ratificación electoral relacionada con el estatus político de Puerto Rico que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos.**

Específicamente, la Ley Núm. 165-2020, *supra*, faculta al primer oficial electo del Pueblo, "para hacer cumplir todos los propósitos de esta Ley mediante Orden Ejecutiva". Art. 8.3, Ley Núm. 165-2020, *supra*. Para ello, lo autoriza a convocar una Consulta y establecer la fecha y las alternativas que se presentarán en la papeleta de votación.

---

[14] Art. 11.1 de la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4781. Cabe señalar, que el Art. 8.2 de la Ley Núm. 165-2020, conocida como Ley para Implementar la Petición de Estadidad del Plebiscito de 2020, 16 LPRA sec. 948a, establece que "[n]o se aplicará y tampoco se utilizará o interpretará ninguna ley, parte de ley, reglamento, plan, orden ejecutiva o administrativa que sea inconsistente con los propósitos de esta Ley". No obstante, el Art. 1.6 de la Ley Núm. 165-2020, 16 LPRA sec. 977d, autoriza el uso supletorio de varias leyes, incluyendo el Código Electoral a fines de implantar sus disposiciones.

Estas facultades delegadas al Gobernador están sujetas al cumplimiento de los propósitos de la ley. Íd.

Por otro lado, el Art. 5.11 de la Ley Núm. 165-2020, *supra*, recoge los deberes de la CEE,[15] y el Art. 3.1 detalla las tareas de coordinación inicial para la votación que debe realizar el Presidente de la CEE:

> No más tarde de los quince (15) días posteriores a la proclama de convocatoria publicada por el Gobernador para una votación relacionada con los propósitos de este capítulo, el Presidente de la Comisión Estatal de Elecciones deberá presentarle al Gobernador:
> (a) El borrador de la papeleta de votación.
> (b) El proyecto de reglamento para la votación y su escrutinio general.
> (c) Un proyecto o propuesta para el diseño general de la campaña de educación masiva a los electores, la cual será objetiva y no partidista sobre las alternativas en la papeleta de votación.
> (d) Un proyecto de plan presupuestario de los gastos de la votación, incluyendo la campaña educativa a los electores. 16 LPRA sec. 979.

Como podemos observar de la disposición aprobada con relación al presupuesto, la ley requiere al Presidente de la CEE a presentarle al Gobernador "un proyecto de plan presupuestario de los gastos de la votación, incluyendo la campaña educativa a los electores". Art. 3.1 de la Ley 165-2020, *supra*. Asimismo, el Art. 1.7 de la ley, 16 LPRA sec. 977e, especifica que:

> **No se podrá invocar disposición de ley general o especial, reglamento, orden ejecutiva o administrativa, y ningún plan para alterar o posponer las transferencias presupuestarias y las asignaciones económicas que sean necesarias para que el Gobernador, la Comisión Estatal de**

---

[15] El Art. 1.5 de la Ley Núm. 165-2020, *supra*, expresa que en "las sesiones y trabajos de la Comisión Estatal relacionadas con estas votaciones podrán votar los miembros propietarios de esta".

**Elecciones y otros funcionarios puedan cumplir con las votaciones aquí autorizadas y con todos los propósitos de este capítulo,** de las secs. 939 et seq. de este título, las secs. 1721 et seq. del Título 3, y las secs. 621 et seq. de este título, en lo relacionado con el derecho de los ciudadanos americanos de Puerto Rico a determinar su estatus político.

El Director Ejecutivo de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda y el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal tienen el deber ministerial de priorizar, identificar y hacer disponibles los recursos económicos necesarios para cumplir con todos los propósitos de las mencionadas leyes. Los desembolsos de las transferencias presupuestarias y de las asignaciones económicas nunca excederán de los treinta (30) días naturales, contados a partir de la petición presentada a esos fines. (Negrillas suplidas).

Por otro lado, los Arts. 6.1 y 6.2 de la Ley Núm. 165-2020, *supra*, detallan el proceso y los requisitos de certificación ante la CEE para representar una alternativa de estatus político, incluyendo promover la abstención electoral o alguna modalidad de expresión electoral u otra alternativa de estatus político. Para ello, el interesado "deberá cumplir con los requisitos de registro y certificación en la Oficina del Contralor Electoral como requisito previo a sus actividades proselitistas o su certificación en la Comisión" cuando "reciba o utilice donaciones, incurra en recaudaciones y/o gastos de campaña en medios publicitarios o cualquier tipo de actividad proselitista". En cambio, en aquellas instancias en las que no necesariamente media el proceso de certificación

dispuesto en los Arts. 6.1 y 6.2 para representar una alternativa de estatus político, el Art. 7.1 de la Ley Núm. 165-2020, *supra*, requiere "cumplir con la presentación de los informes financieros que le requiera la Oficina del Contralor Electoral por virtud de esta Ley y de la Ley 222-2011" de solicitarse, recibirse o utilizarse donaciones, incurrir en recaudaciones y/o gastos de campaña en medios publicitarios o en cualquier tipo de actividad proselitista.

En resumen, la Ley Núm. 165-2020, *supra*, requiere que todo partido político, agrupación de ciudadanos, comité de acción política y persona natural o jurídica que para sus actividades proselitistas relacionadas a una Consulta plebiscitaria a su amparo, ya sea como representante o no de las alternativas de estatus político, y que recaude o utilice donaciones de un tercero, deberá rendir cuentas a la Oficina del Contralor Electoral. Lo anterior es cónsono con la política pública a favor de que el financiamiento de las campañas políticas sea un proceso público y transparente. Véase Arts. 2.001-2.003 de la Ley Núm. 222-2011, conocida como Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico, 16 LPRA sec. 621 nota.

**B. Orden Ejecutiva OE-2024-016**

Amparado en el mandato legislativo expresado en la Ley Núm. 165-2020, *supra*, el Gobernador emitió la Orden Ejecutiva OE-2024-016, mediante la que proclamó la celebración de un plebiscito el 5 de noviembre de 2024. Esta Consulta recoge tres (3) alternativas: Estadidad, Independencia y Soberanía

en Libre Asociación con los Estados Unidos, tal cual fueron definidas en el proyecto de ley federal *Puerto Rico Status Act*, HR 8393.[16]

Reseña la Orden Ejecutiva OE-2024-016 que estas opciones han sido presentadas y examinadas en los cuerpos legislativos federales con el objetivo de ofrecer a los electores un referéndum y sin alternativas coloniales y vinculante al Congreso de los Estados Unidos. Así, el H.R. 8393 fue presentado en la segunda sesión del 117mo Congreso Federal (2021-2022). El 15 de diciembre de 2022, esta medida contó con la aprobación de la Cámara de Representantes y con el apoyo del Ejecutivo federal.[17] No obstante, llegado el fin de la sesión legislativa sin haber sido evaluado por el Senado, el proyecto fue presentado nuevamente ante la sesión legislativa actual. Se presentó en la Cámara de Representantes federal como el H.R. 2757, y una versión homóloga en el Senado federal, clasificada como el S. 3231.[18]

Además de las alternativas y definiciones indicadas, la Orden Ejecutiva OE-2024-016 copia íntegramente los procedimientos y parámetros de la Ley Núm. 165-2020, *supra*. Específicamente, con relación al presupuesto la Orden Ejecutiva OE-2024-016 recoge las disposiciones pertinentes del Art. 3.1, así como la del Art. 1.7 de la Ley Núm. 165-2020, *supra*.

---

[16] H.R.8393, Gongress.gov, https://www.congress.gov/bill/117th-congress/house-bill/8393 (última visita 18 de agosto de 2024).

[17] Executive Office of the President, Office of Management and Budget, *Statement of Administration Policy, H.R. 8393-Puerto Rico Status Act* (15 de diciembre de 2022) disponible en https://www.whitehouse.gov/wp-content/uploads/2022/12/HR8393-SAP.pdf.

[18] *Véase,* H.R.2757, 118th Cong. (1st Sess. 2023) y S.3231, 118th Cong. (1st Sess. 2023).

Discutida la normativa aplicable, procedamos a su aplicación.

V

La Asamblea Legislativa promulgó la Ley Núm. 165-2020, *supra*, en el ejercicio de su facultad de aprobar leyes que garanticen la expresión del Pueblo mediante el voto. Al hacerlo, expresó que el propósito de la ley es hacer valer la voluntad electoral mayoritaria expresada en el Plebiscito de 3 de noviembre de 2020. Para ello, autorizó al Gobernador a convocar una votación mediante Orden Ejecutiva.

Como adelantáramos, la parte peticionaria impugna el mecanismo utilizado para convocar la Consulta electoral y asignar los recursos económicos necesarios: la Orden Ejecutiva. Sostiene que la Orden Ejecutiva OE-2024-016 es inconstitucional porque carece de una autorización legislativa válida. Expresa que la Ley Núm. 165-2020, *supra*, que habilita la celebración del Plebiscito delega indebidamente funciones legislativas al Poder Ejecutivo por dejar a su discreción la celebración de la votación, la fecha y el contenido de lo que se sometería a la consideración del electorado. Por lo tanto, aunque la parte peticionaria acepta que nuestro ordenamiento jurídico permite la delegación de poderes mediante el establecimiento de criterios inteligibles, arguye que la Ley Núm. 165-2020, *supra*, constituye una delegación al ejecutivo sin estándares.

En primer lugar, en *Aponte Rosario et al. v. Pres. CEE II*, *supra*, pág. 446, reconocimos que ante una ley promulgada

por la Asamblea Legislativa en respuesta al mandato del electorado, no debemos intervenir con la facultad legislativa de hacer valer ese mandato mediante aquellos mecanismos que estime convenientes y que caigan dentro del marco constitucional. A través de la Ley Núm. 165-2020, *supra*, la Asamblea Legislativa optó por delegar ciertas facultades al Gobernador y que este las ejercitara mediante el mecanismo de la Orden Ejecutiva. Tal delegación de poderes se sostendrá de haberse establecido en la ley aquellos estándares o principios inteligibles o salvaguardas procesales y sustantivas que delimiten las facultades así delegadas, de forma tal que se eviten actuaciones ejecutivas arbitrarias o caprichosas. Debemos analizar, además, si el poder delegado puede desembocar en una concentración indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución.

Con estas normas en mente, examinemos la Ley Núm. 165-2020, *supra*. El estatuto faculta al Gobernador a convocar una Consulta e incluir la fecha y las alternativas que se presentarán en la papeleta de votación. Otros asuntos a incluirse en la Orden Ejecutiva fueron especificados por la ley.[19] Al examinar las facultades delegadas, concluimos que estas fueron claramente sujetas al cumplimiento de los

---

[19] Por ejemplo, véase, el Art. 2.2 de la Ley Núm. 165-2020, *supra*, sobre el texto de la Proclama del Gobernador para cada votación convocada por virtud de la ley, el Art. 4.4 sobre las instrucciones en la papeleta de votación, y el Capítulo V sobre votación y escrutinio general.

propósitos de la ley de hacer prevalecer el reclamo electoral del Pueblo de Puerto Rico, **incluyendo el que los electores vuelvan a votar para responder a cualquier propuesta relacionada con el estatus político de Puerto Rico que sea planteada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos.** Arts. 1.3, 2.1 y 8.3 de la Ley Núm. 165-2020, *supra*. Lo anterior, delimita la Consulta electoral que el Gobernador puede convocar al amparo de la Ley Núm. 165-2020, *supra*. Por lo tanto, concluimos que la Asamblea Legislativa proveyó los criterios suficientes para delegar el poder legislativo requerido para que el Gobernador emitiera la Orden Ejecutiva. Asimismo, concluimos que el Gobernador emitió la Orden Ejecutiva OE-2024-016 sujeto a tales criterios y salvaguardas por lo que tampoco se excede del mandato de ley. Veamos.

En cuanto a la **fecha del evento electoral**, el Art. 2.1 de la Ley Núm. 165-2020, *supra*, reconoció que la votación a ser convocada podía coincidir en fecha con eventos electorales convocados por otras leyes, e incluso con las Elecciones Generales. A tenor con eso, la Orden Ejecutiva establece que el plebiscito se celebrará el día de las Elecciones Generales, el 5 de noviembre de 2024.

En cuanto a **las alternativas a presentarse al electorado y sus respectivos significados**, el Gobernador incluyó aquellas que se han presentado y considerado por el Congreso y el Presidente de los Estados Unidos mediante proyectos de

ley, en total conformidad con las consideraciones de la Asamblea Legislativa al promulgar la Ley Núm. 165-2020, *supra*. No podemos perder de perspectiva que las tres (3) fórmulas de estatus político presentadas en la Orden Ejecutiva OE-2024-016 se circunscriben a lo dispuesto en el Art. 1.3 de la Ley Núm. 165-2020, *supra*, de someter ante el electorado cualquier propuesta relacionada con el estatus político de la Isla "que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos".

Además, la parte peticionaria señala que la Ley Núm. 165-2020, *supra*, no asigna fondos para la votación y que la Orden Ejecutiva OE-2024-016 permite que se modifique el presupuesto aprobado el 30 de junio de 2024, sin intervención alguna de la Asamblea Legislativa.[20]

La Asamblea Legislativa autorizó expresamente las transferencias presupuestarias y las asignaciones económicas que sean necesarias para cumplir con las votaciones a convocarse bajo la Ley Núm. 165-2020, *supra*, bajo las mismas condiciones y a través de los mismos funcionarios que dispone para toda otra votación en el Código Electoral de Puerto Rico. Compare el Art. 1.7 de la Ley Núm. 165-2020, *supra*, con el Art. 3.1(3) del Código Electoral de Puerto Rico, *supra.* Además, la Orden Ejecutiva especifica que tales transferencias "deberán mantenerse dentro de los parámetros del presupuesto certificado aplicable".

---

[20] Demanda, págs. 11-13.

En nuestro ordenamiento jurídico la Asamblea Legislativa puede delegar al Ejecutivo la facultad de realizar ciertas transferencias dentro de un presupuesto aprobado. Por lo tanto, no es correcto lo aseverado por la parte peticionaria. Las transferencias presupuestarias requeridas por la Orden Ejecutiva OE-2024-016 no se hacen a espaldas del poder legislativo, sino que han sido aprobadas por ley. Además, estas se han limitado a que el Gobernador las realice dentro de los parámetros establecidos en el presupuesto vigente. Por lo tanto, podemos concluir que el ejercicio de los poderes delegados mediante el uso de la Orden Ejecutiva no fue arbitrario ni caprichoso y que este se ajustó a los parámetros delineados.

Por otro lado, la parte peticionaria argumenta que, ante la alegada inconstitucionalidad de la Ley Núm. 165-2020, *supra*, las disposiciones que ordenan a la Presidencia de la CEE a llevar a cabo ciertas funciones que recaen en las Comisionadas y los Comisionados de conformidad con el Código Electoral de Puerto Rico, les despojarían de sus facultades reglamentarias. Reconocemos la pericia electoral de la CEE. No obstante, el Poder Legislativo tiene la potestad de establecer y reglamentar el proceso electoral. Bajo esa potestad promulgó el Código Electoral, el cual representa una **legislación básica de aplicación general** en todo lo concerniente a los procesos electorales. Posteriormente emitió la Ley Núm. 165-2020, *supra*, ley especial y habilitadora del Plebiscito convocado para el 5

de noviembre de 2024. Esta ley especial identifica al Presidente de la CEE como un funcionario capacitado que también tiene la responsabilidad de dirigir y supervisar los trabajos de naturaleza electoral. Por lo tanto, los argumentos de la parte peticionaria no nos convencen ante la expresión clara de la Asamblea Legislativa.

Como cuarta causa de acción, la parte peticionaria sostiene que varias disposiciones de la Ley Núm. 165-2020, *supra*, persiguen controlar el contenido de la expresión a favor o en contra de las alternativas incluidas en la papeleta. Sin embargo, no ha sometido propiamente una controversia real, genuina y seria de derecho constitucional en sus argumentos que nos suscite una duda seria sobre la constitucionalidad de la misma por violación a su derecho de expresión. Véase, *ELA v. Aguayo*, 80 DPR 552 (1958) (citando a *Ashwander v. Tennessee*, 297 US 288, 346 (1935)). Véase además, *Hernández, Santa v. Srio. de Hacienda*, *supra*, pág. 741. ("El sujeto activo en la impugnación no puede valerse de una mera alegación de inconstitucionalidad").

Recordemos que este Foro, como intérprete de la ley, está afecto por la doctrina de autolimitación ante el cuestionamiento de la validez o constitucionalidad de un estatuto, por lo que "es un principio cardinal que esta Corte primero se asegurará de si existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional". Íd. Véase, además, *Senado v. Tribunal Supremo y otros*, supra, págs. 134-135. Tampoco "se

considerará el aspecto constitucional de una medida legislativa cuando se pueda resolver el asunto mediante un análisis estatutario". *Senado v. Tribunal Supremo y otros, supra,* pág. 135 (citando a *Nadal v. Depto. Rec. Nat.*, 150 DPR 715, 721 (2000)).

Las disposiciones que identifica la parte peticionaria en la Demanda son los Arts. 5.10 y 6.1 de la Ley Núm. 165-2020, *supra*. Al respecto, abunda en el Alegato presentado que:

> El Artículo 5.10 de la ley dispone lo siguiente:
>
> (a) La alternativa impresa en la papeleta de votación que resulte con la mayoría del cien por ciento (100%) de los votos válidos y definidos como "Papeletas Adjudicadas" a su favor, será la alternativa certificada por la comisión como la ganadora y la legítima expresión mayoritaria de los electores…
>
> Es lamentable la chapusería legislativa de la redacción de esta disposición incomprensible. **Literalmente significa que solo se certificará una alternativa en la papeleta si logra "la mayoría del cien por ciento (100%) de los votos" emitidos. Es de suponer que si hay tres alternativas, como luego dispone el gobernador en su inválida orden ejecutiva, ninguna alternativa lograría esa ambiciosa meta de unanimidad. La redacción sugiere que si no hay unanimidad, la comisión no va a poder certificar ninguna alternativa ganadora.** Se habría perdido todo el esfuerzo e inversión económica para viabilizar esta votación. **Dándole el beneficio de la duda, lo que habrán querido decir con esta descuidada redacción debe referirse a la alternativa que hubiere logrado la mayoría de las "papeletas adjudicadas" emitidas por quienes hubieran votado por las alternativas ofrecidas por el gobernador.** Por supuesto, tampoco se define qué significa "mayoría". Habiendo tres alternativas en la papeleta, existe la posibilidad de que solo

prevalezca alguna alternativa por pluralidad, sin alcanzar el 50% de mayoría simple. ¿Qué significa esta enigmática redacción? Ciertamente luce bastante ambigua o vaga la redacción. (Negrillas suplidas). *Alegato de la Parte Demandante Peticionaria*, págs. 24-25.

De una lectura de esta disposición y del examen de las interpretaciones razonables de la misma, no podemos concluir que la frase "la mayoría del cien por ciento (100%) de los votos válidos y definidos como 'Papeletas Adjudicadas'" conlleve el requisito de "unanimidad" y por lo tanto, haga de esta disposición una ambigua. La redacción cuestionada es la misma que se ha contemplado para procesos electorales previos.[21] Incluso, la parte peticionaria reconoce que la disposición citada cuenta con una interpretación razonable por lo que constituye una "alternativa ganadora" aquella "que hubiere logrado la mayoría de las "papeletas adjudicadas". Véase, Demanda, pág. 15, n.2. Por lo tanto, existiendo una interpretación razonable, no vemos méritos en el planteamiento constitucional que se nos presenta sobre este asunto.

La parte peticionaria también expresa que el Art. 6.1 de la Ley Núm. 165-2020, *supra*, requiere:

> que si una persona o partido político realiza actividades en ejercicio de su libertad de palabra en relación con esta votación **habiendo recaudado fondos que emplea para su actividad proselitista, tiene que registrarse con la CEE informar al**

---

[21] Véase, Sec. 3(d) de la Ley 7-2017, según enmendada, conocida como Ley para la Desconolización Inmediata de Puerto Rico, 16 LPRA sec. 975i.("La alternativa de estatus político impresa en la papeleta de votación que resulte con la mayoría del cien por ciento (100%) de los votos definidos como "Papeletas Adjudicadas" a su favor, será la alternativa certificada por la Comisión como la ganadora").

> **Contralor electoral sobre sus actividades, y si no lo hace puede ir a la cárcel o tener que pagar una severa multa por ejercer sus derechos constitucionales.**
>
> Como si eso fuera poco, un partido o persona o agrupación que interese certificarse para participar en la campaña relativa a esta votación **tiene que certificar que no va a promover abstención electoral.** Si no lo hace, no puede obtener su certificación. Es decir que la ley discrimina contra ciertas personas por razón del contenido de su expresión. Conforme a una larga lista de decisiones judiciales tanto de la corte Suprema de los Estados Unidos como del Tribunal Supremo de Puerto Rico, la igual protección de las leyes prohíbe penalizar el ejercicio de un derecho fundamental como la libertad de palabra, especialmente la expresión política, a menos que, bajo un escrutinio judicial muy estricto, sea necesario el discrimen y no haya otras alternativas para lograr intereses apremiantes del estado. Demanda, págs. 15-16.

Como expresáramos anteriormente, el texto claro de la Ley Núm. 165-2020, *supra*, permite a toda persona o entidad ser certificado como representante de una alternativa cuando este lo solicite y cumpla con los requisitos de la ley. A esos efectos, el Art. 6.2 de la Ley 165-2020, *supra*, indica los requisitos que se deben cumplir para ello. Además, el Art. 6.1(f) de la Ley Núm. 165-2020, *supra*, dispone que,

> Todo partido político, por petición, agrupación de ciudadanos, comité de acción política y persona natural o jurídica **que sea certificado como representante de alguna de las alternativas impresas en la papeleta de votación, y que reciba o utilice donaciones, incurra en recaudaciones y/o gastos de campaña en medios publicitarios o cualquier tipo de actividad proselitista para favorecer u oponerse a alguna de las alternativas; incluyendo promover la abstención electoral o alguna modalidad de expresión electoral u otra**

**alternativa de estatus político, deberá cumplir con los requisitos de registro y certificación en la Oficina del Contralor Electoral** como requisito previo a sus actividades proselitistas o su certificación en la Comisión.

La parte peticionaria omite hacer referencia al Art. 7.1 de la Ley Núm. 165-2020, *supra*, el cual no hace alusión al concepto de "representantes de alguna de las alternativas". Por el contrario, dispone que quien participe en actividades proselitistas durante la campaña de alguna de las votaciones autorizadas por la ley deberá sufragar sus gastos de campaña con sus propios recursos económicos. No obstante, si solicita, recibe o utiliza donaciones, incurre en recaudaciones y/o gastos de campaña en medios publicitarios para favorecer u oponerse a alguna de las alternativas en la papeleta; incluyendo la abstención electoral o alguna modalidad de expresión electoral u otra alternativa, "tendrán que cumplir con la presentación de los informes financieros que le requiera la Oficina del Contralor Electoral por virtud de la ley y de la Ley 222-2011".[22]

Nuestro ordenamiento jurídico establece la obligación de informar los recaudos y gastos relacionados a las actividades proselitistas, así como las penalidades de

---

[22] La Ley Núm. 165-2020, *supra*, reconoce como ley supletoria a la Ley Núm. 222-2011, según enmendada, conocida como Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico, 16 LPRA sec. 621, *et seq*. El Art. 2.002 de la Ley Núm. 222-2011, *supra*, dispone que es de aplicación a "toda persona, natural o jurídica, que recaude, gaste, contribuya o de alguna forma reciba recaudos o donativos o participe en el financiamiento de una campaña eleccionaria relacionada con puestos electivos, fórmulas de status, o alternativas para evaluación y selección de los electores en un referéndum, plebiscito o consultas que se establezcan a través de legislación a ese respecto". La ley requiere la presentación de informes y tipifica como delito su incumplimiento.

incumplir con esta, con el fin de brindarle transparencia al sistema electoral de Puerto Rico. Véase, Exposición de Motivos de la Ley Núm. 222-2011, *supra*(2011[Parte 2] Leyes de Puerto Rico 2375-2379). A la luz de lo anterior, concluimos que la parte peticionaria no nos ha presentado cómo la Ley Núm. 165-2020 vincula o distingue el contenido de la expresión a las obligaciones y penalidades que establece de forma que active las protecciones constitucionales que reclama.

Por otro lado, la parte peticionaria expresa que quien "interese certificarse para participar en la campaña relativa a esta votación **tiene que certificar que no va a promover abstención electoral**".(Negrillas suplidas). Demanda, pág. 16. Sin embargo, más allá de presentar ese argumento general, no alude a disposición legal alguna que sustente su planteamiento ni tampoco abunda con fundamentos jurídicos sobre ese asunto. Por lo tanto, no hemos sido puestos en posición para hacer una determinación al respecto.[23]

---

[23] La Regla 16 del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B, requiere que cuando se presente una petición en jurisdicción original se incluya "un señalamiento breve y conciso de las cuestiones de derecho planteadas en la petición, y la argumentación de [estas]". Además, la parte peticionaria cuenta -como norma general- con un término para presentar un alegato que debe ajustarse a las disposiciones de la Regla 33 de nuestro Reglamento, *supra*, en el que debe proveer una discusión a fondo de los méritos de la petición. Como hemos expresado, el alegato es un instrumento fundamental porque trae a la atención del foro judicial las normas de derecho y la jurisprudencia aplicable, y sirve para discutir a fondo las alegaciones y para exponer de forma adecuada los fundamentos del recurso. *Morán v. Martí*, 165 DPR 356, 366-367 (2005). Siendo ello así, nos hemos negado a atender aquellos planteamientos presentados sin discutir y fundamentar apropiadamente dado a que una escasa discusión no pone a este foro en posición de aquilatar y justipreciar el planteamiento anotado. *U.P.R. Aguadilla v. Lorenzo Hernández*, 184 DPR 1001, 1009 n. 5 (2012).

Como quinta causa de acción la parte peticionaria sostiene que las disposiciones impugnadas anulan el valor del derecho al voto, pues al "[n]o contabilizar las papeletas en blanco o dañadas, ni identificar su número para fines de la certificación de los resultados, menoscaba severamente la expresión de los electores en cuanto al proceso y las alternativas, en violación del derecho constitucional al voto libre y sin coacción". *Alegato de la Parte Demandante Peticionaria*, pág. 34. En esencia, su argumento conlleva que reconsideremos o distingamos nuestra decisión en *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31 (2009), del caso de autos y que adoptemos nuevamente la expresada en *Sánchez y Colón v. ELA I*, 134 DPR 445 (1993).

El Art. II, Sec. 2 de la Constitución de Puerto Rico dispone que: "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Sobre lo anterior, en *Suárez Cáceres v. Com. Estatal Elecciones*, *supra*, pág. 71, dispusimos que "el derecho al voto, como instrumento del derecho a la libre expresión, comprende no solo la prerrogativa de un ciudadano de votar por los candidatos o las opciones de su predilección, sino el derecho de acudir a la urna y depositar la papeleta en blanco o dañarla". Íd. Además, añadimos que "la intención de un elector que deposita su papeleta en blanco, que anula voluntariamente su papeleta o que vota por un personaje

ficticio, es expresar su inconformidad, ya sea con las propuestas presentadas o con los candidatos disponibles en [e]sta". Íd., pág. 74. No obstante, aclaramos de manera tajante que este tipo de voto "de ninguna manera puede ser contado para efectos de influir o afectar el resultado de una elección, referéndum o plebiscito, entre otros eventos electorales". Íd. Lo anterior se debe a que, en todo evento electoral, lo justo es que quienes finalmente elijan sean aquellos que tuvieron la intención, clara e inequívoca, de votar por unos de los candidatos o de las propuestas que fueron presentadas en la papeleta. Íd., pág. 73.

En esa misma línea y en el contexto de una controversia que buscaba impedir la celebración de una Consulta de estatus político, en *Aponte Rosario et al. v. Pres. CEE II*, *supra*, pág. 436, expresamos que resulta "particularmente nocivo y contrario al mandato de neutralidad inyectar un elemento totalmente subjetivo y especulativo en la adjudicación de los votos".[24] En particular, detallamos que:

> La adjudicación de las papeletas en blanco como si fueran votos en contra de la fórmula ganadora amplía de manera artificial el universo electoral y diluye la proporción de votos válidos emitidos por las fórmulas en contienda. Esto dificulta e impide que se verifique en el escrutinio el mandato mayoritario y concede una ventaja electoral indebida a la condición territorial actual[…]. Es decir, 'la inercia concedería ventaja solamente a la condición existente, que prevalecería vigente al frustrarse por un escrutinio engañoso la voluntad mayoritaria de cambio'. Ese favoritismo

---

[24] *Aponte Rosario et al. v. Pres. CEE II*, *supra*, pág. 436, citando a *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 91 (2009)(Opinión de Conformidad del Juez Asociado señor Martínez Torres, a la cual se unieron el Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Pabón Charneco).

es contrario al principio de neutralidad de la Constitución en materia de estatus político. (Citas omitidas). Íd., págs. 436-437.

En vista de lo anterior, hemos colegido que no podemos utilizar la decisión voluntaria de los votantes que no participaron en un evento electoral para ir precisamente en contra de la expresión popular. Íd., pág. 437. Lo único que podemos hacer es concluir que quien no votó o depositó su papeleta en blanco dejó la decisión en manos de aquellas personas que sí optaron por participar del evento electoral. Íd. No vemos razones para variar esta norma hoy.

Por último, la parte peticionaria sostiene que el título de la Ley Núm. 165-2020, *supra*, no contempla delegación alguna al gobernador ni la convocatoria y celebración de una votación plebiscitaria. Debido a ello, entiende que esta violenta el Art. III, Sec. 17, Const. PR, *supra*, pág. 417, el cual dispone, en lo pertinente, que:

> "[n]o se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula".

Con respecto a esta disposición, hemos expresado en el pasado que su propósito es asegurar que se informe al público en general y a los legisladores en particular del asunto del cual es objeto de legislación, de manera que se impida la inclusión de materia incongruente y extraña. *Bomberos Unidos v. Cuerpo Bomberos et al.*, 180 DPR 723, 746-747 (2011). Esa disposición no "requiere que el título constituya

un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma". *Íd.*, pág. 747 (citando a *Herrero y otros v. ELA*, *supra*, pág. 295). Tampoco exige que los detalles o los procedimientos estatuidos en las leyes aparezcan relacionados en sus títulos, bastando que el asunto ──el tema o la materia── sobre el cual una ley trata aparezca claramente expresado en su título. *Pueblo v. Vázquez Bruno*, 93 DPR 540, 542-543 (1966); *Pueblo v. Díaz Torres*, 89 DPR 720, 724-725 (1963).

El título de la Ley Núm. 165-2020, *supra*, dispone que la misma es: "Para establecer la "Ley para Implementar la Petición de Estadidad del Plebiscito de 2020"; […], a los fines de establecer la política pública del Gobierno de Puerto Rico para la implementación para la petición de Estadidad […]; y para otros fines relacionados". Concluimos que esta informa de manera suficiente, tanto al público como a los legisladores, sobre los asuntos que son objeto de legislación. Por lo cual, consideramos que la autorización realizada al Gobernador para convocar a la Consulta no es materia incongruente o extraña a la Ley Núm. 165-2020, *supra*, y es parte del asunto objeto de la misma. Véase Parte V, pág. 25 de esta Opinión.

VI

Atendidos todos los asuntos presentados y por todo lo antes discutido, se provee no ha lugar a la Demanda presentada por la parte peticionaria, y se sostiene la constitucionalidad de la Ley Núm. 165-2020, *supra,* y de la

Orden Ejecutiva OE-2024-016 conducentes a la celebración del

Plebiscito convocado para el 5 de noviembre de 2024.

Se dictará Sentencia de conformidad.


                                    Mildred G. Pabón Charneco
                                         Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP<br><br>Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lcda. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MVC); Lcdo. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lcdo. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP)<br><br>Demandados | MC-2024-0035 |

SENTENCIA

En San Juan, Puerto Rico, a 28 de agosto de 2024.

Atendidos todos los asuntos presentados y por todo lo discutido en la Opinión que antecede, se provee no ha lugar a la Demanda presentada por la parte peticionaria, y se sostiene la constitucionalidad de la Ley Núm. 165-2020, conocida como Ley para Implementar la Petición de Estadidad del Plebiscito de 2020, 16 LPRA sec. 984, y de la Orden Ejecutiva OE-2024-016 conducentes a la celebración del Plebiscito convocado para el 5 de noviembre de 2024.

Lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió Opinión de Conformidad. La Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez disienten con Opinión escrita.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lic. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP <br><br> Peticionarios <br><br> v. <br><br> Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lic. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lic. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MCV); Lic. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lic. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP) <br><br> Demandados | MC-2024-0035 |

Opinión de conformidad emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 28 de agosto de 2024.

> "Mientras alguien ejerza poder sobre nosotros a su arbitrio en parte alguna de nuestras vidas, dicte una ley sin nuestra participación o consentimiento o reclame soberanía o superioridad sobre nosotros con visos de legalidad, no somos libres ni iguales. **El consentimiento a que se nos trate así no salva. El consentimiento a la esclavitud o la desigualdad ni libera ni equipara.**" [Énfasis suplido]
>
> Hon. José Trías Monge
> "Un centenario y una denuncia", Diálogo, diciembre de 1998, pág. 24. (1998).

> *

> The perpetuation of this colonial condition runs against the very principles upon which this Nation was founded. *Indefinite* colonial rule by the United States is not something that was contemplated by the Founding Fathers nor authorized *per secula seculorum* by the Constitution. *See Downes,* 182 U.S. at 380, 21 S.Ct. 770 (Harlan, J., dissenting) ("The idea that this country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces,— the people inhabiting them to enjoy only those rights as Congress chooses to accord to them,— is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution."). And far from being a matter of local concern to the United States citizens in Puerto Rico only, the inequality to which these citizens are subjected is an injury to every American, because as surely as the current situation causes irreparable harm to United States citizens residing in Puerto Rico, it just as powerfully denigrates the entire Nation and the Constitution.

> Hon. Juan R. Torruella, Opinión Concurrente en *Igartua de la Rosa v. US*, 229 F.3d 80, pág. 90 (2000).

**I**

Cuando tuve el honor de presentar el libro titulado The Constitutional Evolution of Puerto Rico and Other U.S. Territories de la autoría del Hon. Gustavo A. Gelpí, expresé que:

> Una relación colonial genera desigualdades y controversias en muchos ámbitos de la sociedad. En todas esas dimensiones existe el potencial de que permeen planteamientos, fundamentos, argumentos y soluciones jurídicas. Es por ello que los miembros de la Judicatura federal y local no estamos exentos, como juristas y ciudadanos, de enfrentarnos a controversias civiles y criminales, entre otras, en las que se cuestionen desigualdades, tensiones sociales y, más relevante aun, quién tiene el poder para realizar determinada acción.[1]

Ciertamente, hoy nos enfrentamos a una controversia de alto interés público cuya cuestión medular es si el Pueblo tiene el poder para expresarse en las urnas con respecto al estatus de Puerto Rico a través de un mecanismo delineado por la Asamblea Legislativa e instrumentado por el Poder Ejecutivo. La contestación es en la afirmativa. Por ello, estoy conforme con que este Tribunal haya validado el ejercicio de la libertad de expresión del Pueblo de Puerto Rico a través de un plebiscito. Me explico.

## II

Como sabemos, bajo el esquema constitucional federal Puerto Rico es un territorio de los Estados Unidos sujeto a los poderes plenarios del Congreso por virtud de la

---

[1] L. F. Estrella Martínez, Puerto Rico la Evolución de un Apharteid Territorial, 52 Rev. Jurídica U. Inter. P.R. 425 (2018).

Cláusula Territorial de la Constitución federal. Artículo IV, Sec. 3, Cl. 2, Const. EE.UU., LPRA, Tomo 1. Harris v. Rosario, 446 US 651 (1980); Franklin California Tax-Free v. Puerto Rico, 2015 WL 4079422 (1er Cir. 2015); Pueblo v. Sánchez Valle et al., 192 DPR 594 (2015). Al amparo de este mismo esquema constitucional federal, la llamada "Admissions Clause" faculta al Congreso a admitir nuevos estados a la Unión. En específico, esta dispone que:

> New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress. Artículo IV, Sec. 3, Cl. 1, Const. EE.UU.

Tal cláusula sobre el poder del Congreso para admitir nuevos estados ha desempeñado un papel significativo en la historia estadounidense, puesto que treinta y siete (37) de los estados han sido admitidos de conformidad con este. (Traducción suplida). E. Biber & T. B Colby, National Constitution Center, The Admissions Clause. Ahora bien, se reconoce que no hay un marco regulatorio uniforme en lo que atañe a la aplicación de esta disposición constitucional. En consecuencia, se ha precisado que:

> the Constitution provides almost no guidance as to how Congress should exercise it, nor does the Constitution impose any other express limits on it. Neither is there much guidance in the Framing history about its meaning or scope. Accordingly, much of the practical meaning of the Admissions Clause must be drawn either from caselaw interpreting the Clause or from the practice of Congress in admitting states, beginning with Vermont in 1791 and ending with Alaska and Hawaii in 1959. Íd.

Entiéndase, el conocer la experiencia histórica en los procesos de autodeterminación de los territorios es indispensable para examinar y contextualizar la controversia ante nos. Por lo tanto, debemos tener presente que el camino hacia la autodeterminación de los pueblos no es lineal ni se logra por medio de un método exclusivo. Se ha demostrado históricamente que no hay un proceso único o uniforme para la admisión como estado y que, por el contrario, este ha sido uno flexible y adaptable a las particularidades de cada territorio. Aponte Rosario v. Presidente Comisión Estatal de Elecciones, 205 DPR 407, 442 (2020); Comptroller General of the United States, Experiences of Past Territories Can Assist Puerto Rico Status Deliberations, General Accounting Office, 1980, Capo. 2, pág. 3.[2]

Al revisar el acercamiento de los antiguos territorios a sus reclamos en esta materia, se han reconocido varios métodos, a saber: 1) las asambleas de pueblo; 2) las encuestas; 3) los censos y las convenciones regionales; 4) la elección de diputados territoriales afines a la causa estadista, y 5) la celebración de referéndums o plebiscitos. Aponte Rosario v. Presidente Comisión Estatal de Elecciones, supra, pág. 443 citando a

---

[2] "The history of statehood admissions is one of both tradition and flexibility. While emphasizing the traditional principles of democracy, economics capability, and an adherence to the electorate's choice of self-government, the Congress has also considered each State's unique characteristics". Íd., pág .20

Grupo de Investigadores Puertorriqueños, <u>Breakthrough from Colonialism: An Interdisciplinary Study of Statehood</u>, San Juan, Ed. UPR, 1984, Vol. I, pág. 1182.

Tal como lo ha reconocido el <u>Congressional Research Office</u>, "some states took similar paths to admission, though, in general, those paths have varied considerable."[3] Por ello, resulta inescapable reconocer que el voto directo de los electores de los territorios en un plebiscito constituye un mecanismo válido para utilizarse. Incluso, la historia revela que múltiples territorios celebraron más de una consulta para continuar reclamando su admisión a la Unión Americana. A modo de ejemplo, ese fue el caso de Florida, Alaska[4] y Hawaii, siendo estos dos (2) últimos los territorios que más recientemente fueron admitidos a la Unión. Congressional Research services, supra, págs. 11-13.

_____

[3]Congressional Research Office, <u>Admission of States to the Union: A Historical Reference Guide</u>, <u>Congressional Research Service</u>, pág. 1 https://crsreports.congress.gov/product/pdf/R/R47747/2 (última visita el 23 de agosto de 2024).

[4]Véase, Michael Schwaiger, <u>Understanding the Unoriginal: Indeterminant Originalism and Independent Interpretation of the Alaska Constitution</u>, 22 Alaska L. Rev. 293, 305-06 (2005); G. Alan Tarr, <u>Of Time, Place, and the Alaska Constitution</u>, 35 Alaska L. Rev. 155, 172 (2018); Michael J. Kelly, <u>Quiescent Sovereignty of U.S. Territories</u>, 105 Marq. L. Rev. 501, 537 (2022); Thomas Metzloff, <u>Preparing the Way: Tom Stewart's Recollections on the Alaska State Constitutional Convention</u>, 35 Alaska L. Rev. 289, 305-06 (2018).

Ante ese cuadro, hoy nuestra tarea no es seleccionar el mecanismo que mejor creamos conveniente, sino evaluar si la Orden Ejecutiva aquí impugnada instrumenta un mecanismo que es válido dentro de los principios que rigen la realidad jurídica entre la relación de Estados Unidos y Puerto Rico, y los contornos del sistema constitucional federal y local.

**III**

Para iniciar esta tarea, debemos contextualizar que, en términos sustantivos, el presente caso bien podría considerarse una secuela de Aponte Nazario v. Presidente Comisión Estatal de Elecciones, 205 DPR 407 (2020). En apretada síntesis, allí se declaró la finalidad pública y, con ello, la constitucionalidad de la Ley Núm. 51-2020, conocida como la Ley para la definición final del estatus político de Puerto Rico (Ley Núm. 51-2020), 16 LPRA sec. 939 et seq. (la cual disponía para la celebración de una consulta de estatus político en las elecciones generales de 2020)[5], y del Subcapítulo VIII-B de la Ley Núm. 58-2020, conocida como el Código Electoral de Puerto Rico de 2020 (relacionada con el ejercicio del voto presidencial). Sin ánimo de reproducir todo lo allí discutido, resulta

---

[5] En dicho plebiscito de 2020 se le consultó al electorado la pregunta siguiente: ¿Debe Puerto Rico ser admitido inmediatamente dentro de la Unión como un Estado? Sí o No. De los 1,190,399 votos, el "Sí" obtuvo un 52% y el "No" obtuvo un 48%. Véase, Exposición de Motivos de la Ley Núm. 165-2020.

material que tengamos presente ciertos enunciados por su vínculo con la controversia de autos.

En específico, que el Pueblo de Puerto Rico ostenta el poder de expresarse para ejercer su derecho a la autodeterminación. Íd., pág. 420. Particularmente porque nuestra Constitución es neutral en materia de estatus político, con la consecuencia de no cerrarle la puerta a la autodeterminación de nuestro pueblo. Íd., págs. 420 y 448. En otras palabras, en la Constitución de Puerto Rico no se comprometió el futuro político del territorio, sino que este pertenece al Pueblo, y por esto las aspiraciones que se plantearon en la Constitución no están sujetas a alguna fórmula de estatus político. Íd., pág. 459.

En vista de lo anterior, fundamentamos que los resultados de los plebiscitos de 2012 y 2017 constituyen un ejercicio de autodeterminación donde la fórmula de la estadidad obtuvo la mayoría de los votos. Íd., pág. 434. Así determinamos que estos resultados establecieron un mandato electoral al gobierno por parte del pueblo para la descolonización conforme a la voluntad mayoritaria. Íd., págs. 421 y 457. Muy particularmente, resolvimos que la expresión popular constituye en sí misma un fin público cuya consecuencia es que la legislación que se apruebe al amparo de este mandato tendrá esa finalidad siempre que, claro está, se enmarquen en el esquema constitucional. Íd., págs. 422 y 439. En consecuencia, entre varios asuntos, se validó la finalidad pública de la Ley Núm. 55-

2020, la cual disponía para la celebración de un plebiscito en las pasadas elecciones generales del 2020.

Así las cosas, cuando la legislación impugnada cumpla con nuestro ordenamiento constitucional debemos ser deferentes con las actuaciones de las otras ramas de gobierno, indistintamente de que como jueces y juezas en nuestro carácter personal discrepemos o coincidamos con sus bondades o sabiduría. Íd., págs. 422 y 446. Véanse, P.I.P. v. C.E.E., 120 DPR 580 611 (1988); McCormick v. Marrero Juez, 64 DPR 260, 267 (1944). Pues, al final de cuentas, no podemos ser selectivos al aceptar la voluntad del pueblo y  no reconocer que la decisión de realizar una consulta de estatus político es una prerrogativa que recae primariamente en las ramas políticas de gobierno. Íd., pág. 434 y 436.

En este punto, no cabe duda de que llevar a cabo una consulta de estatus o plebiscito constituye un mecanismo legítimo de las ramas políticas para conocer la voluntad actual del pueblo en lo que concierne a su futuro político. Ahora bien, lo que está aquí en controversia es precisamente identificar cuáles son las prerrogativas de cada una de estas ramas políticas, entiéndase del poder legislativo y del poder ejecutivo, al momento de diseñar, convocar e implementar esta consulta. En específico, si mediante la Ley Núm. 165-2020, infra, aquí impugnada, el poder legislativo violó el principio axiomático de separación de poderes al delegarle al Gobernador ciertas

facultades relacionadas con este mecanismo electoral y su sujeción por medio de una orden ejecutiva. Para responder a esto, procedemos a reseñar la normativa aplicable.

**IV**

**A.**

La Constitución de Puerto Rico estableció un sistema republicano de gobierno por medio de tres (3) poderes subordinados todos a la soberanía del Pueblo de Puerto Rico. Art. I, Sec. 2, Const. P.R. LPRA, Tomo 1. De ordinario, mediante esta forma de gobierno, el Poder Legislativo aprueba las leyes a través de la Asamblea Legislativa, el Poder Ejecutivo las implementa y pone en vigor mediante la figura central del Gobernador(a), y el Poder Judicial las interpreta. Noriega v. Hernández Colón, 135 DPR 406, 458 (1994); Véase, además, Art. III, IV y V, Sec. 1, Const. ELA, supra. Cada uno de estos Poderes, aunque soberano e independiente con respecto al ejercicio del poder conferido, se interrelaciona con los otros, manteniendo íntegra la autoridad de cada cual. Santana v. Gobernadora, 165 DPR 28 (2005); Pueblo v. Santiago Feliciano, 139 DPR 361, 420 (1995).

Por ello, el principio de separación de poderes procura establecer el ámbito de acción de cada una de las ramas mediante un sistema de pesos y contrapesos para evitar que las actuaciones de una de las ramas de gobierno causen detrimento a otra. Dalmau Santiago v. Oronoz Rodríguez, 208 DPR 115, 135 (2021); Rivera Schatz v. ELA y C. Abo. PR. II,

191 DPR 791, 802 (2014), Díaz Carrasquillo v. García Padilla, 191 DPR 97, 110 (2014); Domínguez Castro v. ELA, 178 DPR 1, 93 (2010).

Como resultado, este principio de separación de poderes salvaguarda la independencia de cada rama de gobierno. Acevedo Vilá v. Meléndez, 164 DPR 875 (2005). Ello resulta fundamental para nuestro esquema democrático de gobierno, por lo que no constituye una mera conveniencia o mecanismo de organización gubernamental. Córdova y Otros v. Cámara Representantes, 171 DPR 789, 800, (2007) citando a Colón Cortés v. Pesquera, 150 DPR 724 (2004).

Al resolver una controversia que requiere un pronunciamiento sobre la aplicabilidad de la doctrina de separación de poderes, debemos analizar si "en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución". Dalmau Santiago v. Oronoz Rodríguez, 208 DPR 115, 136 (2021) (citando a Nogueras v. Hernández Colón I, 127 DPR 405, 426 (1990)).

En una de las decisiones judiciales más importantes de este Tribunal en torno a la separación de poderes, la cual contó con el criterio unánime de sus miembros, reiteré que "la doctrina de separación de poderes … tiene como propósito fungir como un sistema de pesos y

contrapesos entre las tres (3) Ramas o Poderes, con el fin de que se garantice que cada una ejerza un ejercicio cabal, legítimo y adecuado de sus funciones". Dalmau Santiago v. Oronoz Rodríguez, supra, pág. 174 (Op. de conformidad del Juez Asociado señor Estrella Martínez)(cita omitida).

Conviene aquí puntualizar que el tema de separación y delegación de poderes ha sido objeto de un extenso análisis en el contexto del Derecho Administrativo. En específico, se ha discutido ampliamente la delegación de poderes reglamentarios y adjudicativos por parte de la Asamblea Legislativa a los organismos administrativos por virtud de sus leyes orgánicas. Véanse, Departamento de Justicia v. Jiménez, 199 DPR 293 (2017); Danosa v. Negociado, 185 DPR 1008 (2012); M.& B. S., Inc., v. Depto. De Agricultura, 118 DPR 319, 326 (1987); López v. Junta de Planificación, 80 DPR 646 (1958); Hilton Hotels v. Junta de Salario Mínimo, 74 DPR 670 (1953); Luce & Company, S. en C. V. Junta de Salario Mínimo de P.R., 62 DPR 452 (1943).

De este modo, hemos expresado que, tanto en la jurisdicción federal como en la nuestra, es incuestionable la validez de la delegación de poderes a un organismo administrativo siempre y cuando mediante ley se establezcan normas adecuadas, pautas, estándares, criterios o principios inteligibles, así como aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus

facultades. Ello para así evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas. Véanse, Sánchez Collazo v. Departamento de la Vivienda, 184 DPR 95 (2011); Bomberos Unidos v. Cuerpo Bomberos, 180 DPR 723, 742 (2011); Domínguez Castro v. ELA, supra, pág. 93; Rodríguez v. Bco. Gub. De Fom., 151 DPR 383, 400 (2000).[6] En el contexto administrativo, el "principio inteligible" tendría el efecto real de establecer límites a la jurisdicción de una agencia administrativa. M. Izquierdo Encarnación, Introducción al derecho administrativo, Ed. Situm, San Juan, 2019, pág. 33.[7]

---

[6] Véase, Mistreta v. U.S., 488 U.S. 361, 372-373 (1989), el cual resume perfectamente la doctrina federal de delegación de poderes y el "principio inteligible". ("So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." Íd., pág. 372 (citas omitidas).

[7] Véase, J.W. Hampton & Co. v. United States, 276 U.S. 394, 409 (1928), el cual acuñó la norma del principio inteligible: "[I]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." Asimismo, en Whitman v. American Trucking, 531 U.S. 457, 474-475 (2001), se validó la delegación de poder hecha a la Environmental Protection Agency (EPA) para adoptar regulación siempre y cuando fuera en protección de la salud pública. Es decir, el Tribunal Supremo de los Estados Unidos validó como principio inteligible el requisito de que la regulación adoptada fuera para proteger la salud pública. Dicho foro judicial ha sido extremadamente deferente con las delegaciones hechas por el Congreso al Ejecutivo para ejecutar la política pública.

No obstante, la determinación de si la legislación en cuestión contiene un principio inteligible o normas adecuadas va a depender de un análisis caso a caso en el que se ausculten la delegación conferida y los criterios establecidos por el legislador. Sánchez V. Depto. Vivienda, 184 DPR 95, 122 (2011) (cita omitida). Véase, Amadeo Ocasio v. Pierluisi Urrutia, supra, pág. (Op. de conformidad Juez Asociado señor Estrella Martínez).

Sin embargo, estos criterios, pautas o principios no tienen que ser expresos, pues pueden surgir, inclusive, del historial legislativo y podrían ser amplios y generales; **si tiene un fin o interés público, por lo general es suficiente justificación para que se sostenga la delegación.** (Negrillas suplidas). Domínguez Castro v. ELA, supra, pág. 93 (citas omitidas); Rodríguez Román v. Bco. Gub. De Fom., supra, pág. 400. Según hemos consignado,

> nada impide que la Legislatura establezca normas generales que sean amplias y que dejen al administrador un **adecuado margen de libertad para complementar las normas legislativas mediante la utilización de un juicio especializado,** que se pueda desarrollar conforme a un análisis, apreciación y discreción administrativa que **tenga una base de razonabilidad.** (Negrillas suplidas). Domínguez Castro v. ELA, supra, pág. 94; Debién v. Junta de Contabilidad, 76 DPR 96, 104 (1954).

En ese contexto, hemos reconocido que la delegación de poderes puede hacerse constitucionalmente a base de normas amplias y generales. López v. Junta de Planificación, 80 DPR 646, 661 (1958) (citas omitidas).

**B.**

En lo aquí pertinente, es norma reiterada que, como parte del principio de separación de poderes en nuestro ordenamiento jurídico, al Poder Ejecutivo se le reconoció, entre otros deberes, las funciones, atribuciones y el poder expreso de "[c]umplir y hacer cumplir las leyes", así como el de "[e]jercer las otras facultades y atribuciones y cumplir con los demás deberes que se le señalen por esta Constitución o por ley". Art. IV, Secc. 4, Const. PR, LPRA, Tomo 1.[8]

De ordinario, el Gobernador no posee poderes legislativos inherentes, los cuales, por arreglo constitucional, pertenecen al Poder Legislativo. Véase, Art. III, Secc. 17 y Art. II, Secc. 19 de la Const. PR, LPRA, Tomo 1. Por esta razón, la única manera en la que el Poder Ejecutivo podría ejercer poderes legislativos es mediante la doctrina de la delegación de poderes. Esto ocurre cuando la Asamblea Legislativa, por medio de un estatuto, le confiere la facultad de ejercer ciertos poderes de naturaleza cuasi-legislativa sujetos a las

---

[8] Véase, además, el Artículo 48 del Código Político de Puerto Rico, 3 LPRA sec. 1. ("El Gobernador ejercerá las facultades y cumplirá las obligaciones enumeradas a continuación:… (14) **Expedirá y trasmitirá las proclamas electorales**. (15) Ejercerá las facultades y cumplirá las obligaciones que le están además asignadas por las leyes de los Estados Unidos y las leyes de Puerto Rico". (Negrillas suplidas). Íd. Véase también la Ley Núm. 104 de 28 de junio de 1956, conocida como la Ley para facultar al Gobernador la delegación de ciertas funciones y deberes, 3 LPRA sec. 1ª inciso (a) et seq.

exigencias constitucionales. Véase, J.M. Farinacci Fernós, Las órdenes Ejecutivas, el poder legislativo y las emergencias, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR, (2020), págs. 2-3.

Ahora bien, el Gobernador tiene a su alcance el uso de las órdenes ejecutivas como un instrumento para ejecutar sus funciones, facultades y deberes. Asunto que nos conduce a auscultar la naturaleza, utilidad y alcance de las órdenes ejecutivas en nuestro ordenamiento jurídico.

## C.

Si bien no existe referencia constitucional o estatutaria que explique o regule el poder del Gobernador para emitir órdenes ejecutivas, estas se han definido como un mandato que el primer ejecutivo da a los componentes de la Rama Ejecutiva en virtud del poder inherente del Gobernador como administrador de esta rama. W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. UPR 951, 953, 988 y 1020 (2007).[9] Véase, Hernández Romero v. Pol. De P.R. 177 DPR 121, 167 (2009) (Hernández Denton, Op. disidente).

---

[9] El Secretario de Justicia también ha emitido varias Opiniones sobre las órdenes ejecutivas. Véanse, Op. Sec. Just. Núm. 1968-2; 1984-31; 1985-5; 1985-10; 1991-25; 1994-3; entre otras. Por otra parte, el Profesor W. Vázquez Irizarry define poder inherente como aquel que un funcionario reclama poseer independientemente de que no exista base textual alguna, directa o indirecta que lo valide o sostenga. W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. UPR 951, 961 (2007).

En ese sentido, representan un mandato dirigido a uno de los brazos auxiliares del Poder Ejecutivo conforme a nuestra Constitución y el ordenamiento jurídico estatutario. Hernández Romero v. Pol. De P.R., supra, pág. 138.

En particular, **existen leyes que sujetan determinadas actuaciones a su autorización mediante órdenes ejecutivas.** (Negrillas suplidas). W. Vázquez Irizarry, op. cit., pág. 1020. Así, consecuentemente, este Tribunal ha expresado que un Gobernador tiene el poder inherente de emitir órdenes ejecutivas, **pero que ese poder estará limitado por las leyes aplicables.** (Negrillas suplidas). Otero De Ramos v. Srio. De Hacienda, 156 DPR 876, 892 (2002). A su vez, enunciamos que una **orden ejecutiva no puede ir por encima y derrotar los objetivos pretendidos por la Asamblea Legislativa al aprobar las leyes.** (Negrillas suplidas) Íd.

Similarmente, hemos reconocido que el uso de las órdenes ejecutivas responde a una actuación consustancial a las facultades delegadas por la Constitución de Puerto Rico al Poder Ejecutivo. Hernández, Romero v. Pol. de P.R., 177 DPR 121, 138 (2009); Otero De Ramos v. Srio. De Hacienda, 156 DPR 876, 892 (2002). Como resultado, el Gobernador tiene el poder de emitir órdenes ejecutivas y estas tendrán fuerza de ley siempre que su promulgación sea a tenor con los poderes explícitos conferidos por la Constitución o por un poder delegado por la Asamblea

Legislativa mediante una ley.[10] <u>Rodríguez Ramos et al. v.</u>
<u>ELA et al.</u>, 190 DPR 448, 463-464 (2014); <u>Otero de Ramos</u>
<u>v. Srio. de Hacienda</u>, 156 DPR 876, 892 (2002).

En otras palabras, el Gobernador puede dictar órdenes ejecutivas tanto para ejercer algún poder cuasi-legislativo debidamente delegado por la Asamblea Legislativa como para ejercer sus poderes de naturaleza ejecutiva. J.M. Farinacci Fernós, <u>Las órdenes Ejecutivas,</u> <u>el poder legislativo y las emergencias</u>, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR, (2020), pág. 3 (citas omitidas).

Como norma general, las órdenes ejecutivas solo aplican a los componentes de la Rama Ejecutiva, es decir, no le aplican a la ciudadanía en general. W. Vázquez Irizarry, <u>op. cit</u>., págs. 1029-1030. En vista de lo anterior, para que una orden ejecutiva pueda tener fuerza de ley, aplicar de forma general a la ciudadanía y tener efecto normativo, "debe tratarse del ejercicio de algún poder cuasi-legislativo debidamente delegado por la Asamblea Legislativa. De lo contrario, estaríamos ante un acto patentemente inconstitucional, por violar el

---

[10] Véase, W. Vázquez Irizarry, <u>Los poderes del</u> <u>Gobernador de Puerto Rico y el uso de órdenes ejecutivas</u>, 76 Rev. Jur. UPR 951, 1029 (2007).("La orden ejecutiva emitida conforme a una facultad dispuesta en ley constituye, al igual que la adopción de un reglamento por una agencia, un ejercicio de poderes delegados por la Asamblea Legislativa. En cambio, la orden adoptada al amparo de facultades constitucionales, aunque también responde a una delegación, posee un sentido más general y quizás menos limitado al provenir del poder constituyente"). Íd., pág. 1052.

principio de separación de poderes". J.M. Farinacci Fernós, op. cit., pág.3.

En ese contexto, surgirán controversias jurídicas como la de autos en la que se procure examinar si la orden ejecutiva emitida por el Poder Ejecutivo está usurpando el poder de legislar de la Asamblea Legislativa. Así, por ejemplo, se podría alegar que la orden ejecutiva es inválida o inconstitucional por el Gobernador carecer de poder para emitirla, que es inconstitucional por infringir alguna disposición de la Constitución o que es inválida por ser contraria a alguna ley. Véanse, W. Vázquez Irizarry, op. cit., pág. 1057. A causa de ello, la orden ejecutiva impugnada estará sujeta a revisión judicial y podría ser declarada inválida o inconstitucional. Véanse, W. Vázquez Irizarry, op. cit., págs. 1061-1062[11]; Regla 21.3 de Procedimiento Civil, 32 LPRA Ap. VI.

Sin embargo, han sido pocas las ocasiones en que la jurisprudencia de este Tribunal ha tenido ante sí o mencionado órdenes ejecutivas específicas en circunstancias que no presentan problemas de separación de poderes por existir una delegación legislativa o por canalizar el ejercicio de poder que la Constitución le brinda al Primer Ejecutivo. J. J. Álvarez González, Derecho constitucional

---

[11] "Aunque no toda acción judicial de impugnación de una orden [ejecutiva] tiene que conllevar un planteamiento constitucional, el remedio adecuado para llevar un caso ante los tribunales es uno que se utiliza tradicionalmente en el litigio público. Nos referimos a una solicitud de sentencia declaratoria acompañada de una petición para la expedición de un interdicto". Íd., pág. 1061.

de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, Tomo 1, 2009, pág. 257 (citas omitidas).

Por ello, cuando se discute la impugnación de una orden ejecutiva es conveniente recurrir de modo ilustrativo a la esfera federal, en particular a lo resuelto por el Tribunal Supremo de Estados Unidos en el caso normativo Youngstown Sheet & Tube Co. v. Sawyer, 343 US 579 (1952). En apretada síntesis, tal caso tuvo su génesis cuando el Congreso cuestionó si el entonces presidente Truman tenía el poder constitucional como primer ejecutivo de la Nación y comandante en jefe de las fuerzas armadas para emitir la Orden Ejecutiva núm. 10340. En esta, se instruyó al Secretario de Comercio a incautar las fábricas de acero del país con el propósito de asegurar la producción de armamentos y municiones para la Guerra de Corea (dado el inminente aviso de huelga de los trabajadores unionados). Las compañías de acero impugnaron la orden ejecutiva y, en una votación de seis (6) a tres (3) con siete (7) opiniones distintas, el alto foro federal declaró la orden inconstitucional por violar el principio de separación de poderes, en particular por haber constituido un acto legislativo no autorizado ni constitucional ni estatutariamente. En concreto, determinó que:

> The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress to which our attention has

> been directed from which such a power can fairly be implied. <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, supra, pág. 585.

En lo aquí material, la opinión concurrente del Juez Asociado Robert Jackson elaboró un análisis de tres (3) escenarios prácticos para determinar la validez de la actuación del ejecutivo y con ello distinguir entre las posibles consecuencias legales. En el primer escenario, que veremos es el mismo que se presenta en el caso ante nos, el presidente **actúa conforme a una autorización expresa** o implícita **del Congreso**. Íd., pág. 635. Bajo este escenario, la **autoridad del primer ejecutivo es máxima, pues incluye la suma del poder que posee por sí mismo como presidente más todo aquel que el Congreso le pueda delegar**. De esta forma, **una actuación bajo este escenario gozaría de una presunción sólida y una amplia libertad de interpretación judicial, y la carga de persuadir recaería pesadamente sobre aquel que intente atacarla**. Íd., págs. 636-637.[12]

En el segundo supuesto, el presidente actúa en ausencia de autorización o prohibición del Congreso y solo se fundamenta en sus poderes inherentes. Aquí se crea un área de penumbra, puesto que tanto el presidente como el Congreso pudieran tener autoridad concurrente o la distribución entre ambos pudiera ser incierta. Íd. En este escenario,

---

[12] El profesor J. J. Álvarez González comenta que, en este escenario, para que la actuación se decrete inválida tiene que haber violado la doctrina de poderes enumerados, las prerrogativas de los estados o un derecho individual. J.J. Álvarez González, <u>Notas sobre derecho constitucional</u>, Ed. Situm, San Juan, 2022, pág.20.

será una cuestión práctica evaluar la inercia, indiferencia o la quietud del Congreso en cuanto a si permitieron o invitaron a la actuación presidencial.

Por último, en el tercero de los escenarios, el presidente actúa tomando medidas que son contrarias a la voluntad legislativa expresa o implícita. Aquí su autoridad está en el punto más bajo porque solo depende de sus propios poderes constitucionales en contraposición a los poderes del Congreso sobre el asunto. Un reclamo presidencial en este escenario requiere un escrutinio cuidadoso porque lo que está en juego es el equilibrio del sistema constitucional. Íd., pág. 637-368.[13]

Según adelantado, comenta el Profesor constitucionalista J.J. Álvarez González que la jurisprudencia puertorriqueña está prácticamente huérfana de análisis sobre las fronteras entre aquellos asuntos que son competencia del poder ejecutivo y aquellos que requieren actuación legislativa, toda vez que no tenemos en nuestro ordenamiento jurídico una decisión análoga a Youngstown Sheet & Tube Co. v. Sawyer, supra. J. J. Álvarez González, Derecho constitucional de Puerto Rico y

---

[13] Al Juez Jackson aplicar su modelo tripartito de análisis a la orden ejecutiva del Presidente Truman, resolvió que se trató de una actuación bajo el tercero de los escenarios. En apretada síntesis, concluyó que el presidente no tiene el poder legislativo, que su acción se originó de su propia voluntad individual, contrario a la voluntad del Congreso, y que, por ello, representó un ejercicio de autoridad sin ley.

relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, Tomo 1, 2009, pág. 256.

Si bien el marco de análisis de Youngstown aún no ha sido aplicado de forma expresa por este Tribunal, sí ha sido empleado por el Tribunal Supremo de los Estados Unidos y algunas cortes inferiores en instancias donde resultó necesario analizar si el Presidente tenía el poder para actuar cuando la autoridad constitucional entre este y el Congreso estaba en disputa. Véase, A. A. Graber, Executive Orders: An Introduction, U.S. Congressional Research Service, (R46738, Mar. 29, 2021), pág. 8.[14] Del mismo modo, se debe tener presente que, aunque este modelo de Youngstown es práctico y conveniente para evaluar la delegación de poderes constitucionales entre el Congreso y el Presidente, existen limitaciones adicionales a la acción del primer

---

[14] Véase, City and County of San Francisco v. Trump, 897 F.3d 1225 (9th Cir. 2018); Zivotofsky v. Kerry, 576 US 1 (2015); Kaplan v. Conyers, 733 F.3d 1148 (Fed. Cir. 2013), cert. denied, 134 S. Ct. 1759, 188 L. Ed. 2d 592 (2014); Dames & Moore v. Regan, 453 US 654 (1981).

Por otra parte, tenemos presente que, recientemente en Amadeo Ocasio v. Pierluisi Urrutia, 211 DPR 278 (2023) (Sentencia), se impugnó la autoridad del Gobernador Hon. Pedro Pierluisi Urrutia para emitir órdenes ejecutivas para declarar una emergencia y delegar en el Secretario de Salud la facultad de establecer ciertas medidas relacionadas con el COVID-19. No obstante, recordemos que, tras divergencias de criterios, el caso se resolvió mediante una Sentencia breve, con varias opiniones de conformidad y, por ello, no hubo una opinión mayoritaria que entrara en los méritos respecto al análisis del poder del Gobernador para emitir órdenes ejecutivas en el contexto de una emergencia, así como el alcance y la validez de las referidas órdenes. Véase, Amadeo Ocasio v. Pierluisi Urrutia, supra (Op. de conformidad del Juez Asociado señor Estrella Martínez).

ejecutivo como, por ejemplo, que este no podría ejercer una acción patentemente inconstitucional aun cuando el Congreso le autorizara a realizarla. A. A. Graber, supra, pág. 11 citando a Clinton v. New York, 524 U.S. 417, 436 (1998).

En ese sentido, debo advertir que este no es el único modelo de análisis existente al cual los tribunales podemos recurrir al momento de revisar una actuación ejecutiva.[15]

Ahora bien, según se adelantado, soy del criterio que este pleito se enmarca en el primero de los escenarios del esquema de Youngstown, en el cual existe una delegación estatutaria al poder ejecutivo. Ante ello, debemos evaluar, además, el alcance de dicha delegación estatutaria y el alcance de la orden ejecutiva impugnada. En la esfera federal para este análisis, los tribunales generalmente pudieran: (1) evaluar el texto del estatuto para determinar el alcance de la delegación de poder; (2)

---

[15] Por ejemplo, a nivel federal se reconoce que:

> […]In other cases, a reviewing court may determine the scope of Congress's delegation of power to the President. To perform that analysis, courts will generally use traditional tools of statutory interpretation. Courts may also be required to determine the scope of the President's action in the executive order. Courts will begin with the text of the executive order, and may defer to agency interpretations of that order (depending on the circumstances of the particular case). Separately, courts may also review other constitutional issues raised by the executive order (for example, whether the order violates the First Amendment to the U.S. Constitution). A. A. Graber, supra.

considerar la cantidad de poder que normalmente se le otorga al poder ejecutivo en la materia en cuestión, y (3) considerar si el poder legislativo no ha actuado después de acciones ejecutivas tomadas conforme al estatuto (la acción o inacción para concluir si hubo aceptación al poder conferido).[16] A. A. Graber, _supra_., pág. 12 (citas omitidas).[17]

En síntesis, ante una controversia como la de autos, el Tribunal evaluará si la actuación ejecutiva, como la

---

[16] Para un caso en que se evaluó el alcance del poder delegado por el Congreso, véase, _Trump v. Hawaii_, 585 U.S. 667 (2018).

[17] El Profesor Farinacci-Fernós propone un análisis similar para evaluar la validez del contenido legislativo de las órdenes ejecutivas emitidas por el Gobernador, el cual dependerá de dos (2) factores a considerarse. En primer lugar, si cumple con los requisitos constitucionales de la doctrina de la delegación de poderes. Es decir: (1) si se trata de un poder delegable; (2) si, en efecto, se llevó a cabo la delegación; (3) si se acompañaron suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado; (4) si las órdenes ejecutivas están dentro de los límites establecidos por la ley, y (5) si el ejercicio de dicho poder no es arbitrario o caprichoso. Luego propone que se debe evaluar el componente sustantivo, que la referida orden ejecutiva no puede violar los derechos consagrados en la Constitución, particularmente que "[d]ado que las órdenes ejecutivas interfieren directamente con derechos fundamentales como la expresión, la asociación y la libertad de movimiento, el contenido de las órdenes ejecutivas debe analizarse a través de un escrutinio estricto". J.M. Farinacci Fernós, _Las órdenes Ejecutivas, el poder legislativo y las emergencias_, 3 Amicus, Rev. Pol. Púb. Y Leg. UIPR, (2020), pág. 5. Nótese que este modelo se asemeja al utilizado al evaluar la delegación de poder de reglamentación y adjudicación a las agencias administrativas por parte de la Asamblea Legislativa en las leyes habilitadoras. Según apreciado, este Tribunal observó esos criterios y examinó con detenimiento los planteamientos de alegadas violaciones de derechos fundamentales de los demandantes.

aquí impugnada, constituye un ejercicio legítimo de poder por existir una delegación con base legal al amparo del esquema constitucional que sustente la facultad o prerrogativa pretendida, o si, por el contrario, representa una usurpación de las facultades legislativas. Indistintamente del modelo de análisis, ello sin duda alguna requiere una evaluación e interpretación judicial tanto del texto del estatuto como de la actuación del Primer Ejecutivo, todo esto enmarcado en nuestro ordenamiento constitucional y en la doctrina de delegación de poderes.

**V**

Así las cosas, la controversia se circunscribe a revisar judicialmente la validez de la Ley Núm. 165-2020 y de la OE-2024-016 bajo el principio de separación de poderes y la doctrina de delegación de poderes. Para esto, como punto de partida, es necesario examinar tanto el texto de la Ley Núm. 165-2020, por tratarse del estatuto en el que el Gobernador sustenta el ejercicio de su autoridad, así como de la OE-2024-016 y la Proclama del Gobernador Boletín Administrativo Núm.: P.2024-277 del 1 de julio de 2024, por constituir la acción ejecutiva impugnada. Veamos.

La Ley Núm. 165-2020 reconoció como política pública del Gobierno de Puerto Rico lo siguiente:

> Conforme a la Ley 51-2020, conocida como "Ley para la Definición Final del Estatus Político de Puerto Rico", y los resultados del Plebiscito de Estadidad Sí o No que por virtud

de dicha ley se realizó el 3 de noviembre de 2020, una mayoría absoluta de los electores reclamó la igualdad de deberes y derechos como ciudadanos americanos con la estadidad. **Este reclamo electoral del pueblo de Puerto Rico constituye un mandato a su gobierno y un fin público con la más alta prioridad.**

[…]

**Esta Ley [165-2020] dispone los procedimientos y los parámetros que regirán la celebración de toda consulta electoral cuyo propósito sea hacer valer la voluntad electoral de la mayoría absoluta de los electores en el plebiscito de 3 de noviembre de 2020,** incluyendo cualquier petición, propuesta, respuesta o ratificación electoral relacionada con el estatus político de Puerto Rico que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos.

En Orlando José Aponte Rosario v. Presidente Comisión Estatal de Elecciones (2020 TSPR 119) el Tribunal Supremo de Puerto Rico resolvió que la Asamblea Legislativa tiene la facultad de escoger mecanismos legítimos para adelantar su objetivo y registrar la expresión del pueblo. La sabiduría o conveniencia de esa determinación legislativa es una cuestión política no justiciable. Por lo tanto, **conforme al mandato del pueblo, en los plebiscitos de 2012 y 2017, el Subcapítulo VII-B de la Ley 58-2020, conocida como Código Electoral de Puerto Rico de 2020 y la Ley 51-2020, conocida como la Ley para la Definición Final del Estatus Político de Puerto Rico tienen un fin público conforme al Sec. 9 del Art. VI de la Constitución de Puerto Rico.**[18]

Esta Ley, por lo tanto, cumple cabalmente en todos sus alcances y propósitos con el principio de "fin público" dispuesto en nuestra Constitución y con las interpretaciones del Tribunal Supremo. (Negrillas suplidas) Artículo 1.3 de la Ley Núm. 165-2020, 16 LPRA sec. 977a.

---

[18] "Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para sostenimiento y funcionamiento de las instituciones del estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. P.R. LPRA, Tomo 1.

Nótese que la Ley Núm. 165-2020 constituyó un ejercicio del Poder Legislativo para institucionalizar como política pública el mandato del pueblo reiterado consistentemente en las tres (3) últimas consultas de estatus político (2012, 2017 y 2020). Como reconocimos en Aponte Nazario, "[e]xiste un fin público en la legislación aprobada por mandato de los electores de Puerto Rico para ejercer su derecho de autodeterminación." Aponte Nazario v. Presidente Comisión Estatal de Elecciones, supra, pág. 422.

En lo aquí pertinente, y relacionado con nuestra discusión previa sobre la formulación del principio de inteligibilidad, el estatuto enumeró en su Exposición de Motivos seis (6) propósitos principales:

1. **Establecer que las acciones y las gestiones dirigidas a hacer valer la petición de la estadidad por la mayoría absoluta de los electores en el Plebiscito de 3 de noviembre de 2020, constituye un fin público de la más alta prioridad y también un mandato del pueblo a su gobierno.**

2. Garantizar la protección del derecho fundamental protegido por la Primera Enmienda de la Constitución federal que tienen los ciudadanos americanos de Puerto Rico para reclamar al Gobierno federal la reparación del agravio que representa la actual condición territorial establecida hace 122 años.

3. **Autorizar al Gobernador a tomar las medidas que sean necesarias dentro del marco de un "fin público" para hacer valer la voluntad electoral mayoritaria del Plebiscito de 2020.**

4. **Implementar y apoyar los propósitos de la Ley 51-2020, conocida como "Ley para la Definición Final del Estatus Político de Puerto Rico",**

**incluyendo la coordinación y la ejecución de la transición a la estadidad ordenada en esta.**

5. Fortalecer a la Comisión para la Igualdad de Puerto Rico, creada por la Ley 30-2017, según enmendada, a los fines de facilitar el cumplimiento de sus funciones y deberes legales.

6. **Establecer las reglas para agilizar y garantizar que el pueblo de Puerto Rico pueda volver a votar, en caso de ser necesario, para hacer valer su voluntad electoral expresada en el Plebiscito de 2020,** incluyendo cualquier votación que sea necesaria para responder a cualquier petición, propuesta, respuesta o ratificación electoral relacionada con el estatus político de Puerto Rico que sea planteada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos. (Negrillas suplidas). Íd., Exposición de Motivos.

Obsérvese que, desde la Exposición de Motivos, se reconoce que el Gobernador posee poderes amplios delegados para implementar la política pública, lo que incluye tomar aquellas medidas que la adelanten y que se enmarquen en un fin público. Cónsono con ello y lo enunciado en el tercero de los propósitos, el estatuto define al "Gobernador" como la persona autorizada por esta Ley para:

**tomar las medidas que sean necesarias dentro del marco de un "fin público", como contratar, asignar, reasignar, obligar o dedicar recursos públicos para hacer valer, dentro o fuera de Puerto Rico, la voluntad electoral mayoritaria del Plebiscito de 3 de noviembre de 2020; incluyendo convocar las votaciones que sean necesarias para hacer valer esa voluntad electoral".** (Negrillas suplidas). Artículo 1.4(o) de la Ley Núm. 165-2020, 16 LPRA sec. 977b.

Similarmente, mediante el Artículo 8.3, siendo este el origen de este pleito, se dispuso expresamente que

[l]a Asamblea Legislativa faculta al Gobernador de Puerto Rico para hacer cumplir todos los propósitos de esta Ley mediante Orden Ejecutiva.

Esta **facultad discrecional que se le confiere al Gobernador, siempre se ejercerá haciendo prevalecer la voluntad electoral de la mayoría absoluta de los ciudadanos americanos de Puerto Rico en favor de la igualdad con la estadidad, según expresada en el plebiscito de 3 de noviembre de 2020.** (Negrillas suplidas). Artículo 8.3 de la Ley Núm. 165-2020, 16 LPRA sec. 984b.

Consecuente con dicha facultad delegada, y muy similarmente a lo que serían las Proclamas de otros eventos electorales, el Artículo 2.1 a su vez delimitó los principios o parámetros de la actuación autorizada al Gobernador al específicamente facultarle a **convocar mediante orden ejecutiva, cuando lo considere necesario:**

a. **Una votación o proceso electoral para hacer valer la voluntad electoral de la mayoría absoluta de los ciudadanos americanos de Puerto Rico en favor de la estadidad, según los resultados del Plebiscito de 3 de noviembre de 2020.**

b. Esa facultad del Gobernador también podrá ser ejercida para convocar e instrumentar una votación cuando medie alguna petición, propuesta, respuesta o ratificación electoral relacionada con el estatus político de Puerto Rico que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos.

c. El Gobernador podrá llevar a cabo una consulta electoral con una papeleta avalada por el Departamento de Justicia Federal conforme a la P.L. 113-76.

d. **Una consulta para una ratificación de la voluntad del Pueblo de Puerto Rico.**

e. **Una votación para resolver el estatus político futuro de Puerto Rico.** (Negrillas suplidas) Artículo 2.1 de la Ley Núm. 165-2020, 16 LPRA sec. 978.

Ahora bien, esta autorización al Gobernador para dictar una Proclama de convocatoria para cada votación que convoque por virtud de la Ley Núm. 165-2020 debe circunscribirse a ciertos criterios de forma y notificación muy puntuales.[19] Íd., Artículo 2.2, infra. Precisamente, el Artículo 2.2 dispone tanto de elementos procesales como sustantivos que deberán incluirse en la Proclama en conjunto con aquellas facultades cuasi-legislativas delegadas al Gobernador. Al respecto, de manera detallada se establece: el horario de la votación; el proceso para certificar los resultados conforme a la doctrina de Suarez Cáceres v. Com. Estatal de Elecciones, 176 DPR 31 (2009); el sistema de escrutinio a utilizarse por la Comisión Estatal de Elecciones; el proceso para identificar a los electores calificados; la garantía del derecho al voto, incluyendo el voto ausente y adelantado; los mecanismos de educación y divulgación al electorado;

---

[19] En particular: Las votaciones convocadas por el Gobernador, en cumplimiento con los propósitos de esta Ley, podrán coincidir en fecha con eventos electorales convocados por otras leyes, e incluso con las Elecciones Generales.

El Gobernador deberá proclamar la convocatoria de esas votaciones no más tarde de los noventa (90) días previos a la fecha seleccionada para su celebración. Deberá publicar la proclama de convocatoria en por lo menos dos (2) periódicos de circulación general en Puerto Rico en los idiomas español e inglés. Además del sello de la gobernación en el encabezamiento de la proclama, se incluirá la fecha y el título "Ley para Implementar la Petición de Estadidad del Plebiscito de 2020". Íd.

y el reconocimiento a las leyes supletorias aplicables en todo aquello que no contradiga la Ley Núm. 165-2020 (incluyendo el Código Electoral de 2020). Véase, Artículo 2.2 de la Ley Núm. 165-2020, 16 LPRA sec. 978a. Del mismo modo, **el contenido sustantivo de todos esos temas también se elabora en los capítulos y artículos subsiguientes de la Ley Núm. 165-2020**. Véanse los Capítulos II en adelante de la Ley Núm. 165-2020.

Además, el Artículo 2.2 también particulariza aquellas prerrogativas delegadas exclusivamente al Primer Ejecutivo "en el ejercicio de las facultades y los deberes que esta Ley le confiere al Gobernador". Íd. Así, sobre la convocatoria, se reconoce que el **Gobernador determinará en su Proclama: (1) la fecha de la votación convocada,[20] (2) las alternativas que se le presentarán a los electores en la papeleta de votación y la pregunta, si alguna, que se les planteará a los electores en la misma papeleta, y (3) el significado de cada alternativa impresa en la papeleta que se le presentarán a los electores**. Íd., 16 LPRA sec. 978a.

Con relación a la fecha de la consulta, el propio estatuto reconoce que la selección de la fecha de la votación pudiese "coincidir en fecha con eventos electorales convocados por otras leyes, e incluso con las elecciones generales". Artículo, 2.1 de la Ley Núm. 165-

---

[20] Véase, además, el Artículo 5.1 de la Ley Núm. 165-2020, 16 LPRA sec. 981.

2020, supra. Ello precisamente fue lo que ocurrió aquí, pues surge tanto de la OE-2024-016 como de la Proclama en controversia que el Gobernador seleccionó el 5 de noviembre de 2024 como la fecha del plebiscito, misma fecha de las elecciones generales. Véase, Proclama del Gobernador Boletín Administrativo Núm.: P.2024-277 del 1 de julio de 2024, pág. 2.

Por otro lado, en cuanto a las alternativas que se les presentarán a los electores y su significado, adviértase que el Artículo 4.1 delimita el alcance de esta facultad. Artículo 4.1 de la Ley Núm. 165-2020, 16 LPRA sec. 980. Asimismo, conviene recordar que, en virtud de la doctrina de delegación de poderes, los criterios, pautas y principios no tienen que ser expresos, pues como vimos, podrían ser amplios y generales y **si tienen un fin o interés público, por lo general será suficiente justificación para sostener la delegación**. (Negrillas suplidas). <u>Domínguez Castro v. ELA</u>, supra, pág. 93 (citas omitidas); <u>Rodríguez Román v. Bco. Gub. De Fom.</u>, supra, pág. 400.

De esta forma, la Asamblea Legislativa facultó al Gobernador, como en efecto ocurrió, a identificar y definir las alternativas. Claramente, estas alternativas tendrían que guiarse y ser consistentes con el propósito e interés público primordial de la Ley Núm. 165-2020, que es, entre otras, la celebración de toda consulta electoral o votación cuyo propósito sea hacer valer la voluntad

electoral de la mayoría absoluta de los electores, reiterada en los pasados plebiscitos de 2020, 2017 y 2012.

Dicho esto, aunque la Ley Núm. 165-2020 confiere al Gobernador el poder cuasi-legislativo de identificar y definir las alternativas o pregunta de estatus político que se incluirán en la papeleta, -lo que a todas luces implica una delegación amplia y general sobre las opciones de la consulta-, la propia ley establece ciertos parámetros al ejercicio de la discreción y potestad que pueda tener el Gobernador sobre el asunto. Ciertamente, esta discreción cedería ante la eventualidad de que fuese el gobierno federal de los Estados Unidos el que estableciera la pregunta que se les hará a los electores, si alguna, y las alternativas a incluirse en la papeleta de votación. Obsérvese que tal excepción no ocurrió en este caso.

Sin embargo, se desprenden tanto de la OE-2024-016 como de la Proclama del Gobernador las tres (3) alternativas identificadas para la consulta plebiscitaria, a saber: la independencia, la soberanía en libre asociación con los Estados Unidos o la estadidad, así como las definiciones de cada una de estas opciones según surgieron del texto propuesto por la Cámara de

Representantes de los Estados Unidos para el proyecto de ley "Puerto Rico Status Act, H.R. 8393".[21]

Ante este panorama, opino que muy difícilmente podría sostenerse con éxito que las alternativas seleccionadas y definidas en virtud del poder cuasi-legislativo delegado por la Ley Núm. 165-2020 y su política pública son arbitrarias, caprichosas, irrazonables o representan una usurpación a la facultad de la Asamblea Legislativa de legislar. Por el contrario, sostengo que tienen apoyo en una base de razonabilidad y en el ámbito de discreción y autoridad delegada estatutariamente al Primer Ejecutivo.

Similarmente, relacionado con los límites del poder delegado, es pertinente clarificar que la Ley Núm. 165-2020 también le reconoce un rol concomitante a la Comisión Estatal de Elecciones. A causa de ello, y cónsono con nuestro Código Electoral de 2020, infra, la identifica como la agencia con la obligación primaria de planificar,

---

[21] Dicho Proyecto de la Cámara de Representantes del Congreso de los Estados Unidos se presentó el 15 de julio de 2022 con el propósito de "[t]o enable the people of Puerto Rico to choose a permanent, nonterritorial, fully self-governing political status for Puerto Rico and to provide for a transition to and the implementation of that permanent, nonterritorial, fully self-governing political status, and for other purposes". H.R. 8393. Este proyecto no culminó su trámite legislativo para convertirse en ley. En lo aquí pertinente, proponía para la realización de un plebiscito en Puerto Rico el 5 de noviembre de 2023 con las siguientes alternativas: independencia, soberanía en libre asociación con los Estados Unidos y estadidad. Véase, H.R. 9393, Congress.Gov, Text - H.R.8393 - 117th Congress (2021-2022): Puerto Rico Status Act | Congress.gov | Library of Congress (última visita el 23 de agosto de 2024).

coordinar y realizar toda votación o proceso electoral autorizado por virtud de dicha Ley, como lo sería el plebiscito aquí impugnado, incluyendo el escrutinio general y la certificación de sus resultados. Artículo 1.5 de la Ley Núm. 165-2020, 16 LPRA sec. 977c. Véase, además, los Artículos 5.11 y 5.12, de la Ley Núm. 165-2020, 16 LPRA sec. 981j-981k.

Por ejemplo, en el Capítulo III de la Ley Núm. 165-2020 se especifican los trámites requeridos por la Presidenta de la Comisión Estatal de Elecciones (C.E.E.) previo a la votación; en el Capítulo IV se detallan las instrucciones a los electores que deben incluirse en las papeletas de votación y la campaña de educación que deberá llevar a cabo la C.E.E.; en el Capítulo V, entre varios asuntos, se incluye una lista de los deberes específicos de la C.E.E. para la votación; en el Capítulo VI se aborda el procedimiento para certificar como representantes de las alternativas de las papeletas, entre otras disposiciones que limitan el alcance de la delegación de poder. Ley Núm. 165-2020, supra.

Adviértase que ello es consistente con el Capítulo XI del Código Electoral de Puerto Rico relacionado con el rol de la C.E.E. ante un referéndum, consulta o plebiscito en virtud de la ley habilitadora que lo instrumente. Artículos 11.1-11.11 de la Ley Núm. 165-2020, 16 LPRA sec. 4781-4791. Además, recuérdese que nos encontramos ante una ley especial y, por reconocimiento expreso, el Código

Electoral de 2020 aplica supletoriamente en todo aquello que no fuese campo ocupado o le contradiga. Artículo 1.6 de la Ley Núm. 165-2020, 16 LPR A sec. 977d.[22]

**VI**

Hasta este punto queda claro que, a través de la Ley Núm. 165-2020, la Asamblea Legislativa delegó en el Gobernador la facultad discrecional de convocar, mediante orden ejecutiva y proclama, una votación o proceso electoral para hacer valer la voluntad de la mayoría absoluta de los ciudadanos de Puerto Rico, según los resultados del Plebiscito del 3 de noviembre de 2020 como pleno ejercicio del derecho a la autodeterminación.

Como resultado, el plebiscito convocado para el 5 de noviembre de 2024 constituye una implementación de la delegación de poderes cuasi-legislativos expresamente conferidos al Gobernador por la Ley Núm. 165-2020. Por

---

[22] **"Todo referéndum, consulta o plebiscito que se realice en Puerto Rico, se regirá por una ley habilitadora y por las disposiciones de esta Ley [Código Electoral] en todo aquello necesario o pertinente para lo cual dicha ley habilitadora no disponga de manera específica"** (Negrillas suplidas). Artículo 11.1 del Código Electoral de 2020, 16 LPRA sec. 4781.(1). A su vez, el inciso subsiguiente clarifica el rol supletorio de los Comisionados ante la eventualidad que la ley habilitadora del plebiscito no lo disponga: "[c]uando cualquier ley o ley habilitadora no disponga de manera específica sobre el diseño y la ejecución de la campaña educativa objetiva y no partidista de la o las alternativas en un referéndum, consulta o plebiscito y la orientación sobre los aspectos electorales de la misma, serán los miembros propietarios de la Comisión quienes deberán realizar ese diseño y ejecución". Íd., (2). Nótese que esta disposición desvanece la alegación de los demandantes peticionarios sobre la usurpación de las facultades de los Comisionados Electorales en el plebiscito, pues todos estos asuntos se atendieron en la Ley Núm. 165-2020.

ello, al dictar la referida orden ejecutiva, el Gobernador se circunscribió a un poder expresamente delegado por virtud de ley.

Por demás, el Gobernador está ejerciendo simultáneamente su función constitucional de cumplir y hacer cumplir las leyes **y aquellos deberes que se le señalen mediante ley**. Art. IV, Secc. 4, Const. PR, LPRA, Tomo 1. En ese escenario, y según la normativa antes reseñada, la OE-2024-016 tiene fuerza de ley, pues su base legal está arraigada en la autoridad y en los parámetros conferidos estatutariamente.

En consecuencia, al considerar los escenarios planteados en Youngstown Sheet & Tube Co. v. Sawyer, supra, la actuación del Gobernador se enmarca en el primer escenario. Es evidente que, al dictar la OE-2024-016, el Gobernador **actuó conforme a una autorización expresa** de la Asamblea Legislativa. A tales efectos, su autoridad es máxima, ya que incluye la suma del poder que posee por su rol como Primer Ejecutivo más todo aquel que la Asamblea Legislativa le delegó. De esta forma, su actuación bajo este escenario goza de una presunción sólida **que merece una amplia libertad de interpretación judicial** y, por ende, la carga de persuadir recae pesadamente sobre aquella parte que pretende atacarla. Véase, Youngstown Sheet & Tube Co. v. Sawyer, supra (Op. concurrente del Juez Jackson).

Igualmente importante, la Constitución de Puerto Rico no presenta algún impedimento ni limita la delegación de

poder que la Asamblea Legislativa otorgó al Gobernador para convocar e instrumentar un plebiscito conforme a la política pública establecida en la Ley Núm. 165-2020. Por el contrario, la propia Constitución de Puerto Rico establece que se dispondrá por ley todo lo concerniente al proceso electoral, tal como ocurrió aquí. Véase, Art. VI, Sec. 4, Const. P.R. LPRA, Tomo 1. Así, en asuntos de materia electoral, la Asamblea Legislativa posee un amplio margen de autoridad para legislar. P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 DPR 248, 256 (1980).

En el contexto de una controversia sobre la separación de poderes, donde la adjudicación se centra en el derecho al voto como herramienta para reclamar la reparación de agravios al Gobierno federal, y con el fin de obtener una solución acerca del estatus jurídico-político de Puerto Rico, es pertinente recordar las palabras del Delegado Figueroa en la Asamblea Constituyente:

> "Vamos a llevar principios a la constitución. Acordémonos que la constitución en su parte dogmática garantiza los derechos del ciudadano. Y acordémonos también que en su parte orgánica debe establecer el funcionamiento de los tres poderes del gobierno dentro del equilibrio balanceado que ha establecido como una norma brillante y admirable la nación americana." Diario de Sesiones de la Convención Constituyen, pág. 1299.

Precisamente, el balance requerido en nuestro ordenamiento constitucional exige reconocer que la Asamblea Legislativa delineó una política pública que es válidamente ejecutable por las acciones administrativas

de diversos componentes del Poder Ejecutivo. La separación de poderes busca el balance adecuado para que, primordialmente, no se vulneren los derechos de la ciudadanía. Sin embargo, la parte demandante nos invita a una interpretación del concepto de separación de poderes que establecería una independencia formalista y rígida entre poderes que, a fin de cuentas, provocaría un obstáculo mayor a la expresión del Pueblo de Puerto Rico a través del ejercicio democrático del derecho al voto.

Por lo tanto, contrario a lo alegado por los demandantes peticionarios, no nos hallamos ante una delegación de poder irrestricta ni ante una actuación unilateral del Gobernador que viole el principio de separación de poderes. Esta delegación al Poder Ejecutivo no constituye, por sí sola, un menoscabo a las facultades legislativas. La OE-2024-016 no representa una acción arbitraria o caprichosa por parte del Gobernador, sino que tiene base en la Ley Núm. 165-2020 y su alcance se circunscribe al poder cuasi-legislativo delegado.

## VII

Dicho todo esto, me es preciso señalar que tampoco tiene méritos el reclamo de los demandantes peticionarios de que tanto la Ley Núm. 165-2020 como la OE-2024-016 violan el derecho a la libertad de expresión en su modalidad de reglamentación de contenido y que, por ello, se infringe la cláusula constitucional de igual protección

de las leyes.[23] Para resolver esto, conviene reseñar la normativa y estándar aplicable ante un reclamo de violación constitucional por control gubernamental en el contenido de la expresión.

**A.**

La Sección Cuarta de la Carta de Derechos de la Constitución de Puerto Rico consagra el derecho fundamental de los ciudadanos a la libertad de expresión como uno de los valores de más alta jerarquía constitucional, al disponer que "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". Art. II, Sec. 4, Const. P.R. LPRA, Tomo 1. ELA v. Northwestern Selecta, 185 DPR 40 (2012); Vigoreaux Lorenzana v.

---

[23] En lo que atañe a la alegación que el Artículo 5.10 (a) de la Ley Núm. 165-2020 es ambiguo por establecer que resultará ganadora la alternativa que obtenga el 100% de los votos válidos, es evidente que se trató de una inadvertencia en su redacción. Acoger lo sugerido por los demandantes peticionarios daría al traste con el sistema electoral democrático representativo donde siempre resulta ganador el candidato o asunto que obtenga la mayor cantidad de votos válidos de los electores. Véase, además, el Artículo 20 del Código Civil de 2020, 31 LPRA sec. 5342. ("Para descubrir el verdadero sentido de una ley cuando sus expresiones son ambiguas, se considerará su razón y su espíritu, mediante la atención a los objetivos del legislador, a la causa o el motivo para dictarla". Íd.) Véase, además, Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31 (2009).

Quizno's, 173 DPR 254 (2008); Muñiz v. Admor. Deporte Hípico, 156 DPR 18 (2002).[24]

El derecho a la libertad de expresión abarca el ámbito general de la libertad de conciencia, de pensamiento, de expresión y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de esos derechos. Oficina del Comisionado de Seguros de P.R. v. Point Guard Ins. Co. Inc., 205 DPR 1005, 1018 (2020); U.P.R. v. Laborde Torres, 180 DPR 253, 286 (2010); Muñiz v. Admor. Deporte Hípico, supra, pág. 23 (citando a 4 Diario de Sesiones de la Convención Constituyente 2564 (1951)).

Este derecho fue concebido no solamente como una garantía de la expresión política, sino también para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático. Izquierdo II v. Cruz, 2024 TSPR 20 (2024); U.P.R. v. Laborde Torres, supra, pág. 286; Velázquez Pagán v. A.M.A., 131 DPR 568, 576 (1992). En vista de ello, esta garantía constitucional es raíz indiscutible de nuestro sistema democrático de gobierno y, en consecuencia, los tribunales estamos llamados a su

---

[24] Esta protección se extiende tanto a personas naturales como a personas jurídicas. Véase, Asoc. de Maestros v. Srio. de Educación, 156 DPR 754 (2002); Colegio de Abogados v. Schneider, 112 DPR 540 (1982) citando a First National Bank of Boston v. Belloti, 435 US 765 (1978). Véase, además, Citizens United v. Federal Election Com'n, 558 US 310 (2010).

más cautelosa protección. U.P.R. v. Laborde, supra, págs. 286-87; Vigoreaux Lorenzana v. Quizno's, supra, pág. 260.

En lo aquí material, esta garantía constitucional a la libertad de expresión no constituye un derecho absoluto, pues puede subordinarse a otros intereses cuando la necesidad y conveniencia pública lo requieran. Oficina del Comisionado de Seguros de P.R. v. Point Guard Ins. Co. Inc., supra, pág. 1019; U.P.R. v. Laborde, supra; Asoc. de Maestros v. Srio. de Educación, supra, pág. 768; Mari Brás v. Casañas, 96 DPR 15, 20-21 (1968). En consecuencia, es norma reiterada que este derecho está sujeto a la imposición de limitaciones, siempre y cuando las mismas sean interpretadas restrictivamente, de manera que no abarquen más de lo necesario. Oficina del Comisionado de Seguros de P.R. v. Point Guard Ins. Co. Inc., supra, pág. 1019; U.P.R. v. Laborde Torres, supra; Muñiz v. Admor. Deporte Hípico, supra, pág. 24; Velázquez Pagán v. A.M.A., 131 DPR 568, 577 (1992).

La precitada Sección Cuarta de nuestra Carta de Derechos tiene su origen en la Primera Enmienda de la Constitución de Estados Unidos. Emda. I, Const. EE.UU., LPRA, Tomo 1. Véase, U.P.R. v. Laborde Torres, supra, (citando a J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. U.P.R., 1982, T. 3, pág. 181).[25]

---

[25] Véanse, Balzac v. People of Porto Rico, 258 US 298, 314 (1922). Véanse, además: Pueblo v. García Colón I, 182 DPR 129, 147 (2011); U.P.R. v. Laborde Torres y otros I, supra, pág. 288; Izquierdo II v. Cruz, supra.

Por esa razón, en nuestro ordenamiento jurídico hemos adoptado el análisis utilizado por el Tribunal Supremo de los Estados Unidos al momento de resolver controversias que involucren el derecho a la libertad de expresión, entiéndase, la distinción entre la reglamentación gubernamental del contenido de la expresión vis a vis la reglamentación gubernamental del tiempo, lugar y manera de la expresión. Íd. en la pág. 288; Muñiz v. Admor. Deporte Hípico, supra, (citando a R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan. Ed. C. Abo. P.R., 1988, Vol. II, pág. 1278); Asoc. de Maestros v. Srio. de Educación, supra, pág. 769.

En lo que aquí nos concierne, las reglamentaciones de contenido son especialmente desfavorecidas y suelen someterse a un escrutinio estricto, el cual requiere que exista un propósito gubernamental apremiante y que la medida sea necesaria para alcanzarlo. J. J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, Tomo 1, 2009, pág. 972. Sin embargo, "algunas reglamentaciones de contenido se permiten cuando conciernen a ciertos tipos de contenido que no se consideran protegidos por la libertad de expresión o cuya protección es de menor grado". Íd.

Ante una controversia donde se alegue una intervención gubernamental con el contenido de cierta expresión, el tribunal tendrá que determinar si la

reglamentación impugnada es neutral o no en cuanto al contenido de la expresión que se pretende prohibir o restringir, indistintamente del foro donde se haya realizado la expresión. Asoc. de Maestros v. Srio. de Educación, supra, pág. 769; Muñiz v. Admor. Deporte Hípico, supra, pág. 25. En cuanto esto último, se entenderá que una medida procura limitar el contenido de una expresión cuando la prohibición va dirigida precisamente a las ideas o a la información que se quiere diseminar, por el mensaje o punto de vista específico de la expresión, o por el efecto que esa información o idea pueda tener. Íd. Ante ello, como norma general, una reglamentación limita el contenido de una expresión cuando favorece cierta expresión sobre otra, por las ideas o los puntos de vista que se transmiten. Asoc. De Maestros v. Srio. De Educación, supra, pág. 769 citando a Turner Broadcasting System Inc. v. FCC, 512 U.S. 622 (1994). Asimismo, se entiende que el propósito es restringir el contenido de la expresión si la reglamentación no puede justificarse sin hacer referencia a este. Íd., citando a Bartnicki v. Vopper, 532 U.S. 514 (2001).

**B.**

En lo pertinente, los Artículos 6.1 y 6.2 de la Ley Núm. 165-2020 establecen los requisitos para certificarse como representante de una de las alternativas que se presentarán a la consideración de los electores en el plebiscito. De entrada, se indica que no se certificará a

organización alguna que incumpla con los requisitos allí dispuestos, con los de la C.E.E. o los de la Ley Núm. 222-2011, conocida como <u>Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico</u>, (Ley Núm. 222-2011) 16 LPRA secs. 621 <u>et seq</u>. Artículo 6.1(a) de la Ley Núm. 165-2020, 16 LPRA sec. 982ª.

Por ello, **previo a la certificación**, el partido político, la agrupación de ciudadanos o el comité de acción deberán demostrar que están registrados según lo requerido por la Ley Núm. 222-2011, independientemente de que su participación sea individual, en alianza o coalición. Artículo 6.2(a) de la Ley Núm. 165-2020, 16 LPRA sec. 982ª. El siguiente inciso añade, entre varios asuntos, **que al presentar su solicitud también deberán informar a la C.E.E. si su certificación tiene el propósito de solo favorecer u oponerse a alguna de las alternativas impresas en las papeletas de votación, promover la abstención electoral, alguna modalidad de expresión electoral u otra alternativa.** (Negrillas suplidas). Íd., (b). En lo aquí material, el Artículo 6.1(f) dispone que:

> Todo partido político, por petición, agrupación de ciudadanos, comité de acción política y persona natural o jurídica **que sea certificado como representante de alguna de las alternativas** impresas en la papeleta de votación, **y que reciba o utilice donaciones, incurra en recaudaciones y/o gastos de campaña en medios publicitarios o cualquier tipo de actividad proselitista para favorecer u oponerse a alguna de las alternativas; incluyendo promover la abstención electoral o alguna modalidad de expresión electoral u otra alternativa de estatus**

**político, deberá cumplir con los requisitos de registro y certificación en la Oficina del Contralor Electoral como requisito previo a sus actividades proselitistas o su certificación en la Comisión.** Artículo 6.1(f) de la Ley Núm. 165-2020, 16 LPRA sec. 982ª

En lo que concierne a la penalidad por incumplimiento, tanto el Artículo 6.1(h) como el 6.2(d) reconocen que toda persona natural o jurídica que, fraudulentamente, obrare en contravención a cualesquiera de las disposiciones de esta sección o que, teniendo una obligación impuesta por éste, voluntariamente dejare de cumplirla, o se negare a ello, será culpable de delito electoral y, convicta, será sancionada con pena de reclusión que no excederá de dos (2) años o multa que no excederá de diez mil dólares ($10,000) por cada infracción, o ambas penas a discreción del tribunal. Íd.

Los demandantes sostienen que el precitado Artículo 6.1(f) no deja claro si el requisito de certificación es aplicable a personas o entidades que no han solicitado representar una de las alternativas de la papeleta o si incurren en gastos con fondos propios no solicitados mediante recaudos. Sostienen que el Artículo provoca ambigüedad ya que, si una persona, grupo o partido realiza actividades en el ejercicio de su libertad de palabra en relación con la votación, lo haría sin tener claro si incurrirá o no en la conducta punible penalmente, lo que sería contrario a su derecho a la libertad de palabra y al voto. Argumentan que la ley discrimina por razón del contenido de la expresión al requerir que la persona o

entidad a certificarse "tiene que certificar que no va a promover abstención electoral. Si no lo hace, no puede obtener su certificación".[26] Además, sostienen que discrimina entre las personas que interesan promover las alternativas y aquellas que no están de acuerdo con alguna o que desean ejercer su derecho al voto para hacer constar su oposición, lo que constituye una violación a la igual protección de las leyes. No les asiste la razón.

Ante el planteamiento de los demandantes peticionarios, debemos responder si el Artículo 6.1(f)-(h) y el Artículo 6.2(d) contienen disposiciones estrictamente necesarias para adelantar un interés gubernamental apremiante. Ciertamente, el interés apremiante del Estado es proteger la pureza e integridad de los procesos electorales y su adecuada fiscalización, todo esto de conformidad con la propia Ley Núm. 222-2011. En esencia, dicho cuerpo estatutario establece el marco regulatorio para el financiamiento de las campañas políticas, incluyendo aquellos provenientes del Fondo Especial para el Financiamiento de Campañas y el Manejo de las Donaciones y Aportaciones.

Esta ley procura que nuestro sistema electoral se fundamente en guías y procedimientos que estimulen el ejercicio del derecho al voto y donde cada elector tenga la seguridad de que existen unas reglas uniformes que

---

[26] Véase, Alegato de la parte demandante peticionaria, pág. 26.

serán implementadas de manera equitativa a todos los participantes de cada evento. Exposición de motivos, Ley Núm. 222-2011. Esto es particularmente importante cuando el sistema electoral conlleva el financiamiento de campañas políticas y el manejo de donativos y gastos de campaña. En lo aquí material, se dispone que:

> **Los donativos y gastos con fines electorales componen una parte esencial del complejo aparato electoral.** Estos conceptos operan en una zona constitucionalmente sensitiva de principios y derechos fundamentales de expresión y de asociación. **Coinciden con esos derechos el interés gubernamental de carácter apremiante, de proteger la integridad del proceso electoral.** A través de los años, este balance ha sido objeto de evaluación legislativa, lo que ha resultado en medidas diseñadas para mantener un sistema electoral íntegro y responsivo a las necesidades institucionales del Pueblo, de forma consistente con los imperativos constitucionales que le guían y sirven de referencia.

> […]

> **La ciudadanía tiene un interés particular en conocer quién contribuye a las campañas electorales, y el Estado tiene un interés apremiante en asegurarse que dicha libertad de expresión sea debidamente reconocida, respetada, canalizada y protegida.** De esta manera, se alerta y **previene contra la corrupción e ilegalidades que en algunos momentos han flagelado al sistema electoral,** promoviendo decisiones informadas para el **beneficio de presentes y futuras generaciones.** Esta legislación le brindará al sistema electoral de Puerto Rico la **transparencia** que requiere. Es menester que el sistema electoral de Puerto Rico tenga las guías y requisitos necesarios para asegurar que **el pueblo conozca quién financia las expresiones que intentan influenciarlo mediante actividades y anuncios de campaña.** (Negrillas suplidas). Exposición de motivos, Ley Núm. 222-2011.

Para lograr este propósito, y cumplir con la política pública de transparencia y fiscalización de las campañas políticas, la Ley Núm. 222-2011 creó la Oficina del Contralor Electoral como la entidad a cargo de velar por su cumplimiento.[27] Para ello, esta ley le es aplicable a toda persona, natural o jurídica, **que recaude, gaste, contribuya o de alguna forma reciba recaudos o donativos o participe en el financiamiento de una campaña eleccionaria relacionada con puestos electivos, fórmulas de estatus, o alternativas para la evaluación y selección de los electores en un referéndum, plebiscito o consultas que se establezcan a través de legislación a tales fines.** (Negrillas suplidas). Artículo 2.002 de la Ley Núm. 222-2011, 16 LPRA sec. 621 nota.

Así, por ejemplo, el mencionado estatuto exige a los distintos comités (de campaña, de acción política, autorizado o de partido político) presentar una declaración de organización ante la Oficina del Contralor Electoral (Registro de Comités) y radicar informes trimestrales donde detallen la contabilidad de todo donativo o contribución recibida y de todo gasto incurrido, incluyendo aquellos con cargo al Fondo Especial para el Financiamiento de Campañas Electorales (entre

---

[27] El estatuto impone ciertas penas por el incumplimiento con sus disposiciones, las cuales incluyen multas o pena de reclusión bajo ciertos delitos electorales allí reconocidos. Véase, Capítulo XIII de la Ley Núm. 222-2011.

estos informes se incluyen los de ingresos y gastos, donativos tardíos, usos de medios de difusión, divulgación de comunicaciones electorales,[28] recaudos, entre otros). Véase el Capítulo VII de la Ley Núm. 222-2011; Artículo 7.000, 16 LPRA sec. 627.

Retomando el texto del Artículo 6.1 (f) de la Ley Núm. 165-2020, adviértase que lo único que requiere es que todo partido político, persona (natural o jurídica) o comité de acción política que fuese certificado como representante de una de las alternativas **y reciba o utilice donaciones, o lleve a cabo recaudaciones y/o gastos de campaña en medios publicitarios o cualquier actividad proselitista** (sea para favorecer u oponerse a alguna de las alternativas, incluyendo la abstención electoral o alguna modalidad de alternativa de estatus político), deberá cumplir con el requisito de registro en la Oficina del Contralor Electoral, previo a incurrir en dichas actividades proselitistas. En otras palabras, tanto los favorecedores como los detractores de las alternativas de consulta que incurran en gastos de campaña deberán

---

[28] Véase, Artículo 2.004(20) de la Ley Núm. 222-2011, 16 LPRA sec. 621. (Comunicación electoral o con fines electorales: "toda comunicación que: (a) se refiere a un partido político, ideología política, aspirante o candidato, y (b) aboga expresamente por la elección o derrota de dicho partido político, ideología política, aspirante o candidato, lo que ocurre cuando contiene palabras, tales como, pero sin que se entienda que excluye otras expresiones con idéntico resultado: vota por, vota en contra de, apoya a, rechaza o repudia a, trabaja por la elección de, trabaja por la derrota de, elige a, derrota a, ayúdanos a elegir a, ayúdanos a derrotar o a sacar, entre otras".[…].) Íd.

registrarse en la Oficina del Contralor Electoral. Tal cuestión es la norma en todos los eventos electorales de nuestra historia moderna.

Nótese que contrario a lo alegado, el texto de esta disposición no le niega a persona o entidad alguna el derecho a la libertad de expresión por tener que confirmar que no promoverá la abstención electoral como requisito para ser certificada por la C.E.E. como representante de una de las alternativas. Su único alcance se circunscribe a procurar que se cumpla con la Ley Núm. 222-2011 y la política pública de transparencia y fiscalización de los donativos políticos, el financiamiento y los gastos de campaña, aunque se trate de un plebiscito.[29] Esta disposición no está favoreciendo una expresión sobre otra.

Por lo tanto, su aplicabilidad es neutral y responde estrictamente a la necesidad de proteger un interés público apremiante. Por ello, no constituye una reglamentación discriminatoria en el contenido de su expresión. Véase, Asoc. de Maestros v. Srio. de Educación,

---

[29] Véase, Berríos Martínez v. Gobernador II, 137 DPR 185 (1994) (donde se validó la imposición de restricción a contribuciones en el contexto de un referéndum sobre enmienda constitucional). ("En resumen, en la jurisprudencia federal se ha reconocido la validez de los estatutos dirigidos a preservar la integridad del proceso electoral y la confianza del ciudadano en su Gobierno, mediante mecanismos que eviten tanto la realidad como la apariencia de corrupción, así como las influencias indebidas. First National Bank of Boston v. Bellotti, 435 U.S. 765, 788789 (1978); Buckley v. Valeo, 424 us 1, 48(1976)"). Íd., pág. 235.

supra, pág. 770; Muñiz v. Admor. Deporte Hípico, supra, pág. 26.

A su vez, los peticionarios parecen pasar por alto que en el Capítulo 7, que trata de las recaudaciones y gastos de campaña, el Artículo 7.1 de la Ley Núm. 165-2020 vuelve a clarificar el requisito de cumplir con la presentación de los informes ante la Oficina del Contralor cuando se soliciten, reciban o utilicen donaciones, se incurran en recaudaciones y/o gastos de campaña en medios publicitarios o en cualquier tipo de actividad proselitista para favorecer u oponerse a alguna de las alternativas en la papeleta. En específico, que:

> **Cada partido político**, por petición, agrupación de ciudadanos, comité de acción política y persona natural o jurídica que participe en actividades proselitistas durante la campaña de alguna de las votaciones autorizadas por este capítulo, **deberá sufragar sus gastos de campaña con sus propios recursos económicos. No obstante, si éstos solicitan, reciben o utilizan donaciones, incurren en recaudaciones y/o gastos de campaña en medios publicitarios o en cualquier tipo de actividad proselitista para favorecer u oponerse a alguna de las alternativas en la papeleta; incluyendo promover la abstención electoral o alguna modalidad de expresión electoral u otra alternativa, tendrán que cumplir con la presentación de los informes financieros que le requiera la Oficina del Contralor Electoral por virtud de este capítulo y de las secs. 621 et seq. de este título, conocidas como 'Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico**.[…] (Negrillas suplidas). Artículo 7.1 de la Ley Núm. 165-2020, 16 LPRA sec. 983.

En fin, es evidente que el propósito ulterior de las disposiciones aquí impugnadas es prevenir la corrupción y las ilegalidades en el sistema electoral y a su vez

promover las decisiones electorales informadas. Véase, Exposición de Motivos, Ley Núm. 222-2011. Así las cosas, se trata de un balance entre el interés en la fiscalización y la prevención de la corrupción mediante restricciones razonables y adecuadas, sin que estas representen una limitación a los derechos constitucionales de libertad de expresión y derecho al voto.

Precisamente, tanto la Constitución de los Estados Unidos de América como la Constitución de Puerto Rico consagran como garantía fundamental el derecho al voto. Rodríguez Ramos v. Comisión Estatal de Elecciones, 205 DPR 16, 54 (2021) (Op. de conformidad el Juez Asociado señor Estrella Martínez). Como muestra del arraigo de estos preceptos, la Constitución de Puerto Rico impuso una restricción a la intervención de este derecho al establecer que las leyes aprobadas por la Asamblea Legislativa siempre "garantizarán la expresión de la voluntad del [P]ueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. PR, LPRA, Tomo 1.

En ese sentido, la Constitución facultó a la Asamblea Legislativa a regular todo lo concerniente a nuestro ordenamiento electoral, teniendo en cuenta la ineludible dimensión constitucional de la cual goza el derecho al voto. Art. VI, Sec. 4, Const. PR, supra; Pierluisi et al. v. C.E.E. et al., supra, pág. 855 (citando a McClintock

v. Rivera Schatz, 171 DPR 584, 597 (2007)). En atención a

esto, el Código Electoral de 2020 reconoce a los Electores

ciertos derechos y prerrogativas individuales, a saber:

> (2) La supremacía de los derechos electorales individuales del ciudadano sobre los derechos y las prerrogativas de todos los Partidos, Candidatos Independientes y agrupaciones políticas;
> (3) La administración de los organismos electorales de Puerto Rico dentro de un marco de estricta imparcialidad, uniformidad, pureza, transparencia y justicia.
> […]
> (9) **El derecho del Elector a participar y votar hasta resolver de manera final y concluyente el estatus jurídico-político de Puerto Rico.** (Negrillas suplidas). Artículo 5.1 del Código Electoral de 2020, 16 LPRA sec 4561.

## VII

Ante este panorama, queda claro que mediante la Ley

Núm. 165-2020 no hubo una indebida delegación de poder al

Poder Ejecutivo, por lo que no se incurrió en una violación

al principio constitucional de separación de poderes. Esta

delegación tiene un fin e interés público bien delimitado,

fundamentado en cumplir la política pública reiterada por

la mayoría de los electores en las pasadas consultas de

estatus. Como señalamos, ese interés público es suficiente

para sostener la delegación. Además, la delegación de

poder que realizó la Asamblea Legislativa es

constitucionalmente válida al proveer unas guías adecuadas

que orientaron la utilización de ese poder.

**Ciertamente, el mecanismo de una consulta a través**

**de un plebiscito es uno de los pasos permitidos por el**

**ordenamiento jurídico de los Estados Unidos para que un**

**territorio reclame salir de las garras de la cláusula**

territorial y solicite al Congreso ser admitido como Estado. Por otra parte, los que se opongan a ello tendrán la opción de votar por otras fórmulas descolonizadoras. En su vertiente más participativa, esa determinación debe recaer en el voto directo del Pueblo para atender su estatus político.

En ese sentido, no podemos adscribirles a los pasados eventos electorales de estatus una especie de cosa juzgada que impida que el Pueblo nuevamente ejerza su libertad de expresión. Realmente, hasta que la descolonización de Puerto Rico no sea una realidad, el asunto de su estatus político será juzgado por el Pueblo de Puerto Rico, y el foro más democrático, pacífico y adecuado para ello son las urnas electorales. El reclamo repetitivo de un Pueblo no se considera cosa juzgada hasta que se vea el fruto de la justicia descolonizadora. Por ello, sostengo que, contrario a la posición de los demandantes-peticionarios, ni la Ley Núm. 165-2020 ni la OE-2024-016 inciden sobre sus derechos individuales, por lo que procede en Derecho declarar no ha lugar la demanda.

                                        Luis F. Estrella Martínez
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lcda. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MVC); Lcdo. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lcdo. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP)<br><br>    Demandados | MC-2024-0035 |

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente.

En San Juan, Puerto Rico, a 28 de agosto de 2024.

Todo puertorriqueño y toda puertorriqueña ostenta el derecho fundamental a la autodeterminación. No obstante, como garantes de los derechos fundamentales de las personas

ciudadanas e intérpretes últimos de nuestra Constitución, es nuestra responsabilidad auscultar si los mecanismos diseñados para la consecución de ese derecho cumplen con los lineamentos constitucionales que rigen nuestro ordenamiento.

Hoy, una mayoría de esta Curia soslaya los principios democráticos que sostienen nuestro sistema republicano en cuanto al poder para promulgar las leyes que realizó la Asamblea Legislativa a través de la Ley 165-2020, infra, al Primer Mandatario del país. En ese proceder, la Legislatura se amparó en el alegado interés público de hacer valer los resultados del plebiscito celebrado el pasado 3 de noviembre de 2020.

Un análisis desapasionado, sereno y objetivo del derecho aplicable nos forzaba a declarar el referido estatuto inconstitucional por infringir indebidamente el principio de separación de poderes y la doctrina de la delegación. Por tanto, debido a que el curso mayoritario avala las actuaciones patentemente inconstitucionales de las ramas de gobierno hermanas, disiento.

## I

Debido a que no existe controversia sobre los hechos medulares que dieron pie a la demanda de epígrafe y estos están reseñados satisfactoriamente en la Opinión mayoritaria, me refiero directamente al derecho aplicable.

### A. Separación de poderes

"El gobierno del Estado Libre Asociado de Puerto Rico

tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const. ELA [Const. PR] LPRA, Tomo 1.

En Puerto Rico, la separación de poderes está consagrada expresamente en el Artículo I, Sección 2 de nuestra Carta Magna. Su propósito yace en que las tres ramas de gobierno comprendan y respeten sus poderes, entiendan la interrelación de sus funciones, y así garanticen la independencia de cada una. Dalmau Santiago v. Oronoz Rodríguez, 208 DPR 115, 135 (2021). De esta manera, lo que se forma es un sistema de pesos y contrapesos que impide la acumulación excesiva e impropia en un solo ente y en detrimento de los demás. Íd.; Díaz Carrasquillo v. García Padilla, 191 DPR 97, 110 (2014); Colón Cortés v. Pesquera, 150 DPR 724, 752 (2000).

En la jurisdicción federal, aun cuando la doctrina de separación de poderes no está incorporada explícitamente en la Constitución de los Estados Unidos de América, esta se ha reconocido jurisprudencialmente por ser fundamental para el buen funcionamiento de un organismo democrático. Colón Cortés v. Pesquera, supra, pág. 750. Así, el Máximo Foro federal ha reiterado que esta "regla técnica de derecho" "protege la libertad del ciudadano frente a una peligrosa acumulación de poder en una rama de gobierno". Íd., págs. 751-752.

**B. Delegación de poderes**

"Está bien establecido en los sistemas federal y

puertorriqueño que el poder legislativo puede delegar funciones legislativas al ejecutivo, siempre que la legislación en que lo haga contenga parámetros que limiten el ejercicio de discreción del ejecutivo". J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis S. A., 2009, pág. 245. Véase, además: D. Fernández Quiñones, *Derecho administrativo y Ley de procedimiento administrativo uniforme*, 3ª ed., Bogotá, Forum, 2013, cap. 2, sec. 2.

En la esfera federal, la doctrina de la no-delegación supone una traba para que se deleguen aquellos poderes investidos exclusivamente en el Poder Legislativo según surgen del Artículo I, Sección 1 de la Constitución de la Unión Americana. Es decir, como norma general, queda prohibido que la Asamblea Legislativa le transfiera sus poderes a otras ramas del gobierno. Gundy v. United States, 139 S. Ct. 2116, 2123 (2019); Wayman v. Southard, 23 US 1, 42 (1825). No obstante, "en reconocimiento de las complicaciones que surgen de una sociedad moderna y la naturaleza técnica de muchos de estos problemas, el Congreso está autorizado a delegar poder al amparo de directrices amplias". J.M. Farinacci Fernós, *Divergencias entre la Doctrina Federal y Puertorriqueña en el Derecho Administrativo*, 92 REV. JUR. UPR 187, 201 (2023). Véanse también: Gundy v. United States, *supra*, pág. 2123; Mistretta v. United States, 488 US 361, 372 (1989).

En materia de la delegación legislativa, el Prof. Demetrio Fernández Quiñones nos indica que la tendencia prevaleciente en Estados Unidos es imprimirle validez a delegaciones amplias y vagas. D. Fernández Quiñones, *op. cit.*, pág. 44. En Yakus v. United States, 321 US 414 (1944), el Tribunal Supremo federal reiteró la validez de la delegación del poder legislativo, cuando esta fuese sustentada por "estándares 'suficientemente definidos y precisos para permitirle al Congreso, las cortes, y al público comprender' si la guía establecida por la Asamblea legislativa había sido acatada". (Traducción nuestra). Gundy v. United States, *supra*, pág. 2136.[1] Así pues, al examinar un estatuto bajo el crisol de la doctrina de la no-delegación, los tribunales no deben limitarse a si existe una norma inteligible, sino que deben analizar la totalidad del sistema de controles diseñados por la Asamblea Legislativa, tanto procesales como sustantivos, para el ejercicio de las facultades delegadas. D. Fernández Quiñones, *op. cit.*, pág. 44. Véase Kent v. Dulles, 375 US 116 (1958).[2]

---

[1] Véase además las decisiones emitidas por la Corte Suprema federal en Buttfield v. Stranaham, 192 US 470 (1904) y en J. W. Hampton Jr., & Co. V. United States, 276 US 394 (1928), donde se incorpora a la jurisprudencia el concepto del "principio inteligible". D. Fernández Quiñones, *Derecho administrativo y Ley de procedimiento administrativo uniforme*, 3ª ed., Bogotá, Forum, 2013, págs. 38-39.

[2] "[E]xiste un aclara postura en la jurisprudencia del Tribunal Supremo federal en torno a la cuestión de si el estatuto contiene o no una norma. La ausencia de esa norma que pueda precisarse de la faz del estatuto plantea de suyo graves y serios problemas de delegación. La acción administrativa, independientemente de lo razonable que pueda ser o no, de las medidas procesales que invoque para poner en vigor el estatuto, no tendrá el efecto de subsanar la falla cometida en el ámbito de la doctrina del poder de delegación". D. Fernández Quiñones, *op. cit.*, pág. 45. Véanse Panama Refining Company v. Ryan, 293 US 388 (1935); Yakus v. United States, 321 US 414 (1944); Cf. Zemel v. Rusk, 381 US 1 (1965).

Por otro lado, la doctrina que hemos desarrollado en el derecho puertorriqueño es consistente con su vertiente análoga federal. Desde la década de los cuarenta, este Tribunal reconoció la complejidad de ciertos asuntos que requerían una reglamentación particularizada y que se podría beneficiar del conocimiento especializado de las agencias administrativas. Luce & Co. v. J.S.M., 62 DPR 452, 466 (1944). En esa coyuntura, hemos reconocido la importancia de que la Asamblea Legislativa pudiera delegar en una agencia del Poder Ejecutivo, mediante reglas amplias y generales, la facultad de reglamentar.

Hemos reconocido, además, ciertos criterios a examinar para identificar si la Asamblea Legislativa ha delegado válidamente parte de sus poderes a la Rama Ejecutiva. Entre estos, que estemos ante un **poder delegable**; que la legislación que provee para la delegación contenga **suficientes principios inteligibles** para guiar el ejercicio del poder delegado; que el ente que recibe la delegación **actúe dentro de los linderos establecidos** en el estatuto y, que el ejercicio del poder delegado **no sea arbitrario o caprichoso**. J. M. Farinacci Fernós, *Las órdenes ejecutivas, el poder legislativo y las emergencias*, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR 190, 192 (2020).

Al igual que en Estados Unidos, en Puerto Rico,

> La creciente complejidad de la vida moderna y la multiplicación de los eventos y servicios que se fiscalizan [hacen] necesaria la delegación de poderes por la Asamblea Legislativa a un organismo especializado que pudiese encararlo en todos sus frentes. Esta delegación de autoridad bajo criterios amplios no se cuestiona hoy día. Gallardo v. Clavell, 131 DPR 275, 285 (1992).

Sin embargo, cabe destacar que la gran mayoría de la jurisprudencia sobre la materia se ha circunscrito a la delegación del poder "cuasilegislativo" **a una agencia administrativa**. Véanse: Asoc. Farmacias Com. V. Depto. de Salud, 156 DPR 105 (2002); Gallardo v. Clavell, *supra*; López Vives v. Policía de Puerto Rico, 118 DPR 219 (1987); Consejo de Educación Superior v. U.I.A., 120 DPR 241 (1987); M. & B.S., Inc v. Depto. de Agricultura, 118 DPR 319, 326 (1987); López Salas v. Junta de Planificación, 80 DPR 646 (1958); Hilton Hotels International Inc. v. Junta de Salario Mínimo, 74 DPR 670 (1953); Luce & Co. v. J.S.M., *supra*.

En lo pertinente a la controversia de autos, es a través de las órdenes ejecutivas que el Primer Funcionario del país puede ejercer los poderes que la Asamblea Legislativa le ha delegado debidamente.[3] J. M. Farinacci Fernós, *Las órdenes ejecutivas, el poder legislativo y las emergencias*, *supra* pág. 193. Así pues, al promulgar un mandato al palio de este mecanismo, la orden ejecutiva debe hacer referencia al estatuto que autoriza su ejercicio. Íd. Por tanto, **"una orden ejecutiva sólo tiene fuerza de ley cuando descansa en una autoridad conferida por la Constitución o las leyes"**. (Negrillas suplidas). Íd. (citando a W. Vázquez Irizarry, *Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 REV. JUR. UPR 951, 1029 (2007)).

---

[3] La orden ejecutiva es utilizada para ejercer los poderes inherentes al cargo, aquellos que emanan de la Constitución o de alguna ley en particular. W. Vázquez Irizarry, *Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 REV. JUR. UPR 951, 1052 (2007).

Nótese, sin embargo, que "la Asamblea Legislativa históricamente ha delegado debidamente en el Poder Ejecutivo poderes de naturaleza cuasilegislativa **para la atención de ciertas emergencias**, las cuales, dicho sea de paso, suelen ser atendidas mediante órdenes ejecutivas". Amadeo Ocasio v. Pierluisi Urrutia, 211 DPR 278, 329 (2023) (Sentencia) (Opinión de conformidad del Juez Asociado Estrella Martínez).

**C. El poder de determinar y aprobar el presupuesto**

El proceso para determinar el presupuesto público está enmarcado de manera general en el Artículo I en sus Secciones 4, 6, 7 y 8 de nuestra Constitución. Véase, Presidente de la Cámara v. Gobernador, 167 DPR 149, 177-178 (2006) (Opinión disidente de la Juez Asociada Rodríguez Rodríguez). El conjunto de estas disposiciones constituye "un plan mínimo para mantener la estabilidad económica del gobierno". Íd., pág. 178 (citando a 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2587 (1961) (Diario de Sesiones)). Lo anterior requiere el ejercicio conjunto, pero flexible, entre los Poderes Ejecutivo y Legislativo. Íd., pág. 179.

Según surge del informe preparado por la Comisión de la Rama Legislativa de la Asamblea Constituyente, el proceso presupuestario puede describirse de la forma siguiente:

> En primer lugar[,] el Gobernador debe presentar a la Asamblea Legislativa un mensaje sobre el estado del gobierno y además un informe detallado sobre los propuestos ingresos y desembolsos para el próximo año. Las asignaciones que haga la Asamblea Legislativa no podrán exceder el cálculo de los recursos totales, a menos que se impongan contribuciones suficientes para cubrir el exceso. Si a pesar de esta

precaución los recursos disponibles no son suficientes para cubrir las asignaciones se debe establecer un orden de prioridades comenzando con el pago de intereses y amortización de la deuda pública. Esta prioridad constitucional se adopta con el propósito de asegurar garantías para mantener el crédito público, tan necesario para el mejoramiento económico del pueblo. Finalmente, habrá una reasignación automática de fondos en el caso de que en un año determinado no se aprueben las asignaciones necesarias. Esta última disposición ha probado su eficacia en dos ocasiones durante las últimas décadas. Diario de Sesiones, *supra*, pág. 2587. Presidente de la Cámara v. Gobernador, supra, págs. 179-180.

Además de lo anterior, la Sección 20 del Artículo III de nuestra Constitución, *supra*, "faculta al Gobernador para que al aprobar cualquier proyecto de ley que asigne fondos en más de una partida, pueda rebajar o eliminar partidas y reducir al mismo tiempo los totales correspondientes". Presidente de la Cámara v. Gobernador, *supra*, págs. 180-181.

En lo concerniente a las transferencias de fondos públicos ya aprobados, es menester resaltar —por su carácter persuasivo— la Opinión del entonces Secretario de Justicia y actual Gobernador de Puerto Rico, a los efectos de ilustrar que **"no existe autoridad legal para que el Gobernador pueda disponer, mediante una orden ejecutiva, el traspaso de fondos entre partidas asignadas en los presupuestos de dos organismos gubernamentales distintos y separados, siendo necesario para ello la acción legislativa a tal fin"**. LXV Op. Sec. Just. Núm. 1 de 1994, pág. 2. Además, este explicó que como "las asignaciones que una ley concede a una agencia gubernamental tienen el carácter de fondos públicos, […] cualquier desembolso de [estos] que no haya sido autorizado expresa o implícitamente por dicha ley, constituye una violación al Artículo VI, Sección 9 de la Constitución de

Puerto Rico". (citas omitidas). Íd. Una ley solamente puede ser enmendada por otra ley posterior y no por una orden ejecutiva ni un convenio interagencial. (citas omitidas). Íd.

### D. Ley 165-2020

A tan solo tres días del cambio de gobierno, según dictaron los resultados de las Elecciones Generales de Puerto Rico en el 2020, se aprobó la *Ley para implementar la petición de estadidad del plebiscito de 2020*, Ley Núm. 165-2020, 16 LPRA secs. 977 *et seq.* (Ley 165-2020). Conforme surge de la Exposición de Motivos del referido estatuto, el interés público que busca adelantar es hacer valer el resultado del plebiscito del 3 de noviembre de 2020 sobre el estatus territorial de la Isla. Exposición de Motivos de la Ley Núm. 165-2020 (2020 [Parte 4] Leyes de Puerto Rico 3789). En conjunto con dicho interés, la Asamblea Legislativa señaló varios "propósitos principales" que propulsaron la promulgación de la ley en cuestión. Entre otros, se incluyó:

> 3. Autorizar al Gobernador a tomar las medidas que sean necesarias dentro del marco de un "fin público" para hacer valer la voluntad electoral mayoritaria del Plebiscito de 2020.
> .    .    .    .    .    .    .    .
> 6. Establecer las reglas para agilizar y garantizar que el pueblo de Puerto Rico pueda volver a votar, en caso de ser necesario, para hacer valer su voluntad electoral expresada en el Plebiscito de 2020, incluyendo cualquier votación que sea necesaria para responder a cualquier petición, propuesta, respuesta o ratificación electoral relacionad con el estatus político de Puerto Rico que sea planteada  o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos. Íd., pág. 3790.

Para la comisión de estos propósitos, la Legislatura delegó en la figura del primer ejecutivo del país el poder para:

[C]onvocar, mediante Orden Ejecutiva, *cuando así lo considere necesario*:
a. Una votación o proceso electoral para hacer valer la voluntad de la mayoría absoluta de los ciudadanos americanos de Puerto Rico en favor de la estadidad, según los resultados del Plebiscito de 3 de noviembre de 2020.
b. Esa facultad del Gobernador también podrá ser ejercida para convocar e instrumentar una votación cuando medie alguna petición, propuesta, respuesta o ratificación electoral relacionada con el estatus político de Puerto Rico que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos.
c. El gobernador podrá llevar a cabo una consulta electoral con una papeleta avalada por el Departamento de Justicia Federal conforme a la P.L. 113-76.
d. Una consulta para una ratificación de la voluntad del Pueblo de Puerto Rico.
e. Una votación para resolver el estatus político futuro de Puerto Rico. 16 LPRA sec. 978.

La Ley 165-2020 dispone que la cabeza del Poder Ejecutivo escogerá la(s) fecha(s) en el que se celebrará(n) el(los) evento(s) electoral(es). Asimismo, el Gobernador tendrá la discreción sobre cuáles serían aquellas "alternativas que se le presentarán a los electores en la papeleta de la votación y la pregunta, si alguna, que se les planteará a los electores en la misma papeleta".[4] 16 LPRA sec. 978a. No tan solo eso, sino que el Legislador le concedió el poder de determinar cuál sería el significado que tendrían cada una de estas alternativas. Íd.

Por otro lado, la precitada ley incide sobre las facultades y deberes que ostenta el Presidente de la Comisión Estatal de Elecciones (CEE). Esto, pues, luego de que el Gobernador emita una proclama a los efectos de poner en vigor los poderes investidos a través de la Ley 165-2020, el

---

[4] "Excepto cuando el Gobierno federal haya establecido la pregunta a los electores, si alguna, y/o las alternativas a imprimirse en la papeleta de votación, ambos asuntos serán establecidos por el Gobernador a través de Orden Ejecutiva y al publicar la proclama de la votación, según se dispone en esta Ley". *Ley para implementar la petición de estadidad del plebiscito de 2020*, Ley Núm. 165-2020, 16 LPRA sec. 980. (Ley 165-2020).

Presidente de la CEE tendrá la obligación de presentarle al Primer Ejecutivo una propuesta que debe incluir: el borrador de la papeleta a ser utilizada; el reglamento para la votación y el escrutinio general; el diseño general de la campaña de educación a través de los medios de comunicación, y **el plan presupuestario de los gastos de votación lo que incluye el costo de la campaña educativa**. 16 LPRA sec. 979.

En cuanto a las asignaciones económicas se refiere, la ley objeto de litigio, en su Artículo 1.7, señala que:

> No se podrá invocar disposición de ley general o especial, reglamento, orden ejecutiva o administrativa, y ningún plan para alterar o posponer las transferencias presupuestarias y las asignaciones económicas que sean necesarias para que el Gobernador, la Comisión Estatal de Elecciones y otros funcionarios puedan cumplir con las votaciones aquí autorizadas y con todos los propósitos de este capítulo, de las secs. 939 *et seq*. de este título, las secs. 1721 *et seq*. del Título 3, y las secs. 621 *et seq*. de este título, en lo relacionado con el derecho de los ciudadanos americanos de Puerto Rico a determinar su estatus político.
>
> **El Director Ejecutivo de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda y el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal tienen el deber ministerial de priorizar, identificar y hacer disponibles los recursos económicos necesarios para cumplir con todos los propósitos de las mencionadas leyes.** Los desembolsos de las transferencias presupuestarias y de las asignaciones económicas nunca excederán de los treinta (30) días naturales, contados a partir de la petición presentada a esos fines. (Negrillas suplidas). 16 LPRA sec. 977e.

En ese sentido, la Ley 165-2020 deja a la completa discreción de la Rama Ejecutiva el poder de establecer el presupuesto hábil y necesario para celebrar el evento electoral que proclama el Gobernador.

**E. Orden Ejecutiva 2024-016**

El 1 de julio de 2024, el Gobernador incumbente, Hon. Pedro Pierluisi Urrutia, proclamó el Boletín Administrativo Núm. OE-2024-016 de 1 de julio de 2024,

conocido como *Orden Ejecutiva del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi, para convocar la celebración de una consulta electoral a los fines de implementar la petición de estadidad del plebiscito de 2020,* *https://docs.pr.gov/files/Estado/OrdenesEjecutivas/2024/OE-2024-016.pdf* (última visita, 27 de agosto de 2024) (OE-2024-016). En virtud de los poderes conferidos por la Ley 165-2020, el Gobernador decretó la celebración de un plebiscito sobre el estatus territorial el día de las Elecciones Generales, el 5 de noviembre de 2024. Dispuso, además, que las alternativas de votación que se le ofrecerán a las y los electores serán: (1) la estadidad, (2) la independencia y, (3) la soberanía en libre asociación con los Estados Unidos; con sus respectivas definiciones. OE-2024-016, *supra*, sec. 2ª.[5]

A su vez, ordenó a la Presidenta alterna de la CEE a que, en un término de quince días, cumpliera con el mandato dispuesto en el Artículo 3.1 de la Ley 165-2020. OE-2024-016, supra, sec. 3ª. Esto incluye la preparación de un proyecto presupuestario de los gastos necesarios para el plebiscito, así como la campaña educativa a las y los electores. Asimismo, ordenó al Director Ejecutivo de la Oficina de Gerencia y Presupuesto (OGP), al Secretario del Departamento de Hacienda

---

[5] Estas, así como sus respectivas definiciones, tienen origen en el Proyecto Núm. 8393 de la Cámara de Representantes del Congreso de los Estados Unidos. Puerto Rico Status Act, H.R. 8393, 117th Cong. (2022), https://www.congress.gov/bill/117th-congress/house-bill/8393/text. Cabe resaltar que el referido proyecto fue presentado por el Rep. Raúl M. Grijalva del estado de Arizona y contó con el aval mayoritario en dicho cuerpo legislativo. Sin embargo, la medida no obtuvo la aprobación del Senado previo a que culminara la sesión legislativa.

(Hacienda) y al Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal (AFFAF) a identificar y hacer disponibles los fondos públicos necesarios para la ejecución de dicha orden. Agregó que:

> El presupuesto final será aprobado por el Gobernador, con el consejo de la OGP, la AFFAF y el Departamento de Hacienda y se convertirá para todos los efectos fiscales y legales en la petición presupuestaria que regirá las asignaciones económicas necesarias para cumplir con los propósitos de la Ley Núm. 165-2020 y esta Orden Ejecutiva. OE-2024-016, *supra*, sec. 5ª.

De igual forma, y según lo establecido en el Artículo 1.8 de la Ley 165-2020 el Gobernador reiteró que, según lo dispuesto expresamente en la Sección 402 de la Ley Pública 114-187, 2016, *Puerto Rico Oversight Management, and Economic Stability Act* (PROMESA), ninguna "asignación de fondos relacionados con este plebiscito requerirá ser consultado con, ni considerado por la [Junta de Supervisión y Administración Financiera] por ésta carecer de jurisdicción y facultad para ello". OE-2024-016, *supra*, sec. 5ª.

## II

Entre las distintas causas de acción que levanta la parte demandante, resaltan aquellas que emanan del principio cardinal que rige el sistema republicano de gobierno: **la separación de poderes.** Alegan que la Asamblea Legislativa, a través de la Ley 165-2020, claudicó impermisiblemente su autoridad de legislar y la delegó de forma inconstitucional al Primer Mandatario del país.[6] Asimismo, y dentro de ese ejercicio de poder presuntamente inválido, se le otorgó al

---

[6] Demanda, págs. 8-11.

Gobernador o a la Gobernadora la potestad de usurpar el poder de la Legislatura para aprobar el presupuesto anual del gobierno.[7] Las Comisionadas y el Comisionado del Partido Popular Democrático,[8] del Movimiento de Victoria Ciudadana[9] y del Proyecto Dignidad[10] —codemandados en el pleito— presentaron argumentos en apoyo a estas contenciones. Comienzo con el asunto atinente al presupuesto.

**A.**

La parte demandante ampara su reclamo en que la potestad que reside en el Gobernador para aprobar un presupuesto para celebrar el plebiscito, en virtud del Artículo 1.7 de la Ley 165-2020, *supra*, se desvía de los contornos delineados para la aprobación del presupuesto gubernamental. Es decir, según lo expuesto en la Sección 5ª de la OE-2024-016, se pretende modificar el presupuesto aprobado el 30 de junio de 2024 por la Asamblea Legislativa y firmado por el propio Gobernador.

La Opinión mayoritaria despachó superfluamente este planteamiento al expresar que tales transferencias presupuestarias y asignaciones económicas necesarias fueron autorizadas por la Ley Núm. 165-2020. A su vez, coligió que se utiliza un lenguaje similar en el Artículo 3.1(3) del Código Electoral de Puerto Rico, 16 LPRA sec. 4511(3). Por tanto, sostuvo que, debido a que nuestro ordenamiento permite la delegación al Poder Ejecutivo para "realizar ciertas transferencias dentro de un presupuesto aprobado" y que la

---

[7] Íd., pág. 11-13.
[8] Lcda. Karla Angleró González.
[9] Sa. Lillian Aponte Dones.
[10] Lcdo. Juan Manuel Frontera Suau.

OE-2024-016 expresamente circunscribe los fondos públicos necesarios al presupuesto certificado, estamos ante una delegación de poder, y un ejercicio de este, válido.

Sin embargo, según reseñado, el proceso previo a aprobar el presupuesto supone el ejercicio integrado de los poderes legislativos y ejecutivos. **Una vez aprobado, el Gobernador no puede realizar transferencias de fondos entre partidas asignadas en los organismos gubernamentales distintos, debido a que ello supone acción legislativa a esos efectos.** LXV Op. Sec. Just. Núm. 1 de 1994, pág. 2.

La ley objeto de litigio, en su Artículo 1.7, *supra*, le concede al Gobernador la potestad y la discreción irrestricta de establecer el presupuesto final para la celebración de un plebiscito. En específico, la Asamblea Legislativa estableció que:

> **No se podrá invocar disposición de ley general o especial, reglamento, orden ejecutiva o administrativa, y ningún plan para alterar o posponer las transferencias presupuestarias y las asignaciones económicas que sean necesarias para que el Gobernador, la Comisión Estatal de Elecciones y otros funcionarios puedan cumplir con las votaciones aquí autorizadas y con todos los propósitos de este capítulo,** de las secs. 939 *et seq.* de este título, las secs. 1721 *et seq.* del Título 3, y las secs. 621 *et seq.* de este título, en lo relacionado con el derecho de los ciudadanos americanos de Puerto Rico a determinar su estatus político.
>
> **El Director Ejecutivo de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda y el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal tienen el deber ministerial de priorizar, identificar y hacer disponibles los recursos económicos necesarios para cumplir con todos los propósitos de las mencionadas leyes.** Los desembolsos de las transferencias presupuestarias y de las asignaciones económicas nunca excederán de los treinta (30) días naturales, contados a partir de la petición presentada a esos fines. (Negrillas suplidas). 16 LPRA sec. 977e.

Como surge de la primera porción del precitado Artículo, al delegar estos poderes a la figura del Gobernador, **la**

**Asamblea Legislativa no estableció límites o linderos sobre dónde podría obtener el presupuesto necesario para cumplir con el interés público de la legislación.** A esos efectos, prohibió tajantemente utilizar disposiciones legales, reglamentarias y administrativas vigentes que puedan alterar o posponer la asignación de fondos públicos que, a discreción del Primer Mandatario, sean necesarios para la consecución de su objetivo.

Si bien esta Curia ha favorecido la delegación de poderes cuasilegislativos a la Rama Ejecutiva, nuestro análisis como intérpretes últimos y guardianes de la Constitución de Puerto Rico no se puede dar en el vacío. En el caso ante nos, es evidente que la norma necesaria o el principio inteligible para sostener la validez constitucional de dicha delegación no surge ni de la intención legislativa ni del texto expreso del estatuto. No estamos ante una delegación permisible del poder de la Asamblea Legislativa para realizar transferencias dentro de un presupuesto aprobado, pues aún dentro de la mirada más liberal de la doctrina de la delegación, esta falló en establecer los límites mínimos para facultar al Gobernador a realizar dichos actos.

El análisis realizado por la mayoría es uno flaco y descarnado. Para imprimirle validez constitucional a la delegación sin límites que realiza la Asamblea Legislativa, el cuerpo mayoritario de esta Curia se enfrasca en la "razonabilidad" del contenido de la OE-2024-016. **Este no es el único criterio aplicable.** "La acción administrativa,

independiente de lo razonable que pueda ser o no, de las medidas procesales que invoque para poner en vigor el estatuto, no tendrá el efecto de subsanar la falla cometida en el ámbito de la doctrina del poder de delegación". D. Fernández Quiñones, *op. cit.*, pág. 45. Por tanto, es erróneo el resultado al que llega la mayoría de mis compañeros y mi compañera al sostener la validez constitucional de la delegación para la transferencia de fondos públicos dentro del presupuesto aprobado.

**B.**

De otro lado, la parte demandante plantea que la Ley 165-2020 le confiere de manera íntegra la facultad de decidir sobre los siguientes asuntos: (1) la ocurrencia o no de la votación; (2) la fecha para su celebración; (3) si se presentará al electorado una pregunta para que responda de alguna forma no definida con su voto; (4) cuáles alternativas se les ofrecerán a dicho electorado, y (5) cuál será el significado de tales alternativas.[11] En ese sentido, resalta que el ejercicio de dicha discreción recaerá inevitablemente en el criterio político del Gobernador.

Por su parte, el criterio mayoritario avaló la delegación sobre estos asuntos, en tanto y en cuanto la Asamblea Legislativa estableció los principios inteligibles necesarios para la delegación de dicho poder de carácter legislativo. Particularmente, señala que la actuación del Primer Ejecutivo del país está limitado a la declaración de

---

[11] Demanda, pág. 10.

política pública (Artículo 1.3), y al poder de convocatoria (Artículo 2.1) y, sus facultades de propulsar la consecución de la estadidad (Artículo 8.3), según los resultados del plebiscito de 3 de noviembre de 2020. Véase, 16 LPRA secs. 977a, 978, 984b. Asimismo, sostuvo que la actuación del Gobernador mediante la OE-2024-016 estuvo dentro de los contornos delineados en la Ley 165-2024. Esto último, al hacer énfasis en que las alternativas que habrán de aparecer en la papeleta y el significado que estas tendrán se desprende del Proyecto de la Cámara Núm. 8393, *supra*.

Sin entrar a dirimir la validez jurídica de los últimos plebiscitos celebrados en Puerto Rico y al asumir la legitimidad del interés público expresado en la Ley 165-2020, es palpable que existen preocupaciones genuinas en cuanto al poder que posee el Gobernador en un asunto tan debatible en nuestro país como lo es el estatus territorial. Nuevamente, una mayoría de la y los miembros del Tribunal sopesan la validez de la delegación de poderes por parte de la Rama Legislativa, según la razonabilidad que surge de la actuación ejecutiva. Como mencioné, y reitero, nuestro análisis no puede ni debe limitarse al último.

En ese sentido, la ley no limita de forma efectiva la facultad que tiene el Gobernador para utilizar la convocatoria para celebrar un plebiscito y que, a través de este, se busque adelantar sus propios intereses políticos. Máxime cuando este representa a un partido político cuya base ideológica principal está basada, en gran medida, en el marco

del estatus territorial. Más allá, la Ley 165-2020 no provee salvaguardas y atenta contra los intereses de aquellas y aquellos puertorriqueños que ostentan distintos ideales políticos y territoriales, pues no tienen a su haber un ente que los represente a la hora de la toma de decisiones.

Dicho esto, es menester traer este análisis a la luz de la jurisprudencia aplicable. Como es norma reiterada, existe una corriente que favorece la delegación de la Asamblea Legislativa. Particularmente, porque en la sociedad en la que habitamos, la proliferación del sistema administrativo ha permitido la regulación minuciosa de asuntos específicos que, a su vez, se beneficia de la pericia con la que cuentan personas expertas en las distintas materias. Es decir, responde a una necesidad de naturaleza práctica, pues la Asamblea Legislativa posee limitaciones reales de recursos, especialidad y tiempo. Véase J.M. Farinacci Fernós, *Divergencias entre la Doctrina Federal y Puertorriqueña en el Derecho Administrativo*, supra, pág. 204.

No obstante, creo que este Tribunal pasó la oportunidad para atemperar estos pronunciamientos que se fundamentan en la necesidad de un derecho administrativo robusto, para entonces auscultar la aplicación de estos mismos principios ante una delegación directa a la figura del gobernador. ¿Qué sucede cuando no estamos ante una situación que requiera el *expertise* del Primer Ejecutivo? ¿Qué sucede cuando ante una delegación como la anteriormente descrita, no está presente una cuestión de emergencia? ¿Se justifica la delegación

entonces? O, por el contrario, ¿estaríamos ante una delegación inconstitucional?[12] A mi juicio, estas interrogantes merecen mayor discusión y una mirada integral del Derecho administrativo y los poderes conferidos al primer ejecutivo del país.

## IV

Por los fundamentos expuestos, disiento del curso de acción mayoritario.

Maite D. Oronoz Rodríguez
Jueza Presidenta

---

[12] Obsérvese que, la promulgación de reglas legislativas por las agencias administrativas está sujeta al cumplimiento de las disposiciones aplicables en la LPAU. A saber, notificación pública al inicio del proceso, la oportunidad de comentarios por parte de la comunidad, evaluación de estos por la agencia, la adopción final, la presentación del reglamento ante el Departamento de Estado y su promulgación. "[E]l cumplimiento estricto con este procedimiento tiene tres importantes consecuencias: 1) da efecto de ley a los reglamentos, 2) concede legitimidad al proceso de adopción de política pública, y 3) justifica la deferencia que eventualmente le darán los tribunales a las interpretaciones de ley que allí se dispongan". W. Vázquez Irizarry, *Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas*, *supra*, pág. 1052. Esto, ciertamente, no es lo que ocurre en el caso de la promulgación de una orden ejecutiva.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Juan Dalmau Ramírez, como Secretario General y en representación del Partido Independentista Puertorriqueño (PIP) y sus miembros individuales; Hon. María De Lourdes Santiago Negrón, Senadora y Portavoz del PIP en el Senado; Hon. Denis Márquez Lebrón, Representante y Portavoz del PIP, Cámara de Representantes; Roberto Iván Aponte Berríos, Comisionado Electoral del PIP<br><br>    Peticionarios<br><br>            v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Pedro Pierluisi Urrutia, Gobernador de Puerto Rico; Comisión Estatal de Elecciones (CEE); Hon. Jessika D. Padilla Rivera, Presidenta Interina de la CEE; Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (PNP); Lcda. Karla Angleró González, Comisionada Electoral del Partido Popular Democrático (PPD); Lillian Aponte Dones, Comisionada Electoral del Movimiento Victoria Ciudadana (MVC); Lcdo. Juan Manuel Frontera Suau, Comisionado Electoral del Proyecto Dignidad (PD); Hon. Nelson Pérez Méndez, Secretario del Departamento de Hacienda; Lcdo. Juan Carlos Blanco Urrutia, Director de la Oficina de Gerencia y Presupuesto (OGP)<br><br>    Demandados | MC-2024-0035 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 28 de agosto de 2024.

Por encontrarnos ante unas actuaciones de los Poderes Legislativo y Ejecutivo sustantiva y procesalmente disparatadas, las cuales entran en conflicto con los más elementales principios del derecho constitucional estadounidense y puertorriqueño, enérgicamente disentimos del curso de acción seguido por una mayoría de mis compañeros y compañera de estrado en el presente caso. Estos últimos, en un acto de interpretación judicial totalmente acomodaticio, una vez más le dan la espalda al Pueblo de Puerto Rico y, al así hacerlo, permiten el uso ilegal e indiscriminado de fondos públicos para fines estrictamente político-partidistas. En esta ocasión, para la celebración de una nueva consulta plebiscitaria en el País, -- que tendrá lugar el próximo 5 de noviembre de 2024 --, la cual fue exclusivamente diseñada, mediante una Orden Ejecutiva, por el gobernante de turno, sin la participación de las distintas fuerzas políticas que aquí cohabitan; y cuya puesta en vigor en nada resolverá el déficit de democracia que afecta a nuestra isla, pues la misma no goza del aval del Congreso de los Estados Unidos de América, parte indispensable al tratar este tipo de asunto. **Ello, -- el que este Tribunal dé paso a lo que a todas luces parece ser una encuesta de simpatías financiada con fondos del erario público --, como mínimo, "hiere la retina".** Veamos.

I.

El origen de esta controversia pudiera trazarse allá para el mes de diciembre de 2020, en las postrimerías de uno de los cuatrienios más convulsos y complejos en la historia

reciente de Puerto Rico. Específicamente, el 30 de diciembre de 2020 la Asamblea Legislativa, entonces dominada por el Partido Nuevo Progresista (en adelante, "PNP"), aprobó la Ley Núm. 165-2020, *infra*, mejor conocida como la *Ley para implementar la petición de estadidad del plebiscito de 2020* (en adelante, "Ley Núm. 165-2020"). La referida pieza legislativa fue aprobada con el velado propósito de convocar la celebración de un nuevo evento plebiscitario en la Isla que facilitara una supuesta transición hacia la estadidad.

Entre otras cosas, la Ley Núm. 165-2020, *infra*, concedió al Gobernador de Puerto Rico amplias facultades para decidir cuándo y cómo se realizaría la votación o proceso electoral al que hemos hecho referencia. Entre estas facultades, **la Asamblea Legislativa cedió al Poder Ejecutivo la potestad para decidir y confeccionar: si se realizaría o no la consulta aludida, la fecha y horario de la mencionada votación, las alternativas de estatus que se presentarían a los electores, y el significado de estas alternativas.**

Para poder iniciar el referido proceso plebiscitario se dispuso en la ley que, noventa (90) días antes de la fecha designada para su celebración, el Gobernador de Puerto Rico tendría que emitir una proclama mediante la cual anunciara al País su intención de convocar la consulta plebiscitaria en cuestión con todos los detalles y elementos necesarios para su realización. De igual manera, la referida pieza legislativa facultó al Primer Ejecutivo para adelantar los

propósitos de la Ley Núm. 165-2020, *infra*, mediante el uso de órdenes ejecutivas.

Así las cosas, el pasado 1 de julio de 2024 el Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi Urrutia (en adelante, "gobernador", "Gobernador Pierluisi Urrutia" o "Primer Ejecutivo"), emitió la Orden Ejecutiva OE-2024-016, titulada "Orden Ejecutiva del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi, para convocar la celebración de una consulta electoral a los fines de implementar la petición de estadidad del plebiscito de 2020". En ésta, haciendo uso de las cuestionadas facultades que le cedió la Asamblea Legislativa mediante la Ley Núm. 165-2020, *infra*, el Primer Ejecutivo proclamó y reguló la celebración de una consulta plebiscitaria el día 5 de noviembre de 2024, misma fecha en que se celebrarán los comicios generales en el País.

Como si fuera poco, en virtud de los poderes ya aludidos, el Gobernador Pierluisi Urrutia determinó, unilateralmente, que en la consabida consulta plebiscitaria los votantes puertorriqueños tendrían la opción de escoger, únicamente, entre tres (3) opciones de estatus político, a saber: (a) Estadidad; (b) Independencia; o (c) Soberanía en Libre Asociación con los Estados Unidos. Adicionalmente, el Primer Ejecutivo, mediante la misma Orden Ejecutiva, adoptó, nuevamente de forma unilateral, las definiciones y explicaciones de cada una de las opciones de estatus político.

Asimismo, en la referida Orden Ejecutiva, y conforme a lo estatuido en la Ley Núm. 165-2020, *infra*, el Gobernador

Pierluisi Urrutia reguló, entre otras cosas, todo lo relacionado a: (1) la certificación de los resultados del plebiscito, (2) la manera en que se contarían los votos, (3) la forma en que se podrían realizar actividades proselitistas a favor de una alternativa de estatus, y (4) el modo mediante el cual se presupuestaría la consulta. **Sobre esto último, el Primer Ejecutivo ordenó al Director Ejecutivo de la Oficina de Gerencia y Presupuesto, al Secretario de Hacienda y al Director de la Autoridad de Asesoría Financiera y Agencia Fiscal, para que priorizasen, identificasen e hicieran disponibles los fondos públicos necesarios para cumplir con la aludida orden ejecutiva.**

Enterados de lo anterior, el 11 de julio de 2024 el Partido Independentista Puertorriqueño (en adelante, "PIP" o "los peticionarios"), representado por su Secretario General, el Lcdo. Juan Dalmau Ramírez y otros miembros de dicha colectividad,[1] presentaron ante este Tribunal una *Demanda* en jurisdicción original en contra del Estado Libre Asociado de Puerto Rico, su Gobernador y varios funcionarios de la Comisión Estatal de Elecciones (en adelante, "CEE"), entre otros. En la misma, éstos solicitaron la concesión de una sentencia declaratoria e interdicto permanente mediante los cuales se declarase la inconstitucionalidad de la Ley Núm. 165-2020, *infra*, por diversos fundamentos, y, a su vez, se

---

[1] Específicamente, comparecieron como co-peticionarios la senadora Hon. María de Lourdes Santiago Negrón, el representante Hon. Denis Márquez Lebrón y el Comisionado Electoral del Partido Independentista Puertorriqueño (PIP), Lcdo. Roberto Iván Aponte Berríos.

impidiese la celebración de la consulta plebiscitaria aquí en controversia.

A grandes rasgos, en su recurso legal el PIP sostiene que, -- en lo sustantivo --, la pieza legislativa objeto de estudio en el presente caso, es inconstitucional por violentar: (1) el principio de separación de poderes; (2) los derechos constitucionales a la libertad de expresión, la igual protección de las leyes y al voto, y (3) el requisito constitucional de que el título de toda ley debe reflejar el contenido de ésta. De igual manera, -- y en lo relacionado al aspecto procesal --, los peticionarios arguyen que el llamado a la celebración de una consulta plebiscitaria el próximo 5 de noviembre de 2024 mediante el mecanismo de la Orden Ejecutiva, -- en este caso la OE-2024-016 --, constituye una usurpación de determinadas facultades legislativas del Poder Legislativo y violenta, además, la facultad reglamentaria que, por ley, le ha sido delegada a la CEE.

Acogido por este Tribunal el antedicho recurso, emitimos una *Resolución* en la cual le concedimos, a todas las partes con interés en este litigio, un breve término para que expresaran su posición respecto a lo aquí peticionado por el PIP. Dicha *Resolución* fue oportunamente notificada a éstas últimas.

Así las cosas, y luego de que el PIP presentara su alegato, el 15 de agosto de 2024 compareció ante nos el Comisionado Electoral del PNP, Lcdo. Aníbal Vega Borges (en adelante, "Comisionado Vega Borges"), mediante dos escritos.

En el primero de éstos, titulado *Moción de desestimación por falta de jurisdicción, del demandado Comisionado Electoral del PNP, Lcdo. Aníbal Vega Borges*, el referido Comisionado nos solicita que desestimemos el recurso presentado por el PIP, ya que, según alega, las controversias ahí planteadas no son justiciables por los peticionarios carecer de legitimación activa y por tratarse de un asunto que constituye una cuestión política.[2] A dicha moción, los peticionarios se opusieron mediante un escrito presentado el 26 de agosto de 2024.

En su segundo escrito, titulado *Alegato en oposición, del demandado Comisionado Electoral del PNP, Lcdo. Aníbal Vega Borges*, el referido Comisionado sostiene, a grandes rasgos, que los planteamientos de los peticionarios son inmeritorios y que tanto la Ley Núm. 165-2020, *infra*, como la Orden Ejecutiva OE-2024-016 son, respectivamente, actuaciones legislativas y ejecutivas, totalmente válidas. Por tanto, nos solicita que reconozcamos la constitucionalidad de la ley y orden ejecutiva aquí impugnadas y que deneguemos la sentencia declaratoria solicitada. Similar posición adoptó el Estado, representado por su Gobernador, la CEE, y otros funcionarios del Poder Ejecutivo.

---

[2] Sobre el particular, basta con señalar que los planteamientos de justiciabilidad esgrimidos por la parte demandada son improcedentes en derecho. Por tanto, concluimos que la controversia traída ante nuestra consideración por los peticionarios es justiciable. Al respecto, véanse *Ramos, Méndez v. García García*, 203 DPR 379 (2019) (Colón Pérez, Opinión Disidente); *Sierra Club et al. v. Jta. Planificación*, 203 DPR 596, 612-614 (2019) (Colón Pérez, Opinión de Conformidad); *Bhatia Gautier v. Gobernador* 199 DPR, 59, 68-73 (2017); *Aponte Rosario et al. v. Pres. CEE II*, *infra* (Colón Pérez, Opinión Disidente); *Córdova y otros v. Cámara de Representantes*, *infra*; *Noriega v. Hernández Colón*, 135 DPR 406 (1994).

Por otro lado, el 16 de agosto de 2024 comparecieron ante nos, mediante sus correspondientes alegatos, las demás partes con interés en la presente causa, entiéndase los Comisionados Electorales del Partido Popular Democrático, del Movimiento Victoria Ciudadana y del Proyecto Dignidad. Estos, en apretada síntesis, nos solicitan que declaremos con lugar la demanda presentada por los peticionarios por, entre otros fundamentos, existir una flagrante violación a la doctrina de separación de poderes en la Ley Núm. 165-2020, *infra*, y la acción ejecutiva aquí impugnadas.

Así pues, atendida la controversia presentada ante nos, una mayoría de mis compañeros y compañera de estrado, como ya mencionamos, valida una actuación del Poder Ejecutivo totalmente antidemocrática y procesalmente disparatada, la cual choca frontalmente con la doctrina de separación de poderes, y cuya puesta en vigor en nada resuelve el déficit de democracia que afecta a nuestro País, y mucho menos vincula al Congreso de los Estados Unidos de América, parte indispensable en el asunto que hoy nos ocupa. A tan leniente trato, -- a lo que consideramos un proceder totalmente contrario a los más nobles postulados que engalanan nuestra Carta Magna --, no podemos imprimirle nuestra aprobación. Es por ello que, como ya mencionamos, enérgicamente disentimos del curso de acción seguido por la mayoría de esta Curia. Explicamos por qué.

II.

A.

Como es sabido, allá para el 25 de julio de 1952, en nuestra jurisdicción, entró en vigor la Constitución del Estado Libre Asociado de Puerto Rico, uno de los documentos más importantes en nuestra vida como colectivo. Desde entonces, y dada la manifiesta voluntad del Pueblo que así la adoptó en las urnas, ha imperado en nuestro País un sistema republicano de gobierno divido en tres grandes poderes: el Ejecutivo, el Legislativo y el Judicial. Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1.

Es, precisamente, de esta organización estructural de nuestro gobierno de donde surge lo que los juristas conocemos como la doctrina constitucional de separación de poderes; figura jurídica que, desde hace casi un siglo, ha gobernado el funcionamiento de nuestro aparato gubernamental. Véase, *Córdova y otros v. Cámara de Representantes*, 171 DPR 789, 799-800 (2007); *Hernández Agosto v. Romero Barceló*, 112 DPR 407, 427 (1982). Mediante la aludida doctrina de estirpe constitucional, se persigue evitar la concentración indebida de poder en una misma rama de gobierno a través de la distribución de poderes y facultades complementarias entre las otras ramas, *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 88 (1998); *Noriega v. Hernández Colón*, 135 DPR 406, 458-459 (1994); *Silva v. Hernández Agosto*, 118 DPR 45, 57 (1986), procurando, a su vez, el cerrarle las puertas a la tiranía que pudiera engendrar la concentración de poderes en una sola

de las ramas de gobierno, a expensas de las demás. *Clases A, B y C v. PRTC*, 183 DPR 666, 681 (2011); *Colón Cortés v. Pesquera*, 150 DPR 724, 750 (2000); *Nogueras v. Hernández Colón I*, 127 DPR 405, 426 (1990).

Así pues, nuestro sistema de gobierno está fundado en el reconocimiento de la interrelación o interdependencia entre las funciones de cada poder. *Córdova y otros v. Cámara de Representantes*, *supra*, pág. 800; *Sánchez et al. v. Secretario de Justicia*, 157 DPR 360, 386 (2002); *Silva v. Hernández Agosto*, *supra*, pág. 57. Para lograr lo anterior, las y los miembros de nuestra Convención Constituyente concibieron un complejo sistema de pesos y contrapesos que evita que las actuaciones de un poder de gobierno causen detrimento o vulneren las prerrogativas constitucionalmente asignadas a otro de los poderes. *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 135 (2021); *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 110 (2014); *Noriega v. Hernández Colón*, *supra*, pág. 459. Véase, también, A. Acevedo Vilá, *Separación de Poderes: entre la teoría y práctica*, 2ª ed., San Juan, Ediciones SITUM, 2023, págs. 35-36.

**Esta interacción que nuestra Carta Magna establece entre las distintas ramas de gobierno promueve que, dentro del aparato gubernamental, se "gene[re] un equilibrio dinámico entre poderes coordinados y de igual rango, [para] evitar así que ninguno de éstos amplíe su autoridad a expensas de otro".** *Misión Ind. P.R. v. J.P.*, *supra*, pág. 89. Lo anterior, claro está, no supone una enajenación total entre los tres poderes

de gobierno, sino que instaura en nuestra estructura de gobierno un sistema de colaboración y de supervisión tripartita entre los mismos.

Dicho ello, conviene recordar aquí que, en el ejercicio de delimitar el alcance de la doctrina de separación de poderes, este Tribunal ha sido enfático en que no permitirá "que [los poderes políticos] del Gobierno se conviertan en árbitros de sus propios actos". *Silva v. Hernández* Agosto, *supra*, pág. 55. Conforme a ello, cuando surjan conflictos o choques constitucionales entre las referidas ramas de gobierno, le corresponderá al Poder Judicial resolver las controversias habidas entre estas. *Acevedo Vilá v. Meléndez*, 164 DPR 875, 883 (2005); *Silva v. Hernández Agosto*, *supra*, pág. 55. Esto, en virtud de su función y facultad de ser el último intérprete de la ley y de la constitución. *Acevedo Vilá v. Meléndez*, *supra*, pág. 883; *Noriega Rodríguez v. Jarabo*, 136 DPR 497, 516 (1994); *Peña Clos v. Cartagena Ortiz*, 114 DPR 576, 591 (1983).

B.

Establecido lo anterior, precisa señalar también que, en virtud de la doctrina de separación de poderes antes aludida, en nuestra jurisdicción se instauró un Poder Ejecutivo facultado para, entre otras determinadas cosas, cumplir y hacer cumplir las leyes y ejercer cualquier otra facultad o atribución que se le señale por la Constitución o por ley. Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1. Véase, además, *Santana v. Gobernadora*, 165 DPR 28, 48 (2005); *Noriega v.*

*Hernández Colón*, *supra*, pág. 458. El Poder Ejecutivo, por mandato constitucional, lo ejerce el Gobernador quien es elegido por el voto directo en cada elección general. Art. IV, Sec. 1, Const. ELA, LPRA, Tomo 1.

Así las cosas, y en aras de que el Gobernador de Puerto Rico pueda ejercer adecuadamente sus funciones, en el pasado hemos sentenciado que ello requiere, como mínimo, que "el Primer Ejecutivo tenga la autoridad legal para impartir instrucciones u órdenes de carácter obligatorio a los funcionarios de la Rama Ejecutiva […] para que se tomen las medidas que, a su juicio, adelanten la política pública del Gobierno". *Santana v. Gobernadora*, *supra*, pág. 47. Para ello, el Gobernador puede valerse de diversos documentos como lo son las proclamas, los memorandos y las **órdenes ejecutivas**. *Amadeo Ocasio et al. v. Gobernador et al.*, 211 DPR 278, 361 (2023) (Colón Pérez, Opinión de conformidad) (citando a J.M. Gaffney, *Executive Order An Introduction*, U.S. Congressional Research Service, (R46738, March, 29, 2021), pág. 1).

Sobre estas últimas, -- entiéndase, las órdenes ejecutivas --, hemos reconocido que las mismas constituyen una actuación consustancial a las facultades del Gobernador como autoridad máxima del Poder Ejecutivo que lidera, las cuales, de ordinario, tienen el propósito de hacer valer sus designios como administrador de dicho poder de gobierno. W. Vázquez Irizarry, *Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 Rev. Jur. UPR 951, 988 (2007). Véase, además, *Amadeo Ocasio et al. v. Gobernador et*

*al.*, *supra*, pág. 361 (Colón Pérez, Opinión de conformidad); *Hernández, Romero v. Pol. de P.R.*, 177 DPR 121, 138 (2009). Por lo tanto, y como regla general, las órdenes ejecutivas carecen de fuerza de ley ya que se limitan a regular determinados asuntos atinentes exclusivamente al Poder Ejecutivo como ente administrativo. W. Vázquez Irizarry, *supra*, pág. 1029. Véase, además, *Guzmán v. Calderón*, 164 DPR 220, 266 (2005) (Rivera Pérez, Opinión de conformidad).

Empero, existen circunstancias en las que las órdenes ejecutivas emitidas por el Gobernador de Puerto Rico sí podrían tener fuerza de ley. Para que esto sea posible, la directriz emitida por el Primer Ejecutivo debe descansar en la autoridad conferida a éste ya sea por medio de la Constitución o por alguna ley mediante la cual la Asamblea Legislativa le haya delegado el poder para ello. *Amadeo Ocasio et al. v. Gobernador et al.*, *supra*, pág. 362. Véase, además, W. Vázquez Irizarry, *supra*, pág. 1029.

En ese sentido, y según ya hemos visto, si bien las órdenes ejecutivas pueden servir al Gobernador de Puerto Rico para ejercer sus prerrogativas como Primer Ejecutivo y jefe de la Rama Ejecutiva, también pueden servirle para ejercer aquellas facultades que le sean delegadas por la Asamblea Legislativa. J.M. Farinacci Fernós, *Las órdenes ejecutivas y las emergencias*, 3 (Núm. 2) AMICUS, Rev. Leg. & Pol. Púb. UIPR 190, 192-193 (2020). Cuando esto último sucede, es preciso que el Gobernador haga referencia expresa al estatuto

que autoriza dicho ejercicio. J.M. Farinacci Fernós, *supra*, pág. 193; W. Vázquez Irizarry, *supra*, pág. 1024.

Sin embargo, lo anterior no es suficiente. **Sobre el particular, y como bien señala el profesor Jorge M. Farinacci Fernós, "el o la Gobernador(a)** *solamente* **puede utilizar una orden ejecutiva para adoptar medidas de naturaleza legislativa si la Asamblea Legislativa en efecto así se lo ha delegado, mediante un estatuto que cumpla con las exigencias constitucionales correspondientes".** (Énfasis suplido). J.M. Farinacci Fernós, *supra*, pág. 193. Por lo tanto, es necesario que la delegación de poderes o facultades hechas por el Poder Legislativo sea una igualmente válida.

**En esa dirección, y para que así sea, la aludida delegación debe cumplir con ciertas exigencias entre las cuales, en lo pertinente, podemos mencionar las siguientes:**

(1) que se trate de un poder delegable

(2) que, en efecto, se haya llevado a cabo la delegación

**(3) que se acompañen suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado**

(4) que la entidad a la que se le otorga el poder actúe dentro de los límites establecidos por la ley; y

(5) **que el ejercicio de dicho poder no sea arbitrario o caprichoso.** (Énfasis suplido). J.M. Farinacci Fernós, *supra*, págs. 192 y 195. Véase, además, *Domínguez Castro v. ELA*, 178 DPR 1, 92-93 (2010).

**Por lo tanto, aun cuando el Primer Ejecutivo tenga la facultad para emitir órdenes ejecutivas bajo el supuesto de un poder delegado por la Asamblea Legislativa, su actuación**

**pudiera ser contraria a derecho si la delegación del referido poder no cuenta con "suficientes principios inteligibles para guiar el ejercicio de [los] poderes cuasi-legislativos" delegados**. (Énfasis suplido). J.M. Farinacci Fernós, *supra*, pág. 195. Véase, además, J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales*, Bogotá, Ed. Temis, 2009, pág. 245. **Ello fue, precisamente, lo que sucedió aquí.**

Al respecto, en el normativo caso de *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579 (1952), el Tribunal Supremo de los Estados Unidos de América, confrontado con una controversia de esta índole, invalidó una orden ejecutiva emitida por el Presidente de ese país debido a que, entre otras razones, ésta no pretendía ejecutar un mandato legislativo de la forma que lo había prescrito el Congreso, -- como cuestión de hecho, no había actuación legislativa alguna que delegara al Primer Ejecutivo el poder que pretendió accionar --, sino que buscaba ejecutar una política ejecutiva de aplicación general creada y delineada por él mismo. *Íd.*, pág. 588. ("*The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President*").

En ese mismo caso, -- y de particular importancia para un cabal entendimiento de la controversia ante nuestra consideración --, el Juez Jackson emitió una reconocida Opinión Concurrente en la que propuso un esquema de análisis

para evaluar la constitucionalidad de las órdenes ejecutivas emitidas por el Presidente de los Estados Unidos de América cuando el Primer Ejecutivo actúa en tres distintos escenarios, a saber: (1) por virtud de una autorización legislativa expresa o implícita; (2) en ausencia de autorización o prohibición estatutaria y alude a sus poderes constitucionales independientes; o (3) de forma contraria a la voluntad legislativa expresa o implícita. *Amadeo Ocasio et al. v. Gobernador et al.*, *supra*, pág. 377 (Colón Pérez, Opinión de conformidad) (citando a *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, págs. 635-638). Es al primero de esos escenarios al que en este escrito le prestaremos particular atención.

Sobre el primer escenario, -- a saber, cuando el gobernante actúa en virtud de una autorización legislativa expresa o implícita, como alegadamente sucedió en la causa de epígrafe --, el Juez Jackson concluyó que la autoridad del Primer Ejecutivo "está en su máxima expresión pues [ésta] incluye atribuciones que posee por sí mismo, así como las delegadas por el Congreso. En [ese] escenario las cortes deben presumir que el poder existe y el peso de la prueba lo tiene quien impugna". W. Vázquez Irizarry, *supra*, pág. 967; véase, además, *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, págs. 635-646 (Juez Jackson, Opinión concurrente).

Ahora bien, aun cuando haya tal delegación expresa por parte de la Asamblea Legislativa, es de notar que existen escenarios en donde es posible cuestionar si la acción del

Primer Ejecutivo está o no dentro del alcance del poder que se le ha conferido por ley y si dicha actuación viola o no lo dispuesto en la Constitución de los Estados Unidos de América o en la de Puerto Rico. *Amadeo Ocasio et al. v. Gobernador et al.*, *supra*, págs. 381-381 (Colón Pérez, Opinión de conformidad); véase, además, J.M. Gaffney, *supra*, pág. 12.[3] **Y es que, después de todo, "el Primer Ejecutivo no puede incurrir en una acción inconstitucional a[u]n cuando el Poder Legislativo haya autorizado tal acción".** (Énfasis suplido). *Amadeo Ocasio et al. v. Gobernador et al.*, *supra*, pág. 384, esc. 15. (Colón Pérez, Opinión de conformidad). Véase, además, *Clinton v. New York*, 524 US 417, 436 (198).

En esos casos, y como hemos sentenciado previamente, el análisis que vienen llamados a seguir los tribunales debe tener presente: "[(1)]el texto del estatuto o legislación que le delegó el poder al Presidente de los Estados Unidos [o al Gobernador]; [(2)] **el alcance del poder delegado por el Congreso [o la Asamblea Legislativa] en dicho estatuto;** [(3)] **el poder que tradicionalmente ostenta el Presidente de los Estados Unidos [o el Gobernador] en el tema particular bajo estudio;** y [(4)] la acción o inacción del Congreso [o la Asamblea Legislativa], tras un patrón prologado de la acción del Primer Ejecutivo ejercitada al amparo de determinado estatuto". (Énfasis nuestro). *Amadeo Ocasio et al. v. Gobernador et al.*, *supra*, pág. 381 (Colón Pérez, Opinión de conformidad). Véase, además, J.M. Gaffney, *supra*, pág. 12.

---

[3] https://crsreports.congress.gov/product/pdf/R/R46738/4

Solo habiendo realizado dicho análisis estaríamos en posición de evaluar la corrección, o no, de las actuaciones del Presidente de los Estados Unidos o, como en este caso, las del Gobernador de Puerto Rico.

Examinado ya lo relacionado a la facultad del Primer Ejecutivo para dictar órdenes ejecutivas, así como los criterios a analizarse a la hora de sopesar su legalidad, pasemos ahora a estudiar aquello relacionado a las facultades del Poder Legislativo que aquí nos compete.

III.

A.

En lo que a las referidas facultades se refiere, la Constitución del Estado Libre Asociado de Puerto Rico dicta que el Poder Legislativo recaerá en una Asamblea Legislativa que se compondrá de dos cámaras: el Senado y la Cámara de Representantes. Art. III, Sec. 1, Const. ELA, LPRA, Tomo 1. Asimismo, nuestra Carta Magna concede a la Asamblea Legislativa amplios poderes para aprobar leyes en protección de la vida, la salud y el bienestar del Pueblo, Art. II, Sec. 19, Const. ELA, *supra*. Véase, además, *Misión Ind. P.R. v. J.P.*, *supra*, págs. 84-85,[4]. **Entre estos poderes, y en lo aquí pertinente, se encuentra el poder exclusivo de "regular todo lo concerniente al proceso electoral y de inscripción de**

---

[4] Tal facultad es la que, habitualmente, se conoce como el "poder de razón de estado". Dicho poder, ha sido definido por esta Curia como "[a]quel poder *inherente al Estado que es utilizado por la Legislatura* para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud *y bienestar general de la comunidad*, el cual puede delegarse a los municipios". *Domínguez Castro v. ELA*, 178 DPR 1, 36 (2010).

**electores, así como lo relativo a los partidos políticos y candidaturas".** (Énfasis suplido). (Citas omitidas). *Rivera Segarra et al. v. Rivera Lassen et al.*, 2024 TSPR 60. (Colón Pérez, Opinión disidente). Véase, *P.R.P. v. E.L.A.*, 115 DPR 631, 636 (1984). Véase, además, Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1.

**Esta encomienda legislativa, -- la de regular mediante legislación todo lo concerniente a los procesos electorales que acontecen en la Isla --, constituye una delegación constitucional específica.** De este modo, y en virtud del principio de separación de poderes, se "dispuso el ámbito de acción" de la Asamblea Legislativa en lo que respecta al proceso electoral puertorriqueño. *Córdova y otros v. Cámara de Representantes*, *supra*, pág. 799.[5]

B.

Por otro lado, -- y en otro renglón que impacta la correcta disposición de los asuntos que nos ocupan, por éstos conllevar la erogación de fondos públicos --, es menester señalar que la Constitución del Estado Libre Asociado de Puerto Rico también dispone de la manera en que se atenderá la confección y aprobación del presupuesto del Gobierno de

---

[5] Por tanto, es norma conocida que, de ordinario, y velando por el fiel cumplimiento del aludido principio constitucional, la Rama Judicial no intervendrá en asuntos que claramente son de la competencia de otras ramas de Gobierno. *Córdova y otros v. Cámara de Representantes*, 171 DPR 789, 801 (2007). Sin embargo, es igualmente sabido que "la Rama Judicial tiene el poder de determinar si las otras ramas del Gobierno observaron las limitaciones constitucionales y si los actos de una de éstas exceden sus poderes delegados". *Íd.* Lo anterior, y en lo aquí pertinente, debido a que, si bien la Asamblea Legislativa posee amplia facultad para regular todo lo relacionado al proceso electoral, dicho poder "no es carta blanca ni absoluta", pues está limitado por lo que permite la constitución. *P.R.P. v. E.L.A.*, 115 DPR 631, 636-637 (1984).

Puerto Rico. Art. III, Sec. 20; Art. IV, Sec. 4; y Art. VI Secs. 6-8, Const. ELA, LPRA, Tomo 1. Sobre el particular, se ha reconocido que nuestra constitución provee un procedimiento de elaboración presupuestaria que contempla una estrecha interrelación, aunque flexible, entre el Poder Ejecutivo y el Legislativo. *Presidente de la Cámara v. Gobernador*, 167 DPR 149, 179 (2006) (Rodríguez Rodríguez, Opinión disidente). Véase, además, A.L. Guzmán Santiago, *Aspectos legales del proceso presupuestario del Gobierno del Estado Libre Asociado de Puerto Rico*, 35 (Núm. 2) Rev. Jur. UPR, 291, 308 (1966).[6]

Es decir, si bien el Poder Ejecutivo goza de ciertas facultades que le confiere la Constitución en el proceso de adopción de un presupuesto, lo cierto es que el presupuesto, una vez aprobado por la Asamblea Legislativa y el Gobernador, constituye una Ley que solo puede ser enmendada mediante ulterior legislación a esos efectos. Véase, a modo ilustrativo, Op. Sec. Just., Núm. 1 de 1994 (suscrita por el entonces Secretario de Justicia, Pedro R. Pierluisi Urrutia). **Por tanto, no existe autoridad legal para que el Gobernador, por encima de los poderes que la constitución confiere al**

---

[6] "La Constitución establece una coordinación estrecha entre las ramas ejecutiva y legislativa en la elaboración del presupuesto al disponer que la Rama Ejecutiva preparará y someterá el proyecto de presupuesto a la Asamblea Legislativa y que corresponderá a ésta el promulgar la legislación necesaria para darle vigencia a ese presupuesto. Para evitar la posibilidad, quizás remota, de que la Asamblea Legislativa abuse del poder absoluto que tiene sobre la promulgación de las leyes presupuestarias, la Constitución le concede al Gobernador el veto de partidas para eliminar las desviaciones indeseables y/o innecesarias en la promulgación o aprobación del presupuesto". A.L. Guzmán Santiago, *Aspectos legales del proceso presupuestario del Gobierno del Estado Libre Asociado de Puerto Rico*, 35 (Núm. 2) Rev. Jur. UPR, 291, 308 (1966).

**Poder Legislativo, traspase, mediante orden ejecutiva, "fondos entre partidas asignadas en los presupuestos de dos organismos gubernamentales distintos y separados, siendo necesario para ello la acción legislativa a tal fin".** (Énfasis nuestro). *Íd.*

C.

Dicho ello, nos parece en extremo necesario aprovechar esta oportunidad para también expresarnos sobre otro asunto que está entrañablemente relacionado a la controversia que hoy atendemos. Se trata de la cesión de facultades constitucionalmente delegadas a una Asamblea Legislativa que comprometen el criterio y la facultad de actuar de una Asamblea Legislativa futura.

Sobre el particular, y a modo de ejemplo, basta con señalar que el Tribunal Supremo de los Estados Unidos de América ha reiterado, en innumerables ocasiones, que un Congreso no puede limitar el poder o facultades de un Congreso posterior. *Lockhart v. U.S.*, 546 US 699, 703 (2005); *U.S. v. Winstar Corp.*, 518 US 839, 872 (1996) (citando con aprobación a W. Blackstone, *Commentaries on the Laws of England* 90 (1765)); *Fletcher v. Peck*, 10 US 87, 135 (1810) ("*[t]he principle asserted is, that one legislature is competent to repeal any act which a former legislature was competent to pass:* **and that one legislature cannot abridge the powers of a succeeding legislature**"). (Énfasis nuestro).

En igual dirección, este Tribunal, en *Córdova y otros v. Cámara de Representantes*, *supra*, págs. 808-809, resolvió,

entre otras cosas, que la Ley Núm. 477 de 23 de septiembre de 2004 (mejor conocida como la *Ley del referéndum sobre el sistema cameral de la Asamblea Legislativa*), 16 LPRA ant. sec. 971 *et seq.*, aprobada por la decimocuarta Asamblea Legislativa, era inconstitucional por cuanto obligaba a su homóloga decimoquinta a actuar de determinada manera en contravención de las funciones básicas de las que gozan los legisladores en su quehacer legislativo. Abundando en lo anterior, en una Opinión de Conformidad emitida por la entonces Jueza Asociada señora Rodríguez Rodríguez en dicho caso, esta última expresó que **"es inválido un mandato legislativo que comprometa los votos de una Asamblea Legislativa posterior y pretenda obligar a sus miembros a aprobar cierta legislación"**. (Énfasis nuestro). *Córdova y otros v. Cámara de Representantes*, *supra*, pág. 808 (Rodríguez Rodríguez, Opinión de conformidad). Véase, además, *Pueblo v. Tribunal de Distrito*, 70 DPR 678, 681 (1966).

En ese asunto, tanto lo sentenciado por el Máximo Foro Judicial Federal, como por este Alto Foro, tiene una razón de ser. Y es que, como bien expresamos en el pasado, **"[e]l despojo o la limitación de alguna de las funciones básicas de un parlamento socavaría la base misma de la democracia en el país"**. (Énfasis suplido). *Romero Barceló v. Hernández Agosto*, 115 DPR 368, 375-376 (1984). Todo lo anterior cobra mayor relevancia cuando se trata de facultades legislativas tan trascendentales como lo son la de decidir y regular todo lo concerniente a los procesos electorales que se celebran en

nuestro País, y la de aprobar las partidas presupuestarias relacionadas con el mismo.

Evaluado lo anterior, entendemos necesario analizar aquella normativa constitucional que gobierna todo lo relacionado al uso de fondos públicos para fines privados y políticos.

IV.

Sobre esto último, la Constitución del Estado Libre Asociado de Puerto Rico claramente dispone que "[s]ólo se dispondrá de las propiedades y fondos públicos y para sostenimiento y funcionamiento de las instituciones del estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. ELA, LPRA, Tomo 1, ed. 2023, pág. 450. Al analizar el alcance de la precitada disposición constitucional, este Tribunal ha manifestado que la misma no encierra enigma alguno y que su mandato es claro: **todo uso del dinero del País debe ir destinado, únicamente a la consecución de una finalidad pública**. Véase, *Rosario Rodríguez v. Rosselló et al. II*, 207 DPR 870, 884 (2021) (Colón Pérez, voto particular disidente); *Báez Galib y otros v. C.E.E. II*, 152 DPR 382, 395 (2000); *P.I.P. v. C.E.E.*, 120 DPR 580, 606 (1988).

La determinación de qué constituye una finalidad pública, es una tarea que recae en la prudencia de las otras ramas de gobierno, y especialmente en la Asamblea Legislativa, quien "tiene la facultad de asignar fondos públicos -- ya sea a entidades públicas, semipúblicas o aun privadas -- siempre que cumplan con una función

reconocidamente pública y cuando el propósito de estas sea colaborar en el desempeño de alguna labor gubernamental". *Aponte Rosario et al. v. Pres. CEE II*, 205 DPR 407, 472 (2020) (Colón Pérez, Opinión disidente). Al ejercer tan delicada tarea hemos reconocido que "las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución". *P.I.P. v. C.E.E.*, *supra*, pág. 608.

Sin embargo, la determinación de lo que constituye un fin público debe "resultar en el más razonable acomodo entre los diversos intereses particulares de la ciudadanía, y en ajuste a los tiempos". *Rosario Rodríguez v. Rosselló et al. II*, *supra*, pág. 884 (Colón Pérez, voto particular disidente). Ello quiere decir que el concepto de fin público "está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica". *P.P.D. v. Gobernador I*, 139 DPR 643, 686 (1995). Véase, además, *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 DPR 982, 997 (1960).

**Nótese que las expresiones de este Tribunal han aludido al vínculo entre finalidad pública y las cambiantes condiciones sociales del País, no a sus cambiantes circunstancias políticas, y, mucho menos, a las político-partidistas. En ese sentido, la utilización de fondos públicos para promover agendas político-partidistas está vedada por el Art. VI, Sec. 9, *supra*, de nuestra Constitución.**

Véase, *P.P.D. v. Gobernador I*, *supra*; *Miranda v. C.E.E.*, 141 DPR 775 (1996).

Es por ello que, aunque de ordinario, la determinación inicial que tomen los poderes de gobierno aludidos sobre lo que constituye un fin público nos merece prudencia y deferencia, nada nos impide que, en el descargo de nuestra función revisora, podamos "evaluar si determinado uso de propiedad o fondos del Estado por parte de la Legislatura y el Ejecutivo constituye un uso para un fin público". *Báez Galib y otros v. C.E.E.*, *supra*, pág. 396. En otras palabras, la deferencia debida a las ramas hermanas, no puede llevarnos "al absurdo de que este Tribunal se cruce de brazos para permitir un uso de fondos públicos para un fin claramente contrario a nuestro ordenamiento constitucional". *Íd.* Véase, además, *Aponte Rosario et al. v. CEE II*, *supra*, pág. 474 (Colón Pérez, Opinión disidente).[7]

Una vez examinado todo lo referente a aquellas disposiciones constitucionales que guardan relación con las controversias que hoy nos ocupan, pasamos, por último, a evaluar el contenido de la Ley Núm. 165-2020, *infra*, objeto del presente litigio, y de la OE-2024-016 que nace de la misma.

---

[7] Sobre el particular, debemos recordar que: "la Constitución, cuerpo de normas supremas, se impone a la legislación ordinaria. Dicho documento, que constituye nuestro proyecto de vida en comunidad, otorga a la Rama Judicial amplios poderes para examinar actuaciones alegadamente inconstitucionales del Poder Legislativo o Ejecutivo al amparo de la relación dinámica de la separación de poderes". *P.I.P. v. C.E.E.*, 120 DPR 580, 612 (1988).

V.

A.

Según ya habíamos mencionado en la exposición fáctica que antecede, la Ley Núm. 165-2020, 16 LPRA sec. 977 *et seq.*, -- disposición legal aquí bajo estudio --, fue aprobada en las postrimerías del cuatrienio pasado en un intento desesperado por conferir al gobernador electo para los próximos cuatro años, -- en este caso, el Gobernador Pierluisi Urrutia --, la facultad de poder realizar una consulta plebiscitaria en el momento y circunstancias que éste entendiera conveniente. Lo anterior, debido a que, como es sabido, a raíz del evento eleccionario de noviembre de 2020, el PNP había perdido el control del poder legislativo para el próximo cuatrienio.

Según el propio texto de la Ley Núm. 165-2020, *supra*, dicho estatuto lleva el nombre oficial de *Ley para implementar la petición de estadidad del plebiscito de 2020*. 16 LPRA sec. 977. Como parte de su declaración de política pública, la precitada disposición legal expresa:

> Este capítulo dispone los procedimientos y los parámetros que regirán la celebración de toda consulta electoral cuyo propósito sea hacer valer la voluntad electoral de la mayoría absoluta de los electores en el plebiscito de 3 de noviembre de 2020, incluyendo cualquier petición, propuesta, respuesta o **ratificación electoral** relacionada con el estatus político de Puerto Rico que sea presentada o solicitada por una o ambas cámaras legislativas del Congreso, el Presidente de Estados Unidos de América o ambos. (Énfasis suplido). Art. 1.3, 16 LPRA sec. 977a.

Es decir, de una somera lectura del precitado texto surge diáfanamente que la celebración de una consulta electoral en

virtud de la Ley Núm. 165-2020, *supra*, solo podrá realizarse: (1) si se tratase de una consulta que busca "hacer valer" la supuesta voluntad electoral de los puertorriqueños expresada en noviembre de 2020; o (2) si una o ambas cámaras del Congreso de los Estados Unidos de América o el Presidente del mismo País, o ambos poderes federales, solicitan o presentan a Puerto Rico la realización de una consulta electoral relacionada al estatus político de la Isla.

No obstante, en su Artículo 2.1, *infra*, y de forma contradictoria con la precitada declaración de política pública, la mencionada disposición legal facultó "al Gobernador de Puerto Rico para convocar, mediante Orden Ejecutiva, cuando así lo considere necesario: […] (d) una consulta para una ratificación de la voluntad del Pueblo de Puerto Rico; (e) una votación para resolver el estatus político futuro de Puerto Rico". 16 LPRA sec. 978. Para poder ejercer esta supuesta facultad plebiscitaria, la Ley Núm. 165-2020, *supra*, mandata para que el Gobernador de Puerto Rico emita una proclama al menos noventa (90) días previos a la fecha seleccionada por él para la celebración de la consulta. *Íd.*

El texto de lo que debe contener la referida proclama se halla transcrito en el Artículo 2.2 de la mencionada disposición legal. 16 LPRA sec. 978a. Sin embargo, el mismo contiene ciertos espacios en blanco que tendrían que ser llenados por el Gobernador en virtud de las facultades que se le delegan.

En ese sentido, el Artículo 4.1 de la Ley Núm. 165-2020, *supra*, faculta al Gobernador de Puerto Rico para que, mediante Orden Ejecutiva y sin participación alguna de la Asamblea Legislativa, determine cuáles serán las alternativas que se le presentarán a los electores en la votación. 16 LPRA sec. 980. De igual modo, el texto de la proclama que se transcribe en la ley autoriza al Gobernador para definir, unilateralmente, cada una de las alternativas de estatus que vayan a aparecer en la papeleta de la consulta. Art. 2.2, 16 LPRA sec. 978a.

Por otro lado, la mencionada disposición legal también dispone en varias secciones que será el Presidente de la CEE, la persona encargada de entregar al Gobernador diversos borradores y proyectos necesarios para la votación. Véanse, Arts. 3.1, 3.2 y 4.4, 16 LPRA secs. 979, 979a y 980c. Esto, en aparente contradicción con la organización operativa de la CEE. A esos efectos, véase los Arts. 3.1(2) y 3.4 del Código Electoral de Puerto Rico. 16 LPRA secs. 4511 y 4514.[8]

### B.

En virtud de lo anterior, y como ya habíamos reseñado, el 1 de julio de 2024, el Gobernador Pierluisi Urrutia emitió la Orden Ejecutiva OE-2024-016. Mediante ésta, el Primer Ejecutivo, "a los fines de hacer valer la voluntad electoral

---

[8] El Código Electoral de Puerto Rico de 2020 establece que "las decisiones de la Comisión relacionadas con asuntos de específica naturaleza electoral se tomarán con la unanimidad de los Comisionados Electorales propietarios presentes que la componen". Art. 3.4, 16 LPRA sec. 4514. Es decir, como el cuerpo colegiado que es, el Código Electoral exige la toma de decisiones mediante la participación de los comisionados electorales que componen la Comisión Estatal de Elecciones.

expresada en el Plebiscito 2020", y de manera unilateral, ordenó la celebración de una nueva consulta plebiscitaria en el País para el próximo 5 de noviembre de 2024.

Asimismo, y mediante la aludida Orden Ejecutiva, el Primer Ejecutivo decidió, -- nuevamente a su exclusivo arbitrio --, que las tres alternativas a ser presentadas a las y los electores hábiles serían únicamente: (A) la Estadidad; (B) la Independencia; y (C) la Soberanía en Libre Asociación con los Estados Unidos de América.

Como si ello fuera poco, en la referida Orden Ejecutiva, el Gobernador Pierluisi Urrutia, sin consultar con nadie, se dio a la tarea de definir las mencionadas alternativas de estatus político, a su gusto y conveniencia. Para ello, y según indica la Opinión Mayoritaria en el presente caso, el Primer Ejecutivo se basó en las alternativas y definiciones contenidas en el proyecto de ley federal, *Puerto Rico Status Act*, HR 8393. Proyecto que, habiendo sido presentado ante la Cámara de Representantes federal durante el año 2022, no llegó a ser considerado por el Senado federal.

De igual forma, mediante la mencionada Orden Ejecutiva, y sobrepasando sus facultades constitucionales, el Primer Ejecutivo ordenó al Director Ejecutivo de la Oficina de Gerencia y Presupuesto, al Secretario de Hacienda y el Director de la Autoridad de Asesoría Financiera y Agencia Fiscal, para que priorizasen, identificasen e hicieran disponibles los fondos públicos necesarios para cumplir con la aludida orden ejecutiva. Lo anterior, a pesar de que el

presupuesto aprobado por la actual Asamblea Legislativa no contempla ninguna asignación para dicho fin.

Es, pues, a la luz de los hechos y el derecho antes expuestos que, -- desde la disidencia --, procedemos a disponer de los asuntos que nos ocupan.[9]

VI.

Como mencionamos anteriormente, en el presente caso el PIP nos solicita que declaremos la inconstitucionalidad de la Ley Núm. 165-2020, *supra*, que delegó en el Gobernador de Puerto Rico la potestad para realizar, a su libre albedrío, una consulta plebiscitaria en el País; la que, como cuestión de hecho, ha sido pautada para el próximo 5 de noviembre de 2024. Lo anterior, por entender que, -- entre otras razones --, el referido estatuto violenta el principio de separación de poderes. A todas luces, les asiste la razón a los peticionarios.

Y es que, de conformidad con la normativa antes expuesta, ha quedado claramente demostrado aquí que:

1) La Ley Núm. 165-2020, *supra*, choca frontalmente con la doctrina de separación de poderes en la medida en

---

[9] Si bien en los alegatos que presentaron las partes ante este Tribunal, y particularmente en el presentado por el PIP, también se impugnan la ley y la orden ejecutiva aquí en controversia por las mismas violentar el derecho al voto, el derecho a la libertad de expresión y la denominada "regla de un solo asunto", entendemos que no es necesario en estos momentos tener que elaborar sobre el particular, pues con tan solo enfatizar en la doctrina de separación de poderes y en aquello relacionado a las facultades que tiene el gobernante para emitir órdenes ejecutivas, resulta suficiente para decretar la inconstitucionalidad de la Ley Núm. 165-2020, 16 LPRA sec. 977 *et seq.*, y de la Orden Ejecutiva OE-2024-016. Es por tal razón que limitamos nuestro análisis a lo antes expresado.

que ésta permite que el Gobernador de Puerto Rico, mediante orden ejecutiva, dé paso a un proceso electoral que, conforme a nuestra Constitución, debe ser exclusivamente determinado por ley.[10] Al así hacerse, también se

---

[10] A nuestro juicio, tanto la referida legislación como la orden ejecutiva emitida en virtud de ésta, son actuaciones totalmente contrarias al principio constitucional de separación de poderes. Ello queda diáfanamente constatado con el texto de la Ley Núm. 165-2020, *supra*, que delega excesiva y ampliamente en la figura del gobernador una facultad que, por el texto expreso de nuestra constitución, recae exclusivamente en la Asamblea Legislativa.

**Es decir, estamos convencidos de que cuando la ley aquí en controversia dispone que el Gobernador podrá determinar, <u>a su exclusivo arbitrio y mediante orden ejecutiva</u>, cuándo realizar determinada consulta plebiscitaria, qué se le preguntará a los electores y cuáles serán las definiciones de las distintas opciones de estatus político a presentarse en la papeleta, -- lo que de por sí consideramos una actuación antidemocrática --, se perfecciona una flagrante violación a la disposición constitucional que reza que "[s]e dispondrá <u>por ley</u> de todo lo concerniente al proceso electoral".** (Énfasis suplido). Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2023, pág. 447.

La Opinión Mayoritaria, en cambio, aduce, entre otras razones, que la selección de las alternativas de estatus político a presentarse en la consulta por parte del Gobernador, así como sus respectivas definiciones, se trata de una actuación válida por cuanto se refiere a alternativas que han sido discutidas y adoptadas por uno de los cuerpos legislativos del Congreso federal. Yerran mis compañeros y compañera de estrado. El mero hecho de que el Gobernador Pierluisi Urrutia haya decidido, por sí solo y sin la participación de la actual Asamblea Legislativa, llamada por nuestro ordenamiento constitucional a legislar todo lo relacionado a los procesos electorales, que las alternativas a presentarse a los electores, así como sus definiciones, serían las consideradas por el Congreso federal, constituye un acto decisorio unilateral e insostenible, -- al menos hasta el día de hoy --, a la luz de los principios que contempla nuestra Constitución.

De igual manera, hoy una mayoría de este Tribunal concluye que la delegación de poderes contenida en la Ley Núm. 165-2020, *supra*, es válida por cuanto contiene suficientes principios inteligibles para guiar el proceder del Gobernador. Con dicha apreciación no podemos coincidir. Y es que, según ha quedado demostrado, semejante conclusión resulta indefendible cuando, como en el presente caso, se trata de una ley que deja en el exclusivo arbitrio del Gobernador la decisión final sobre elementos esenciales de la consulta plebiscitaria aquí en controversia (incluyendo la pregunta que ha de presentarse a las y los electores). Por tanto, resulta incomprensible determinar que hubo una delegación de poderes con suficientes principios inteligibles, cuando la ley aquí en controversia lo que delega es la facultad exclusiva al Gobernador para hacer lo que le venga en gana con relación al plebiscito.

impuso, por parte de la Asamblea Legislativa que aprobó la mencionada disposición legal, una traba a la actual Asamblea Legislativa en el descargo de sus funciones constitucionales.[11]

2) La Ley Núm. 165-2020, *supra*, vulnera aquellas disposiciones constitucionales que prohíben el uso de fondos públicos para sufragar asuntos estrictamente político-partidistas. A esos efectos, basta solo con acudir a la carta que, en el año 2020, y en un proceso plebiscitario muy similar al que hoy es objeto de estudio, el Departamento de Justicia federal remitió al entonces Presidente de la CEE, en la que dejaba entrever que aquella consulta adolecía de un claro elemento político-partidista.[12] Elemento que hoy, nuevamente, resurge al menor asomo.[13]

---

[11] No albergamos duda alguna que, con la aprobación de la Ley Núm. 165-2020, *supra*, aquí en controversia, la decimoctava Asamblea Legislativa procuró usurpar las facultades de la próxima Asamblea Legislativa con el velado propósito de brindar al futuro gobernador del PNP, -- en ausencia del poder sobre las cámaras legislativas para el próximo cuatrienio tras los resultados electorales de 2020 --, el amplio poder para convocar, dirigir, planificar y ejecutar una consulta plebiscitaria para que, ante la celebración de unos nuevos comicios, pudiera motivar a salir votar a sus huestes.

[12] Véase, Anejo I.

[13] **Así las cosas, nos reiteramos en nuestro criterio esbozado, desde la disidencia, en *Aponte Rosario et al. v. Pres. CEE II*, 205 DPR 407, (2020)**

De otra parte, y relacionado al uso de fondos públicos, el referido estatuto también infringe los postulados de nuestra Constitución al permitir que, mediante Orden Ejecutiva, el Gobernador pudiese "enmendar" el presupuesto vigente aprobado por ley por la actual Asamblea Legislativa; poder que el Primer Ejecutivo finalmente ejerció al instruir al Director Ejecutivo de la Oficina de Gerencia y Presupuesto, al Secretario de Hacienda y el Director de la Autoridad de Asesoría Financiera y Agencia Fiscal, para que priorizasen, identificasen e hicieran disponibles los fondos públicos necesarios para cumplir con lo dispuesto en la aludida Orden Ejecutiva, en contravención de las asignaciones presupuestarias establecidas por ley.

**En fin, como hemos podido apreciar, nos encontramos ante una pieza legislativa que dio paso a unas desacertadas actuaciones del Poder Ejecutivo, con serios visos de inconstitucionalidad. Sostener lo contrario y permitir que,**

---

**(Colón Pérez, Opinión disidente) en el sentido de que las agendas anexionistas promovidas desde las ramas del gobierno de Puerto Rico no constituyen un "fin público" que justifique el dispendio de fondos públicos.**

-- en una clara violación al principio constitucional de separación de poderes, y a aquel que prohíbe el uso de fondos públicos para fines estrictamente político-partidistas --, se someta al País, <u>por enésima vez</u>, a una consulta plebiscitaria inconsecuente y hecha a la medida y antojo de cierto gobernante, resulta, sin más, un absurdo jurídico. Lo que está mal, está mal, sin importar las bondades que algunos miembros de esta Curia pudieran encontrarle al referido estatuto.

VII.

Es pues, por los fundamentos antes expuestos que enérgicamente disentimos del curso de acción seguido por una mayoría de mis compañeros y compañera de estrado. En consecuencia, hubiésemos declarado la inconstitucionalidad de la Ley Núm. 165-2020, *supra*, y de la Orden Ejecutiva OE-2024-016.

Ángel Colón Pérez
Juez Asociado



Office of the Deputy Attorney General
Washington, D.C. 20530

July 29, 2020

The Honorable Juan Ernesto Dávila Rivera
Chairman
Puerto Rico State Elections Commission
Post Office Box 195552
San Juan, Puerto Rico 00919-5552

*Re: Request of Federal Funds for Puerto Rico Plebiscite*

Dear Chairman Rivera:

     Thank you for your June 3, 2020 submission of materials related to the plebiscite scheduled for November 3, 2020, which will ask voters whether Puerto Rico "should be admitted immediately into the Union as a State." You have requested disbursement of funding under the Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, 128 Stat. 5, 61 (2014) ("Appropriations Act"), which appropriated $2.5 million for "objective, nonpartisan voter education about, and a plebiscite on, options that would resolve Puerto Rico's future political status." Consistent with the House Report that accompanied the Appropriations Act, and as it did with the Government of Puerto Rico's submission related to the 2017 plebiscite, the Department has reviewed the plebiscite materials to determine whether it may notify Congress that "the voter education materials, plebiscite ballot, and related materials are not incompatible with the Constitution and laws and policies of the United States." H.R. Rep. No. 113-171, at 53 (2014). Unfortunately, the Department has determined that it is unable to notify Congress that it approves of the plebiscite ballot and related materials, and therefore it will not obligate the funds.

     Our first concern is that, in light of the deadline in Puerto Rico law, the submission did not provide sufficient time to complete the multi-layered process the Department must follow before releasing grant funding. The statute authorizing the plebiscite, Puerto Rico Act No. 51 of May 16, 2020 ("Act No. 51-2020" or "the Act"), establishes June 30, 2020, as "the deadline for completing any transaction, certification, and disbursement related to the holding of this plebiscite." *Id.* § 3.1. And as you noted in your submission letter, the Act further contemplates that the Department would complete any "process, certification and disbursement" of funding under the Appropriations Act by the June 30 deadline. *Id.* § 3.3. The Act characterizes June 30 as a "deadline . . . to serve as a guide for the U.S. Attorney General" that is necessary "so as to not adversely affect [plebiscite] processes or the rights of the voters." *Id.*, "Statement of Motives," at 15. The Department is mindful of the importance of expeditious review. But given the steps involved in reviewing, certifying, and disbursing appropriated funds, the Department was unable to meet the June 30 deadline no matter how quickly it acted.

The Honorable Juan Ernesto Dávila Rivera
Page 2

As Department officials have previously outlined, both in communications with your office about this plebiscite and with Puerto Rico officials following the 2017 submission, the process of disbursing grant funding includes a number of steps. The Department's substantive review of the plebiscite materials is the first step, and it requires time to coordinate among Department components and to request any additional information from the Government of Puerto Rico. Here, for instance, if your deadline and the other considerations discussed below did not preclude us from proceeding, we would have needed additional information about voter-education materials. The materials you submitted include a three-page outline of the planned "Non-Partisan Education Campaign," which states at a high level of generality that the campaign will educate voters on "[t]he importance and relevance of the 2020 Plebiscite vote" and the "Voter's registration process," including the availability of alternative voting mechanisms, and then "motivate people to go out and vote." But neither the outline nor any other materials provide further detail about the contents of the voter-education materials, which would have made it difficult for the Department to determine whether the actual materials will be consistent with the Constitution, laws, and policies of the United States. This stands in contrast to the 2017 submission, which included specific examples of the planned contents for the voter-education campaign.

If, following our substantive review, the Department were to decide to release the funds, additional steps in the funding process would follow. The Department would seek concurrence from the White House Office of Management and Budget ("OMB"); would notify congressional committees; would issue a grant solicitation to the Government of Puerto Rico; would review the grant application submitted in response to the solicitation; and, assuming everything was suitable and there were no objections from OMB or congressional committees, Department leadership would authorize the obligation of the funds. The Department received your submission on June 3, 2020, less than four weeks before the June 30 deadline. The entire funding review and grant-making process could take several weeks. And, in any event, the House Report specifies that "funds provided for the plebiscite shall not be obligated until 45 days after the Department notifies the Committees on Appropriations." H.R. Rep. No. 113-171, at 53. The completion of any one of these steps by June 30 would have been difficult; concluding all of them was simply infeasible, since the waiting period associated with congressional notification, taken alone, was 45 days.

Apart from that timing issue, however, the Department has also identified substantive concerns with the plebiscite materials that make them incompatible with the policies of the United States. First, the United States has consistently remained neutral about the legally permissible status options for the Commonwealth of Puerto Rico—Statehood, continued territorial status, and independence (including free association)—maintaining that the people of Puerto Rico, not the federal government, should "determine their preference among options for the islands' future status that are not incompatible with the Constitution and basic laws and policies of the United States." Exec. Order 13183 of Dec. 23, 2000 (Establishment of the President's Task Force on Puerto Rico's Status); *see also, e.g.*, Report by the President's Task Force on Puerto Rico's Status, at 23 (Mar. 2011) ("It has long been the policy of the Federal executive branch that Puerto Ricans should determine for themselves the future status of the

The Honorable Juan Ernesto Dávila Rivera
Page 3

Island."). Yet multiple aspects of Act 51-2020 make clear that it approaches the question of Puerto Rico's future status from a decidedly pro-Statehood, and anti-territorial, point of view. *See* Act No. 51-2020, "Statement of Motives," at 2, 14 (stating that "Under the U.S. flag and .citizenship, . . . achieving a positive transformation would only be possible upon the recognition of equal rights and obligations for the U.S. citizens of Puerto Rico" through Statehood; that "Puerto Rico continues in this vicious territorial cycle"; and that the party favoring the current "unsustainab[le]" status "employs any mechanism, except the vote, so as to maintain the status quo to the detriment of voters"). In that context, the Department's approval and funding of the plebiscite may be seen as an endorsement of these views and a rejection of the other available status options. And such a perception seems particularly likely because Article 4.4(b) of Act No. 51-2020 provides that the ballot would include language stating that the plebiscite is "promoted and supported by the Government of the United States of America with the funds appropriated under Public Law 113-76 of 2014." While the Department would not object, in appropriate circumstances, to a similar statement endorsing an objective, non-partisan plebiscite process, it must do so here, when such a statement would imply that the United States has departed from its policy of neutrality to endorse a pro-Statehood initiative.

Second, the plebiscite appears to be based in part on a determination by the Legislature of Puerto Rico with which the Department disagrees—namely, that the 2012 and 2017 plebiscites "constitute a direct rejection of the current territory status and . . . . options which entailed separate sovereignties." *Id.* § 1.3(c); *see also id.* § 1.3(f) (stating that voters made an "electoral demand[] for equality through statehood" in 2012 and 2017), § 1.3(h) (describing the results of the 2012 and 2017 plebiscites as "conclusive"). The Department notes, as it did in 2017, that "the validity of the 2012 plebiscite's results 'have been the subject of controversy' and debate," and that "it is uncertain" whether the 2012 results reflect the "present will of the people."[1] With respect to the 2017 plebiscite, the Department's rejection of the initial ballot as incompatible with the laws and policies of the United States, coupled with low voter turnout that was likely related to boycotts by political parties and other groups, prevents us from seeing the results of the 2017 plebiscite as a decisive vote for Statehood.[2] Accordingly, the views on the prior plebiscites reflected in the Act, which provide the basis for the ballot's yes-or-no vote on Statehood, conflict with the policy judgment of the United States that the people of Puerto Rico have not yet

---

[1] Letter from Dana J. Boente, Acting Deputy Attorney General, to Governor Ricardo A. Rosselló Nevares, *Re: United States Department of Justice review of plebiscite ballot, voter education materials, and expenditure plan,* at 2 (Apr. 13, 2017).

[2] The Department recognizes that the "Statehood" option on the 2017 plebiscite received 97% of the votes cast but notes that both the Popular Democratic Party and the Independence Party announced boycotts of the plebiscite based on the ballot language as amended. Congressional Research Service, *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress,* at 1, 13 (Jun. 12, 2017). The Department further notes that the 23% turnout contrasts significantly with a voter-participation rate that "often hovers around 80 percent." *See* Frances Robles, *23% of Puerto Ricans Vote in Referendum, 97% of Them for Statehood,* N.Y. TIMES (June 11, 2017), available at *https://www.nytimes.com/2017/06/11/us/puerto-ricans-vote-on-the-question-of-statehood.html?_r=0; see also, e.g.,* Puerto Rico State Elections Commission, *General Elections 2012 and Plebiscite on Puerto Rico Political Status,* available at *http://168.62.166.179/eg2012/REYDI_Escrutinio/index.html#es/default/CONDICION_POLITICA_TERRITORIAL_ACTUAL_ISLA.xml* (noting that the 2012 plebiscite had a 78.19% participation rate).

The Honorable Juan Ernesto Dávila Rivera
Page 4

definitively rejected the Commonwealth's current status. The Department cannot support a plebiscite in tension with that policy judgment, as it would further suggest that the United States is no longer neutral about the options for Puerto Rico's future status.

Finally, the Department is concerned that statements in the plebiscite materials may cause voters to misperceive the effect of a majority vote in favor of Statehood. The United States remains committed to allowing the people of Puerto Rico to determine the Commonwealth's future political status, but the Department must emphasize that a majority "yes" vote in this plebiscite would not lead automatically or immediately to admission. Yet the Proclamation of the State Elections Commission, which we understand has been made available to the public, states that "[s]hould the Statehood 'Yes' option be favored by a majority vote, a transition process shall begin forthwith to admit Puerto Rico into the Union, as described in the Act." Puerto Rico State Elections Commission, Proclamation of May 19, 2020, *Plebiscite to Define Puerto Rico's Ultimate Political Status* (the "Proclamation"); *see also* Act 51-2020, § 2.2 (same, directing inclusion of that language in the Proclamation). Although Act 51-2020 seems to acknowledge elsewhere that admission as a State would require the enactment of federal legislation establishing the terms of admission, voters may reasonably interpret the Proclamation's statement to mean that a majority "yes" vote will necessarily result in automatic or immediate Statehood, which is incorrect.

This fear of voter confusion is compounded by statements in both Act 51-2020 and the Proclamation that compare this plebiscite to those held in Alaska and Hawaii immediately before their admission to the Union. *See* Act 51-2020, § 1.3(g) (asserting that Puerto Rico has "completed the phase of asking voters about all the possible political status options" and that this plebiscite will "make the final demand to Congress" using "the same final voting mechanism employed by some former territories that became states of the Union which includes Alaska and Hawaii"); *see also* Proclamation (noting that, "[j]ust as the plebiscites held in Alaska and Hawaii . . . in this Puerto Rico plebiscite, there shall be a single ballot with the options Statehood: Yes or No"); Act 51-2020, § 2.2 (same, directing inclusion of that language in the Proclamation). These references to the Alaska and Hawaii plebiscites, however, omit an important distinction between those votes and this plebiscite. For both Alaska and Hawaii, the final, yes-or-no Statehood votes came at the end of the process of admitting them to the Union and were specifically directed by Congress in their admission acts. Act of July 7, 1958, Pub. L. No. 85-508, § 8(b), 72 Stat. 339, 343–44 (Alaska); Act of Mar. 18, 1959, Pub. L. No. 86-3, § 7(b), 73 Stat. 4, 7 (Hawaii). In other words, federal legislation had already established all the terms of their potential admission and conditioned such admission on an affirmative vote from the territories' voters. That is not the posture here. Following the model used for Alaska and Hawaii would require that the question of Statehood again be presented to the people of Puerto Rico once there is certainty as to all the conditions of admission. To the extent that the plebiscite materials' statements about finality and their references to Alaska and Hawaii imply that this plebiscite is the last time that Puerto Rico would conceivably vote on Statehood, they do not provide an accurate depiction of how the Statehood process would be likely to unfold and are therefore likely to result in voter confusion.

The Honorable Juan Ernesto Dávila Rivera
Page 5

     For the reasons stated above, the Department is unable to notify Congress that it approves of the materials for the November 3 plebiscite and is unable to obligate the appropriated funds.

          Sincerely,

          Jeffrey A. Rosen
          Deputy Attorney General